Mark R. Thierman, Nev. Bar No. 8285
mark@thiermanbuck.com
Joshua D. Buck, Nev. Bar No. 12187
josh@thiermabuck.com
Leah L. Jones, Nev. Bar No. 13161
leah@thiermanbuck.com
THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, Nevada 89511
Tel. (775) 284-1500
Fax. (775) 703-5027

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| DONALD WALDEN JR, NATHAN ECHEVERRIA, AARON DICUS, BRENT EVERIST, TRAVIS ZUFELT, TIMOTHY RIDENOUR, and DANIEL TRACY on behalf of themselves and all others similarly situated, | Case No.: 3:14-cv-00320-MMD-WGC |
| Plaintiffs, | **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY FOR UNPAID WAGES UNDER THE FLSA** |
| v. | |
| THE STATE OF NEVADA, *EX REL.* ITS NEVADA DEPARTMENT OF CORRECTIONS, and DOES 1-50, | |
| Defendants. | |

COME NOW Plaintiffs DONALD WALDEN JR, NATHAN ECHEVERRIA, AARON DICUS, BRENT EVERIST, TRAVIS ZUFELT, TIMOTHY RIDENOUR, and DANIEL TRACY, on behalf of themselves and all Opt-In Plaintiffs (collectively referred to as "Plaintiffs"), and hereby move for partial summary judgment on liability with respect to their claims for unpaid wages undert the Fair Labor Standards Act (FLSA).

Plaintiffs' motion is based on this Motion, the Memorandum of Points and Authorities in support thereof, all accompanying exhibits, pleadings, papers, and records on file herein, all matters upon which judicial notice may be taken, any oral argument that may be presented, and upon such other matters the Court deems just and necessary.

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

1    For all the reasons expressed herein, Plaintiffs respectfully request the Court grant their

2    Motion for Partial Summary Judgment on their claims for unpaid wages under the FLSA..

3    Dated this 21st day of February 2020.          Respectfully submitted,

4                                                    THIERMAN BUCK, LLP

5                                         By:        /s/ *Joshua D. Buck*

6                                                    Joshua D. Buck
                                                     *Attorneys for Plaintiff*
7

8               **MEMORANDUM OF POINTS AND AUTHORITIES**

9    **I.      INTRODUCTION**

10          This is an off-the-clock wage and hour case brought on behalf of Correctional Officers

11   ("COs") employed by Defendants the State of Nevada, Ex Rel., its Nevada Department of

12   Corrections ("Defendants" or "NDOC") for work activities they performed without compensation

13   pre and post shift.  Nevada COs are paid on a per shift basis. They do not clock in/out; rather,

14   they are paid according to their normally scheduled shift and supervisors simply submit time

15   sheets that verify the officers worked their scheduled shift.  Although COs are truly "hourly"

16   employees, NDOC uses an exception reporting system for time keeping, only recording

17   variations from the scheduled times required to be worked.  NDOC does not record Plaintiffs

18   actual hours worked.

19          The undisputed facts submitted in support of this Motion demonstrate that COs employed

20   by NDOC are required to perform numerous work related activities prior to the start of their

21   regularly scheduled shift without compensation, namely: (a) reporting for duty to the Shift

22   Sergeant, receiving assignments and briefings for the day, and passing a uniform inspection (i.e.,

23   "muster"); (b) collecting mail and gear needed for their assigned post (e.g., radio, keys, weapons,

24   restraints); and (c) engaging in a "pass down" of information with the outgoing officer at the

25   assigned post.  COs are similarly required to perform most of these same work activities, except

26   for roll call and uniform inspection, after the end of their regularly scheduled shift—i.e., passing

27   down information to the incoming officer and returning their gear to the appropriate location.

28

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

This Court has already concluded that the pre- and post-shift activities at issue in this case are "work", and thus must be compensated accordingly to the law. *See* ECF No. 166 at pp. 10-15. Thus, the only issue remaining for this Court to decide is whether the undisputed facts support Plaintiffs' allegations in the operative complaint—e.g., whether COs performed these pre- and post-shift activities without compensation. Plaintiffs submit that this Court can resolve this issue of liability on summary judment because the documentary and representative testimentary evidence is not in dispute: (1) Plaintiffs were required to report for duty, receive their daily assignments, pass uniform inspection, pick up any necessary gear for the assigned post, and engage in a pass down with the outgoing officer (the same being true at the end of the shift with the exception of muster); and (2) Defendant did not compensate Plaintiffs for these activities because Defendant only compensated Plaintiffs on a per-shift basis when they were on their assigned post.

Plaintiffs hereby move this Court for an order granting summary judgment as to liability on Plaitiffs' unpaid wage claims under the FLSA so that the parties may then focus on presenting the issue of damages to a trier of fact.[1]

## II.  ISSUE PRESENTED

Whether the undisputed facts demonstrate that Plaintiffs performed compensable work for which they were not compensated.

## III.  RELEVANT PROCEDURAL HISTORY

On May 12, 2014, Plaintiffs filed their complaint against NDOC in the First Judicial District for the State of Nevada, for alleged unpaid wages on behalf of themselves and similarly situated individuals under the FLSA and Nevada law including four causes of action. (ECF No. 1 at 7-21.) Plaintiffs alleged that NDOC required correctional officers and other non-exempt employees to perform work activities without compensation. *Id.* Plaintiffs alleged that NDOC

---

[1] Plaintiffs have abandoned claims for those few facilities that do not conform to these procedures, i.e. minimum-security conservation work camps. The following NDOC prisons remain at issue in this litigation: Ely State Prison (ESP), Florence McClure Women's Correctional Center (FMWCC), High Desert State Prison (HDSP), Lovelock Correctional Center (LCC), Northern Nevada Correctional Center (NNCC), Southern Desert Correctional Center (SDCC) and Warm Springs Correctional Center (WSCC). Plaintiffs have voluntarily dismissed the claims at all the other correctional facilities that were previously involved in the litigation. *See* ECF No. 251.

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

1    failed to: (1) pay wages for all hours worked in violation of 29 U.S.C. § 201, et seq.; (2) pay

2    overtime in violation of 29 U.S.C. § 207; (3) pay minimum wages in violation of the Nevada

3    Constitution; and, (4) comply with the terms of its contract with Plaintiffs to pay an agreed upon

4    hourly wage for all hours worked.

5       NDOC removed the action to federal court and filed an answer on June 24, 2014 (ECF

6    Nos. 1, 3).  Plaintiffs filed their motion for conditional certification under § 216(b) of the FLSA

7    on August 6, 2014, (ECF No. 7), which this Court granted on March 16, 2015 (ECF No. 45).  Out

8    of a total potential Opt-In Class of Three Thousand and Seventy-Five (3,075) potential class

9    members, five-hundred and forty-two (542) similarly situated persons joined the FLSA portion

10   of this action after the initial mailing. (ECF No. 95 at ¶52 fn. 2.).  Since the initial mailing of the

11   FLSA Notice, an additional 182 similarly situated employees haveattempted to join in this action.

12   ECF Nos. 217, 225, 226, 228, 229, 231-239, 244-246, 248, 250, 252. As of the filing of this brief,

13   Defendant has refused and continues to refuse to change its employment policies and practices of

14   not compensating COs for work performed before and after arriving at their post.

15      Plaintiffs previously filed a motion for partial summary judgment on two issues of liability

16   on January 31, 2018.  ECF No. 130.  Plaintiffs first motion for partial summary judgment was

17   denied without prejudice because there was a pending issue about the dismissal of the transitional

18   housing and conservation camps.  See ECF No. 192.  Plaintiffs have filed a Notice of Voluntary

19   Dismissal of the Transitional Housing and Conservation Camps in accordance with the Court's

20   request.  *See* ECF Nos. 251 .

21      On March 26, 2018, shortly after Plaintiffs filed their first motion for partial summary

22   judgment, the Court denied Defendant's motion to dismiss Plaintiffs' FLSA claims.   ECF No.

23   166. In doing so, the Court concluded that activities such as reporting for duty, receiving

24   assignments, and passing a uniform inspection (these activities are also collectively known as

25   "muster"), were compensable work activities, stating:

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

As to the purported requisite preliminary activities of check-in and receipt of assignments, "a law enforcement entity cannot ensure the safety of the population it oversees without (1) knowing who is present at a given time and (2) dispatching those that are present to attend to the greatest need." (ECF No. 105 at 12.) Moreover, "a correctional officer simply cannot perform his required job duties without first knowing where to go (whether to the exercise yard or to transport an inmate) nor can he perform his job effectively without knowing whether there is any potential dangerous situation developing amongst the inmates (such as a gang related issue or hunger strike)." (ECF No. 105 at 14.) The activities of check-in and receipt of assignments are therefore necessary to perform the officer's principal duties of safeguarding the prison during his shift.

. . .

As to the preliminary activity of uniform inspection, the FAC contends that "if [a correctional officer's] uniform was not up to standards" then the officer "could not proceed to their post[]." (ECF No. 95 at ¶ 31(b).) Defendant argues that because a uniform can be put on at home, this activity is not compensable under FLSA. (ECF No. 112 at 7 (citing *Balestrieri v. Menlo Park Fire Protection Dist*., 800 F.3d 1094, 1100 (9th Cir. 2015)).) However, Plaintiffs do not contend that it is putting on a uniform at work that is compensable; rather, they state that uniform inspection by an officer's shift supervisor is a component of "muster" and is therefore compensable because it is required. (See ECF No. 95 at ¶ 31(b).) While the time spent by a supervisor visually inspecting an officer's uniform may itself be de minimus, it is a purported component of "muster" and therefore part of a continuous workday activity that is integral to the officer's principal duty of ensuring the safety of the prison and monitoring its inmates.

*Id.* at pp. 12-13.

The Court further concluded that retrieving tools and gear was also compensable:

As to the preliminary activity of retrieving tools and gear, correctional officers need specific items in order to perform assigned duties, for instance, handcuffs to transport inmates or tear gas to quell a potential riot. (See ECF No. 105 at 14.) Retrieving tools and gear, as described in the FAC (ECF No. 95 at ¶ 32), is distinguishable from the example Defendant identifies in its motion of "polishing shoes, boots and duty belts, cleaning radios and traffics vests, and oiling handcuffs." (ECF No. 99 at 15 (citing *Musticchi v. City of Little Rock, Ark*., 734 F. Supp. 2d 621, 630-32 (E.D. Ark. 2010)).) As alleged, Plaintiffs are not cleaning gear; they are retrieving gear that is "necessary and required to complete their daily job tasks"—tasks which they are informed of only once they arrive at the prison and receive a work assignment from their supervisor. (See ECF No. 95 at ¶ 32.) As alleged, this activity is therefore indispensable to the officer's principal duties.

*Id.* at 13.

The Court stated that since the muster activities and retrieval of tools/gear was compensable, walking to the assigned post was also a compensable work activity under the continuous workday doctrine:

> As to the preliminary activity of walking from check-in, receipt of assignment, and tool collection to an officer's assigned post for the day, this activity is compensable under the "continuous workday doctrine." *See IBP, Inc.*, 546 U.S. at 37 ("[D]uring a continuous workday, any walking time that occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity is excluded [from the Portal-to-Portal Act's travel exemption], and as a result is covered by FLSA.").

*Id.* at 14.

Lastly, the Court concluded that the post shift activities of the CO briefing and returning of tools/gear were also compensable work activities:

> As to the postliminary activity of outgoing correctional officers briefing incoming officers, this is similarly necessary to the safety and security of the prison, and is an integral part of the officers' principal duties. (ECF No. 106 at 16-17.) Finally, as to the postliminary activities of walking back to and returning any tools or gear taken by an officer, the allegations in the FAC permit the Court to reasonably infer that Plaintiffs were not allowed to take these tools and gear home with them and so were required to return them. As Plaintiffs are purportedly required to take these tools and gear before starting their shifts in order to perform their assigned duties, the postliminary activity of returning tools or gear is also indispensable to their principal duties during their shifts.

*Id.*

In its Order, the Court concluded that Plaintiffs had alleged sufficient facts to support a claim under the FLSA. Because the legal question of whether these activities are compensable under the FLSA has already been resolved by this Court, partial summary judgment should be granted if Plaintiffs are able to demonstrate that the facts alleged in the operative complaint are supported by undisputed facts submitted in support of this Motion.

## IV.   STATEMENT OF UNDISPUTED FACTS

### A.   Background

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

1.      Plaintiffs and Opt-In Plaintiffs have been employed as correctional officers at various correctional facilities throughout the state of Nevada.

2.      Plaintiffs and Opt-In Plaintiffs were hourly paid non-exempt employees of NDOC.

3.      At all times relevant herein, the State of Nevada has operated 19 correctional facilities within the State of Nevada: two (2) transitional housing units, ten (10) conservation camps, and seven (7) correctional facilities ("Prisons").  *See* NDOC Web site: http://doc.nv.gov/Facilities/Home/ (last visited Feb. 20, 2020).

4.      This action only involves Correctional Officers who worked at the seven (7) correctional facilities ("Prisons").  *See* ECF No. 251.

**B.      Reporting for Duty and Receiving Assignments and Briefings**

5.      NDOC Shift Sergeants are responsible for ensuring minimum staffing requirements at all Prisons.[2]     *See* Exhibit 1, NDOC Administrative regulation (AR) 326, Posting of Shifts/Overtime, § 326.01 (1)(C) ("Shift Sergeants reporting for their scheduled shifts will adjust the shift roster and fill all positions mandated to fulfill the minimum staffing requirements."); Exhibit 2, ESP Operating Procedure ("OP") 322, Posting of Shifts/Reporting for Duty, § 2; Exhibit 3, HDSP OP 032, Posting of Shifts/Reporting for Duty, § 032.02 (1) (Marked Confidential);[3] Exhibit 4, SDCC OP 326, Posting of Shifts/Overtime, § 326.02 (2); Exhibit 5, NNCC OP 326, Posting of Shifts/Overtime, § 326.04 (1); Exhibit 6, FMWCC OP 326, Posting of Shifts/Overtime, § 326.02 (1) (Marked Confidential), Exhibit 7, WSCC OP 326, Security Staffing, § 326.02 (1) (Marked Confidential); *See also* Shift Sergeant Carlson Dep. at 79:3-79:8.

6.      Shift Sergeants are responsible for "posting shifts" prior to the arrival of incoming Correctional Officers ("COs").  *See* Exhibit 2, ESP Operating Procedure ("OP") 322, Posting of Shifts/Reporting for Duty, § 2; Exhibit 3, HDSP OP 032, Posting of Shifts/Reporting for Duty,

---

[2] Despite demand, NDOC has notproduced.   OPs and ARs for the Lovelock Correctional Center.

[3] NDOC has marked some OP's as "Confidential."   Pursuant to the Court's Protective Order, these documents have not been submitted to the Court at this time. The party seeking to maintain the confidentiality of the document—i.e., NDOC—must seek an order to seal this document.  *See* ECF No. 73, at ¶ 11 (a).  Plaintiffs will file these documents, either under seal or in open court, once this Court rules on NDOC's anticipated motion.  *See Id.* ("The confidential material will not be filed until after the Court has ruled on the party's Motion to File Documents Under Seal.")

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com www.thermanbuck.com

§ 032.02 (4) (Marked Confidential); Exhibit 4, SDCC OP 326, Posting of Shifts/Overtime, § 326.02 (4); Exhibit 5, NNCC OP 326, Posting of Shifts/Overtime, § 326.04 (3); Exhibit 6, FMWCC OP 326, Posting of Shifts/Overtime, § 326.02 (3) (Marked Confidential).

7.     "Posting shifts" means that the Shift Sergeants will go over their shift roster to determine minimum staffing levels for each shift.  *See* Exhibit 1 AR 326, § 326.01 1(C); Exhibit 2, ESP Operating Procedure ("OP") 322, Posting of Shifts/Reporting for Duty, § 1; Exhibit 3, HDSP OP 032, Posting of Shifts/Reporting for Duty, § 032.02 (1) (Marked Confidential); Exhibit 4, SDCC OP 326, Posting of Shifts/Overtime, § 326.02 (2); Exhibit 5, NNCC OP 326, Posting of Shifts/Overtime, § 326.04 (1); Exhibit 6, FMWCC OP 326, Posting of Shifts/Overtime, § 326.02 (1) (Marked Confidential); Exhibit 7, WSCC OP 326, Security Staffing, § 326.02 (1) (Marked Confidential).

8.     In order to ensure minimum staffing levels for each shift, Shift Sergeants will "pull" and/or "shutdown" certain posts and re-assign staff from the "pull/shutdown" post to another post.  Exhibit 2, ESP Operating Procedure ("OP") 322, Posting of Shifts/Reporting for Duty, § 2; Exhibit 3, HDSP OP 032, Posting of Shifts/Reporting for Duty, § 032.02 (1) (Marked Confidential); Exhibit 4, SDCC OP 326, Posting of Shifts/Overtime, § 326.06 (1); Exhibit 6, FMWCC OP 326, Posting of Shifts/Overtime, § 326.02 (1) (Marked Confidential); Exhibit 7, WSCC OP 326, Security Staffing, § 326.02 (2) (Marked Confidential).

9.     Shift Sergeants begin posting the shift up to thirty (30) minutes prior to the beginning of the shift.   Exhibit 2, ESP Operating Procedure ("OP") 322, Posting of Shifts/Reporting for Duty, § 1; Exhibit 3, HDSP OP 032, Posting of Shifts/Reporting for Duty, § 032.02 (4) (Marked Confidential); Exhibit 4, SDCC OP 326, Posting of Shifts/Overtime, § 326.02 (4); Exhibit 6, FMWCC OP 326, Posting of Shifts/Overtime, § 326.02 (3) (Marked Confidential).[4]

10.    Shift Sergeants "[a]ssign work by conducting ***roll call*** (verifying attendance) at the beginning of each shift to ensure sufficient employees are available and authorize or recommend overtime when necessary by assessing institution/facility's need and availability of

---

[4] At some point in time NDOC amended § 326.02(3) to 15 minutes.

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

personnel to provide adequate security staffing." *See* Exhibit 9, Correctional Lieutenant and Correctional Sargent Class Specification (also found at http://hr.nv.gov/uploadedFiles/hrnvgov/Content/Resources/ClassSpecs/13/13-310spc.pdf) last visited Feb. 20, 2020 (emphasis added).

11.     All COs, regardless of their normally assigned post, are required to report for duty to the Shift Sergeant upon arriving at the Prison to receive their assigned post each and every workday.[5] *See* Exhibit 1, AR 326, § 326.03 6(E) ("All correctional staff will report to the shift supervisor/shift sergeant upon arrival to ensure their status if required to work mandatory overtime."); Exhibit 2, ESP Operating Procedure ("OP") 322, Posting of Shifts/Reporting for Duty, § 2; Exhibit 3, HDSP OP 032, Posting of Shifts/Reporting for Duty, § 032.02 (5) (Marked Confidential); Exhibit 4, SDCC OP 326, Posting of Shifts/Overtime, § 326.03 (2); Exhibit 5, NNCC OP 326, Posting of Shifts/Overtime, § 326.04 (4); Exhibit 6, FMWCC OP 326, Posting of Shifts/Overtime, § 326.03 (2) (Marked Confidential).

---

[5] As of January 31, 2018, NDOC has requested that all deposition testimony be marked "Confidential." Accordingly and pursuant to the Court's Protective Order, these documents have not been submitted to the Court at this time. The party seeking to maintain the confidentiality of the document—i.e., NDOC—must seek an order to seal this document. *See* ECF No. 73, at ¶ 11 (a). Plaintiffs will file these documents, either under seal or in open court, once this Court rules on NDOC's anticipated motion. *See Id.* ("The confidential material will not be filed until after the Court has ruled on the party's Motion to File Documents Under Seal.")

*See Compendium of Warden Deposition Testimony,* (Marked Confidential): Exhibit 17, FMWCC Warden Jo Gentry ("FMWCC Warden Gentry Dep.") at 39:18-40:8 ("So they will go to the shift commander's office, check in.  The shift supervisor will tell them where they're assigned that day."); Exhibit 16, ESP Warden Renee Baker ("ESP Warden Baker Dep.") at 48:2-48:20 (testifying that COs at Ely State Prison "stop at the sergeant's desk, report[] to the sergeant, get[] their assignment, and the reason I say assignment, even though they bid, depending on institutional needs they may have to be reassigned, and then they head out to their assignment."); Exhibit 18, SDCC Warden Brian Williams ("SDCC Warden Williams Dep.") at 45:7-45:25, 54: 24-55:18 (recognizing that each Prison "has an OP326 for minimum staffing overtime"), 82:7-82:11, 83:13-83:15, 119:2-120:9; Exhibit 15, NNCC Warden Isidro Baca ("Warden Baca Dep.") at 49:3-49:7, 73:1-73:8 (testifying COs have to report for duty), 76:19-76:22. *See also* Exhibit 25, Shift Sergeant Carlman Dep. at 75:16-75:17, 86:24-87:2, 87:21-88:2, 95:18-95:22, 117:14-117:18.

*See also Compendium of CO Deposition Testimony*, (Marked Confidential): Exhibit 46, Walden Dep. at 29:4-29:10; Exhibit 38, Ridenour Dep. at 33:21-34:3; Exhibit 47, Zufelt Dep. at 16:15; Exhibit 19, Allen Dep. at 16:13, 26:2-26:3; Exhibit 21, Arnold Dep. at 57:7-57:15; Exhibit 22, Banks Dep. at 15:8-15:14, 19:19-19:24; Exhibit 24, Bautista Dep. at 11:8-11:13, 52:24-53:22; Exhibit 25, Shift Sergeant Carlman Dep.  at 21:16-21:18, 24:22-24:25, 55:2-55:11; Exhibit 26, Day Dep. at 13:6-13:7, 27:25-28:1; Exhibit 30, Hanski Dep. at 69:24-69:25, 95:7-95:25, 97:20-97:22, 98:1-98:9; Exhibit 31, Jones Dep. at 18:6-18:8, 31:13-31:20; Exhibit 35, Ledingham Dep. at 18:4-18:7; Exhibit 36, Natali Dep. at 15:2-15:13, 31:24-32:1; Exhibit 37, Radke Dep. at 18:9-18:17; Exhibit 40, Rocho Dep. at 13:6-13:11; Exhibit 41, Shultz Dep. at 15:17-15:23; Exhibit 43, Tremblay Dep. at 28:14-28:16; Exhibit 45, Valdez Dep. at 14:22-15:4; Exhibit 39, Riggs Dep. at 18:20, 21:6, 60:3-60:18, 73:5-73:18, 93:1-93:11; Exhibit 33, Krol Dep. at 63:6-63:24; Exhibit 32,  Kl<?>uever Dep. at 21:20-22:11, 23:19-23:22, 25:1-25:3, 79:14-79:17; Exhibit 31, Jones Dep. at 69:6-69:10, 74:7-74:14; Exhibit 20, Arias Dep. at 14:5-14:7, 34:11-34:19; 75:1-75:9.

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

12.     The Shift Sergeant gives COs a briefing about current happenings at the Prisons.[6]

13.     When reporting to the Shift Sergeant, COs are required to check the overtime scheduling sheet to ensure their status if required to work mandatory overtime.  *See* AR 326, § 326.03, No. 6(E) ("All correctional staff will report to the shift supervisor/shift sergeant upon arrival to ensure their status if required to work mandatory overtime."). Exhibit 1, ESP Operating Procedure ("OP") 322, Posting of Shifts/Reporting for Duty, § 2; Exhibit 8, NNCC OP 307 Pull and Shutdown Procedures, § 307.06 (2) (Marked Confidential).

14.     All COs shall report for duty fully prepared for ***any*** work assignment.  *See* Exhibit 2, ESP Operating Procedure ("OP") 322, Posting of Shifts/Reporting for Duty, § 2; Exhibit 3, HDSP OP 032, Posting of Shifts/Reporting for Duty, § 032.03 (Marked Confidential); Exhibit 4, SDCC OP 326, Posting of Shifts/Overtime, § 326.03 (1); Exhibit 5, NNCC OP 326, Posting of Shifts/Overtime, § 326.04 (4); Exhibit 6, FMWCC OP 326, Posting of Shifts/Overtime, § 326.03 (Marked Confidential); Exhibit 7, WSCC OP 326, Security Staffing, § 326.02 (Marked Confidential).

15.     All COs must be in complete uniform when reporting for duty and pass uniform inspection.[7]  *See* Exhibit 2, ESP OP 322, Posting of Shifts/Reporting for Duty, § 3; Exhibit 3,

---

[6] *See Compendium of Warden Deposition Testimony,* (Marked Confidential): ESP Warden Baker Dep. at 88:3-88:8 (testifying that it's the Sergeant's responsibility to exchange information with COs); SDCC Warden Williams Dep. at 112:4-112:9, 113:19-114:5, 120:11-121:4, 130:10-130:13, 130:25-131:5; FMWCC Warden Gentry Dep. at 50:2-50:8; NNCC Warden Baca Dep. at 49:8-49:13. *See also* Shift Sergeant Carlman Dep.  at 21:5-21:13, 54:16-54:19, 61:16-61:19, 86:24-87:2.

*See also Compendium of CO Deposition Testimony*, (Marked Confidential): Walden Dep. at 22:25-23:1, 51:1-51:8, 51:20-52:11; Echeverria Dep. at 26:18-26:22, 30:19-31:2; Everist Dep. at 17:12-17:15, 48:14-48:24; Ridenour  Dep. at 21:20-22:15, 23:16-24:7. 43:2-43:9; Tracy 33:12-33:17, 105:7-106:4; Zufelt Dep. at 22:22-23:5, 24:1-24:17, 31:18-31:20, 33:15-33:16; Allen Dep. at 17:24, 18:8-18:12, 20:5-20:19, 22:19-23:12, 27:5-27:12, 28:18-28:22; Arnold Dep. at 10:23-11:4, 11:14-11:19, 17:16-18:8, 22:13-23:7; Banks Dep. at 23:14-24:15, 29:18-30:2, 31:2-31:11; Baros Dep. at 19:10, 20:17-20:20, 45:8-45:15, 47:12-47:15, 48:1-48:5, 68:10-68:21; Bautista Dep. at 11:18-11:20, 13:3-13:5, 14:19-14:24, 17:12-17:14, 27:8-27:11; Day Dep. at 13:20-13:25, 44:16-44:20; Hanski Dep. at 53:8-53:11, 98:16-98:24; Jones Dep. at 16:21-16:23, 17:21-17:24, 30:19-30:24; Lai Dep. at 12:10-12:15, 13:14-13:21; Ledingham Dep. at 25:21-25:23, 31:20-31:21; Natali Dep. at 30:23-31:13; Radke Dep. at 21:6-21:13; Rocho Dep. at 19:18-19:22; Shultz Dep. at 11:10-11:11; Tremblay Dep. at 16:2-16:5, 17:1-17:4; Tyning Dep. at 12:18-12:20, 15:17-16:9; Kluever Dep. at 26:10-26:12.

*See also Compendium of CO Declarations,* Walden Dec. at ¶ 8; Echeverria Dec. at ¶ 7; Everist Dec. at ¶ 7; Ridenour Dec. at ¶ 8; Tracy Dec. at ¶ 8; Zufelt Dec. at ¶ 7; Allison Dec. at ¶ 6; Bautista Dec. at ¶ 6; Brown Dec. at ¶ 6; Ramirez Dec. at ¶ 6; Tyning Dec. at ¶ 6.

[7] *See Compendium of Warden Deposition Testimony,* (Marked Confidential): ESP Warden Baker Dep. at 49:6-49:9 ("[I]f a supervisor would observe them not dressed appropriately in the normal business day, then they

---

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY FOR UNPAID WAGES UNDER THE FLSA

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

HDSP OP 032, Posting of Shifts/Reporting for Duty, § 032.03 (1) (Marked Confidential); Exhibit 4 SDCC OP 326, Posting of Shifts/Overtime, § 326.03 (1); Exhibit 6, FMWCC OP 326, Posting of Shifts/Overtime, § 326.03 (1) (Marked Confidential); *See also* Shift Sergeant Carlman Dep. at 85:19-86:11.

16.     All COs must report for duty to the Shift Sergeant with sufficient time to be on their assigned post by the starting time of their shift.  *See* Exhibit 2, ESP Operating Procedure ("OP") 322, Posting of Shifts/Reporting for Duty, § 2; Exhibit 3, HDSP OP 032, Posting of Shifts/Reporting for Duty, § 032.03 (1) (Marked Confidential); Exhibit 4, SDCC OP 326, Posting of Shifts/Overtime, § 326.03 (2); Exhibit 5, NNCC OP 326, Posting of Shifts/Overtime, § 326.04 (4); Exhibit 6, FMWCC OP 326, Posting of Shifts/Overtime, § 326.03 (2) (Marked Confidential).

17.     COs must check their respective mailboxes prior to proceeding to their assigned post.[8]  *See* § C, Operating Procedures directly below, Staff Responsibilities.

**C.     NDOC's Operating Procedures**

18.     Every Prison has the substantially the same OP which sets forth all of these requirements:

**Ely State Prison:**

---

would address that with them."); NNCC Warden Baca Dep. at 50:18-50:23; SDCC Warden Williams Dep. at 79:16-79:25, 80:18-81:5. *See also* Shift Sergeant Carlman Dep. at 21:5, 54:16-54:17, 55:16-56:2, 61:15-61:16.

        *See also Compendium of CO Deposition Testimony,* (Marked Confidential): Walden Dep. at 49:23-50:7, 81:10-81:24; 83:10-83:18; Echeverria Dep. at 29:5-29:9; Dicus Dep. 23:6-23:18; Everist Dep. at 13:19-13:21, 14:8-14:13; 34:24, 32:12-32:23; Tracy Dep. at 69:5-69:15, 103:20-104:24, 114:4-115:3; Zufelt Dep. at 62:11-62:20; Allen Dep. at 28:4-28:6; Bautista Dep. at 28:4-28:6; Jones Dep. at 18:13-18:14; Ledingham Dep. at 31:14-31:17, 34:18-34:24; Natali Dep. at 66:14-66:22; Radke Dep. at 48:11-48:12; Shultz Dep. at 22:20-22:23; Tremblay Dep. at 17:10-17:13; Tyning Dep. at 34:10-34:11; Riggs Dep. 60:10-60:18, Krol Dep. at 64:22; Kluever Dep. 26:2; Hanski 98:12-98:13; Arias Dep. 56:8-56:22.

        *See also Compendium of CO Declarations,* Columbus Dec. at ¶¶ 7-8; Walden Dec. at ¶ 8; Echeverria Dec. at ¶ 8; Everist Dec. at ¶ 7; Ridenour Dec. at ¶ 8; Tracy Dec. at ¶ 8; Zufelt Dec. at ¶ 7; Allison Dec. at ¶ 6.

        [8] *See Compendium of Warden Deposition Testimony,* (Marked Confidential): ESP Warden Baker Dep. at 72:20-72:25; NNCC Warden Baca Dep. at 49:17-49:20, 65:23-66:2; FMWCC Warden Gentry Dep. at 60:12-60:15.

        *See also Compendium of CO Depositions,* (Marked Confidential): Dicus Dep. at 92:3-92:4; Echeverria Dep. at 29:7-29:11; Everist Dep. at 17:23-17:24; Ridenour Dep. 94:5-94:14; Tracy Dep. at 106:20-106:22; Banks Dep. at 15:21-15:22; Day Dep. at 11:14-11:20 and 20:22-20:25; Hanski Dep at 95:24-95:25; Jones Dep. at 52:10-52:24 and 74:7-74:14; Krol Dep. at 83:6-83:21; Rocho Dep. at 21:6-21:10; Shultz Dep. at 18:7-18:11; Valdez Dep. at 15:24-16:5; Riggs Dep. at 60:19-60:25 and 62:1-62:7; Kluever Dep. at 55:16-55:24; Arias Dep. at 67:4-67:6, 68:24-69:2.

**OP 322 POSTING OF SHIFTS/REPORTING FOR DUTY** (effective 3/13/2015, Supersedes OP 032 dated 10/21/13, Bates Nos. D009887-009895[9])

1. Shift Sergeant Responsibility
- The shift sergeant shall go over his shift roster to ensure the minimum staffing as set forth by OP 411 is met, making adjustments utilizing identified pull/shutdown posts.
- The shift sergeant/designee shall begin posting the shift thirty (30) minutes prior to the beginning of the shift.
- The shift sergeant/designee will post the shift from the muster room. Only after being posted by the sergeant/designee may staff proceed to their assigned posts.
- Staff may depart their assigned posts after being properly relieved at the end of the shift; i.e., 5:00 A.M., 5:00 P.M., 4:00 P.M., 1:00 P.M., 9:00 P.M.
2. Staff Responsibility
- Staff will report to the Muster Room in Custody Area outside the Sergeant's Office for posting of their assignment. Staff will report to the shift sergeant in the muster room early enough to be on their post by the starting time of their shift; i.e., 5:00 A.M., 8:00 A.M., 1:00 P.M., 5:00 P.M., etc.
- All *custody* staff will report to the shift sergeant on duty upon their arrival at the institution. Everyone must report in person. Area of assignment does not exempt the staff from reporting for duty to the shift sergeant. All *custody* staff will be required to check the Overtime scheduling sheet, and if their name is listed, they are required to initial in the appropriate box after their name. This will be the officer's only notification of their position on the mandatory overtime list.
- All *custody* staff should check their respective mailboxes prior to reporting for duty.

**High Desert State Prison:**
OP 032 (effective 5/27/14, Supersedes OP 032 (1/16/12), Bates Nos. D010310-010324, (Marked Confidential)[10]

032.02 SHIFT SERGEANT RESPONSIBILITY



032.03 STAFF RESPONSIBILITY

---

[9] OP 032 was in effect from 3/31/2011 until 3/13/2015, when it was superseded by OP 322.
[10] Redacted pursuant to Confidentiality Desgination.  Once the Court rules on NDOC's Motion to File Documents Under Seal, Plaintiffs will file an unredacted version of this Motion with the Court.

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com



5.

**Southern Desert Correctional Center:**

OP #326 POSTING OF SHIFTS (effective September 22, 2014, Supersedes OP 325 (Dated November 6, 2013), Bates Nos. D010490-010501; effective November 6, 2013, Supersedes OP 325 (Dated June 2013); effective August 19, 2013, Supersedes OP 326 (dated June 2012), Bates Nos. D010468-010478; effective June 2012, Supersedes OP 325(Dated 4/15/09), Bates Nos. D010479-010489).

RESPONSIBILITY

Each Shift Supervisor is responsible for understanding the tasks/duties that must be completed on their shift, and how to utilize the available manpower in conjunction with the minimum staffing requirements set forth in this operational procedure.

326.02 SHIFT SUPERVISORS RESPONSIBILITY

2. The shift sergeant shall review the shift roster to ensure minimum staffing as set forth by the Associate Warden responsible for Operations.
• If overtime staff is needed, it is the shift supervisor's responsibility to ensure that all overtime can be justified and is necessary.
4. The shift supervisors shall begin posting the shift thirty (30) minutes prior to the beginning of the shift.
5. The shift supervisors will post the shift from the muster room.
• Only after being posted by the shift supervisors may staff proceed to their assigned posts.
6. Staff may depart their assigned posts after being properly relieved no earlier than 15 minute [sic] prior to the end of the shift.

326.03 STAFF RESPONSIBILITY

2. Staff will report to the shift supervisor in the muster room for posting of their assignment.
• Staff will report early enough to be on their post by the beginning of their shift.
• Staff will report in person.
  ○ Areas of assignment or working hours do not exempt the staff from reporting for duty to the Shift Supervisor.
3. All staff shall check their respective mailboxes prior to reporting for duty.

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

**Northern Nevada Correctional Center:**

OP 326 POSTING SHIFTS/OVERTIME (effective 4/28/14, Supersedes October 18, 2013, Bates Nos. D009877-009886)

RESPONSIBILITY

Shift Supervisors are responsible to ensure that their shifts are posted in a timely manner and staffing levels must meet the guidelines set forth in this procedure. Shift Supervisors shall know the resources the institution has available to ensure adherence to this procedure. All deviations from the procedure shall be document [sic] and justified. Shift Supervisors should consult and confer with their chain-of-command when questions arise.

326.04 SHIFT STAFFING RESPONSIBILITY

1. The Shift Supervisor shall review the shift roster to ensure the minimum staffing, as set forth by this procedure is met.
3. The Shift Supervisor shall post the shift from the Gatehouse.
   A. Only after being posted by the Supervisor may staff proceed to their assigned posts.
4. Staff shall report for duty fully prepared and in sufficient time to arrive at their assigned posts prior to the start of their shift.
   A. Staff may report to their posts no earlier than 20 minutes prior to their assigned shift.
5. Staff should check their respective mailboxes prior to reporting for duty.
6. Staff may depart their assigned posts only after being properly relieved at the end of the shift.

OP #307 PULL AND SHUTDOWN PROCEDURES (effective March 9, 2011, Supersedes OP 307 April 1, 2010, Bates Nos. D011583-011590 (Marked Confidential)

307.05 SHIFT SERGEANT RESPONSIBILITY



307.06 STAFF RESPONSIBILITY

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

[redacted]

3. [redacted]

**Florence McClure Women's Correctional Center:**

OP 326 POSTING OF SHIFTS/OVERTIME (effective 7/23/15, Bates Nos. D010536-010544 (Marked Confidential); effective 4/15/15, Bates Nos. D010520-010528 (Marked Confidential); effective 2/3/15, Bates Nos. D010511-01059 (Marked Confidential)

326.02 SHIFT SUPERVISORS RESPONSIBILITY

[redacted]

326.03 STAFF RESPONSIBILITY

[redacted]

3. [redacted]

**Warm Springs Correctional Center:**

OP 326 SECURITY STAFFING (effective 4/8/2014, Supersedes 3/31/2013, Bates Nos. 010269-010274; effective 4/23/12, Supersedes OP 325 Security Staffing – 8/31/2011, Bates Nos. D010265-010268 (Marked Confidential)

326.02 STAFFING PROCEDURE

[redacted]



████████████████████████████████████

19.     After reporting for duty and receiving their assignments and briefings, picking up their mail, and passing uniform inspection, COs must pick up any and all tools necessary for their assigned post, such as radios, keys, weapons, tear gas, and restraints.[11]

20.     After picking up their required tools (if any), COs proceed to their assigned post.

21.     Once COs arrive at their assigned post, they take inventory of the tools at the post.[12]

22.     If they are relieving an outgoing officer, the outgoing officer and incoming officer engage in de-briefing ("pass down") of critical information about current happenings at the post.[13]

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

[11] *See Compendium of Warden Deposition Testimony,* (Marked Confidential): ESP Warden Baker Dep. at 50:20-51:4 (testifying that COs at ESP "would have to pick [a radio, wrist restraints, leg restraints, keys] up when they entered the facility."); SDCC Warden Williams Dep. at 149:11-149:14; FMWCC Warden Gentry Dep. at 41:8-41:13, 44:14-44:20, 46:20-46:25 and 47:1, 47:22-48:2, 53:22-53:24, 60:12-60:14; NNCC Warden Baca Dep. at 57:9-61:3 (testifying COs picked up keys or obtained from post prior to assuming post), 64:13-65:16 (testifying COs pick up radios at the beginning of their shift at central control or in a pass down prior to assuming their post), . *See also* Shift Sergeant Carlman Dep. at 23:3-23:7, 46:11-46:12; Day Dep. at 11:15-11:20, 13:2-13:8, 44:16-45:1;

*See also Compendium of CO Deposition Testimony,* (Marked Confidential): Walden Dep. at 23:3-23:5, 38:19-38:23, 42:6-42:8, 55:12-55:13; Echeverria Dep. at 17:12-17:15, 29:5-30:14, 37:20-37:25, 40:6-40:12, 60:7-60:11; Dicus Dep. at 23:1-23:4, 24:19-24:22; Everist Dep. at 17:21-17:24, 19:24-20:4, 29:2-29:10; Ridenour Dep. at 19:12-19:19, 30:4-30:10, 31:12-31:19; Tracy Dep. at 21:13-22:4, 33:18-34:11, 37:12-37:17, 40:24-41:6, 106:20-107:18; Zufelt Dep. at 18:21-18:25, 24:18-24:22, 27:7-27:9, 29:4-29:5, 31:14-31:17, 33:16-33:18, 35:4-35:8, 40:11-40:15, 47:14-48:6; Allen Dep. at 17:22-17:25, 18:12-18:15, 29:8-29:18; Arnold Dep. at 11:20-11:25, 19:18-19:23, 24:6-24:19; Banks Dep. at 15:21-16:6, 18:7-18:9, 27:13-27:15; Baros Dep. at 19:11-19:13, 38:24-39:4; Bautista Dep. at 11:20-11:23, 21:2-21:8, 23:17-23:21, 50:7-52:6; Hanski Dep. at 18:20-19:10, 19:22-20:11, 23:11-23:25. 53:15-53:18, 102:5-102:8; Jones Dep. at 22:1-22:5, 26:9-26:11, 52:4-52:13; Krol Dep. at 17:1-17:6, 20:22-25:3, 65:7-65:21; Lai Dep. at 11:13-11:17, 13:24-13:25; Ledingham Dep. at 19:4-19:13; Natali Dep. at 15:11-15:13, 15:20, 30:8-30:16, 37:9-37:13; Radke Dep. at 27:11-27:18, 53:17-54:2; Rocho Dep. at 12:25-13:2, 13:20-14:1; Shultz Dep. at 17:3-17:7, 17:23-18:5, 40:20-41:9; Tremblay Dep. at 24:4-24:8, 24:17-25:8, 27:16-27:25, 29:6-29:8; Tyning Dep. at 12:22-12:24, Valdez Dep. at 15:24-16:15, 47:22-47:24; Riggs Dep. at 61:11-61:19, 66:19-66:22; Kluever Dep. at 28:16-28:18, 52:5-52:11.

*See also Compendium of CO Declarations,* Columbus Dec. at ¶¶ 7-8; Walden Dec. at ¶¶ 8-9; Echeverria Dec. at ¶¶ 9-10; Everist Dec. at ¶¶ 7-8; Ridenour Dec. at ¶¶ 8-9; Tracy Dec. at ¶¶ 8-9; Zufelt Dec. at ¶¶ 7-8; Allison Dec. at ¶¶ 6-7; Bautista Dec. at ¶¶ 6-7; Brown Dec. at ¶¶ 6-7; Ramirez Dec. at ¶¶ 6-7; Tyning Dec. at ¶¶ 6-7.

[12] *See e.g.,* (Marked Confidential): NNCC Warden Baca Dep. at 70:18-70:24; Dicus Dep. at 49:7-49:12; Everist Dep. at 44:4-44:5, 46:1-46:3, 49:16-49:23; Tracy Dep. at 29:2-29:5; Zufelt Dep. at 24:18-24:22, 25:19-25:25, 103:1-102:6; Arnold Dep. at 46:24-46:25; Banks Dep. at 12:21-12:22, 20:4, 31:7, 36:6-36:7, 39:25 and 40:1-40:7; Day Dep. at 15:8-15:10, 31:7-31:16, 33:6-33:8.

[13] *See Compendium of Warden Deposition Testimony,* (Marked Confidential): FMWCC Warden Gentry Dep. at 50:8-50:10, 53:13-53:21, 54:2-54:7, 68:1-68:4 and 69:1-69:3; ESP Warden Baker Dep. at 29:9-30:2; NNCC Warden Baca Dep. at 69:13-70:6; SDCC Warden Williams Dep. at 120:25-121:13. *See also* Shift Sergeant Carlman Dep. at 16:9-16:10, 28:13-28:25, 35:22-35:15, 90:3-90:4.

*See also Compendium of CO Deposition Testimony,* (Marked Confidential): Walden Dep. at 63:21-63:25, 67:9-67:24; Echeverria Dep. at 24:1-24:23; Dicus Dep. at 26:6-26:10, 40:5-40:14, 41:1-41:5; Everist Dep. at 41:25-42:5, 42:19-43:1, 49:16-49:23; Ridenour Dep. at 21:20-22:15, 23:16-24:7, 52:22-53:2; Tracy Dep. at 33:18-34:7,

23.     Upon completion of the pass down,[14] the outgoing CO proceeds back to the main control and returns that same equipment and/or drops off/completes paperwork.[15]

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

74:5-74:16; Zufelt Dep. at 16:25-17:2, 27:6, 29:10-26:14, 30:14-30:23, 36:24-36:4, 40:15-40:19, 41:8-41:11, 46:23-47:7; Allen Dep. at 17:9-17:11, 17:24-17:25, 21:2-21:6, 32:4-32:6, 32:18-32:22, 39:14-39:16, 42:13-42:22; Banks Dep. at 20:3-20:10, 36:3-36:4, 37:10-37:16, 37:21-37:22, 38:1-38:2; Baros Dep. at 15:15-15:25, 23:9-23:11; Bautista Dep. at 12:15-12:16, 31:23-32:4; Day Dep. at 23:11-23:23, 29:8-29:15, 44:22, 48:20-49:3; Hanski Dep. at 19:18-19:21, 55:6-55:12; Jones Dep. at 29:4-29:7, 36:7-36:9; Krol Dep. at 16:12, 17:21-17:25; 31:22-31:21, 32:13-32:15, 66:12-66:14; Lai Dep. at 11:13-11:14, 13:22-14:2; Ledingham Dep. at 28:8-28:9, 39:4-39:11, 42:11-42:13; Natali Dep. at 21:2-21:7, 23:15-23:19, 46:2-46:4, 47:2-47:16; Radke Dep. at 28:14-28:20, 40:13-40:18, 45:8-45:9; Rocho Dep. at 16:23-17:2, 17:14-17:17, 26:17-26:19, 34:5-34:6; Shultz Dep. at 18:15-18:25, 30:5-30:17, 56:22-57:2; Tremblay Dep. at 26:25-26:27:10, 49:22-50:8; Valdez Dep. at 35:4-35:7, 38:11-38:12, 44:10-44:12; Riggs Dep. at 68:23-69:1, 76:2-76:7; Kluever Dep. at 34:10-34:12; Jones Dep. at 99:18-99:22; Arias Dep. at 38:18-38:21.

*See also Compendium of CO Declarations,* Columbus Dec. at ¶ 7; Walden Dec. at ¶ 3; Echeverria Dec. at ¶ 9; Everist Dec. at ¶ 7; Ridenour Dec. at ¶ 8; Tracy Dec. at ¶ 8; Zufelt Dec. at ¶7; Allison Dec. at ¶ 6; Bautista Dec. at ¶ 6; Brown Dec. at ¶ 6; Ramirez Dec. at ¶ 6; Tyning Dec. at ¶ 6.

[14] *See Compendium of Warden Deposition Testimony,* (Marked Confidential): SDCC Warden Williams Dep. at 120:25-121:13; FMWCC Warden Gentry Dep. at 50:8-50:10, 53:13-53:21, 54:2-54:7, 68:1-68:4 and 69:1-69:3; Shift Sergeant Carlman Dep. at 16:9-16:10, 28:13-28:25, 35:22-35:15; NNCC Warden Baco Dep. at 71:18-71:25.

*See also Compendium of CO Deposition Testimony,* (Marked Confidential): Walden Dep. at 64:3-64:11, 67:9-67:24; Echeverria Dep. at 24:1-24:23; Dicus Dep. at 26:6-26:10, 40:5-40:14, 41:1-41:5; Everist Dep. at 41:25-42:5, 42:19-43:1, 49:16-49:23; Ridenour Dep. at 21:20-22:15, 23:16-24:7, 52:22-53:2; Tracy Dep. at 33:18-34:7, 74:5-74:16; Zufelt Dep. at 16:25-17:2, 27:6, 29:10-29:14, 30:14-30:23, 36:24-36:4, 40:15-40:19, 41:8-41:11, 46:23-47:7, Allen Dep. at 17:9-17:11, 17:24-17:25, 21:2-21:6, 32:4-32:6, 32:18-32:22, 39:14-39:16, 42:13-42:22; Banks Dep. at 20:3-20:10, 36:3-36:4, 37:10-37:16, 37:21-37:22, 38:1-38:2; Baros Dep. at 15:15-15:25, 23:9-23:11; Bautista Dep. at 12:15-12:16, 31:23-32:4; Day Dep. at 23:11-23:23, 29:8-29:15, 44:22, 48:20-49:3; Hanski Dep. at 19:18-19:21, 55:6-55:12; Jones Dep. at 29:4-29:7, 36:7-36:9; Krol Dep. at 16:12, 17:21-17:25; 31:22-31:21, 32:13-32:15, 67:12-67:22; Lai Dep. at 11:13-11:14, 13:22-14:2; Ledingham Dep. at 28:8-28:9, 39:4-39:11, 42:11-42:13; Natali Dep. at 21:2-21:7, 23:15-23:19, 46:2-46:4, 47:2-47:16; Radke Dep. at 28:14-28:20, 40:13-40:18, 45:8-45:9; Rocho Dep. at 16:23-17:2, 17:14-17:17, 26:17-26:19, 34:5-34:6; Shultz Dep. at 18:15-18:25, 30:5-30:17, 56:22-57:2; Tremblay Dep. at 26:25-27:10, 49:22-50:8; Valdez Dep. at 35:4-35:7, 38:11-38:12, 44:10-44:12.

*See also Compendium of CO Declarations,* Columbus Dec. at ¶ 9; Walden Dec. at ¶ 9; Echeverria Dec. at ¶ 10; Everist Dec. at ¶ 8; Ridenour Dec. at ¶ 9; Tracy Dec. at ¶ 8-9; Zufelt Dec. at ¶8; Allison Dec. at ¶ 7; Bautista Dec. at ¶ 7; Brown Dec. at ¶ 7; Ramirez Dec. at ¶ 7; Tyning Dec. at ¶ 7.

[15] *See Compendium of Warden Deposition Testimony,* (Marked Confidential): SDCC Warden Williams Dep. at 142:4-142:9; FMWCC Warden Gentry Dep. at 61:19-61:22; Shift Sergeant Carlman Dep. at 37:14-37:21, 39:15-39:22, 94:1-94:93.

*See also Compendium of CO Deposition Testimony,* (Marked Confidential): Walden Dep. at 74:12-75:16; Echeverria Dep. at 29:5-30:16, 43:17-43:25; Dicus Dep. at 26:6-26:10, 40:9-40:14; Everist Dep. at 49:24-50:4, 53:8-53:13; Ridenour Dep. at 35:20-36:13, 39:12-40:1; 71:16-71:20; Zufelt Dep. at 35:14-35:13; 44:5-45:7; Allen Dep. at 18:19-19:4, 25:23-26:3, 26:8-26:13, 26:17-26:19; Banks Dep. at 20:3-20:10, 21:20-22:12, 37:14-37:16, 38:10-38:11, 38:14-39-7; Baros Dep. at 38:14-38:20, 40:22-40:23, 42:5-42:25, 44:16-44:20, 50:16-50:20; Bautista Dep. at 28:19-28:22, 30:17-30:19; Day Dep. at 29:19-30:8, 35:6-35:12, 48:20-49:3, 49:12-49:14; Hanski Dep. at 54:22-55:5; Jones Dep. at 36:7, 37:11-37:12, 38:11-38:13, 52:14-52:16; Krol Dep. at 15:24-16:2, 33:4-33:16; Lai Dep. at 11:14-11:17; Ledingham Dep. at 27:14-28:4, 39:12-39:18, 54:4-54:7, 54:23-54:17; Natali Dep. at 24:12-25:3, 56:18-57:10; Radke Dep. at 40:7-40:12, 45:10-45:14; Rocho Dep. at 17:9-17:11, 17:18-18:12, 35:13-35:14, 42:21-43:4, 45:12-45:13; Tyning Dep. at 20:11-21:1, 22:21-23:7, 40:11-40:17, 52:4-52:17; Valdez Dep. at 34:10-34:24; Kluever Dep. at 51:13-51:10.

*See also Compendium of CO Declarations,* Columbus Dec. at ¶ 9; Walden Dec. at ¶ 9; Echeverria Dec. at ¶ 10; Everist Dec. at ¶ 8; Ridenour Dec. at ¶ 9; Tracy Dec. at ¶ 8-9; Zufelt Dec. at ¶8; Allison Dec. at ¶ 7; Bautista Dec. at ¶ 7; Brown Dec. at ¶ 7; Ramirez Dec. at ¶ 7; Tyning Dec. at ¶ 7.

24.     All COs are on duty and must be ready to respond to any emergency when they are on inside of the secured area of the Prisons.[16]

### E.   NDOC's Shift and Pay Reporting System

25.     NDOC maintains a system of shift and pay reporting known as NEATS ("Nevada Employee Action and Timekeeping System").  *See* Exhibit 10, NDOC Payroll Procedures (Bates Nos. 9989-10011).

26.     NDOC's shift and pay reporting is an "exception" reporting system, which means that an employee only reports when he/she does not work.  (For example, an employee would report that he/she was out sick for a particular shift).  *See* Exhibit 11, Chowanski Dep. at 28:9-29:8; Exhibit 12, AR 320, § 320.06(2)("Exception reporters must account for all exceptions in the pay period.")

27.     As a result of this system of reporting, NDOC only pays COs for their assigned shift time (unless there is an exception such as reported and approved overtime).

28.     NDOC does not require COs to record their time worked by clocking-in/out of a timekeeping system.  *See, e.g.*, Exhibit 16, ESP Warden Baker Dep. at 75:2-:75:8;

29.     As a result, NDOC did not record the pre- and post-shift activities at issue in this case.

### F.   CO Work Schedules

30.     All COs are scheduled as full-time employees.

31.     COs may agree to work any of the following for types of schedules:

- Standard workweek: A standard workweek is a work schedule of five shifts with the same number of hour each day and a maximum of 40 hours per week. The work schedule is Monday through Friday.
- Non-standard workweek:  A non-standard workweek is a work schedule of five shifts with the same number of hours each day and a maximum of 40 hours per workweek.  The work schedule is other than Monday through Friday.

---

[16] *See Compendium of CO Deposition Testimony,* (Marked Confidential):Tracy Dep. at 69:5-69:15; Baros Dep. at 23:13-23:16, 67:10-67:18; Bautista Dep. at 24:7-24:11; Jones Dep. at 28:1-28:9, 53:4-53:6; Lai Dep. at 29:14-29:17; Natali Dep. at 55:17-56:5; Rocho Dep. at 31:17; Shultz Dep. at 45:21-46:4; Tyning Dep. at 35:24-36:1, 35:15-35:16; Banks Dep. at 28:3-28:9; Krol Dep. at 84:20-85:3.

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

- 40-hour Variable (Innovative) Work Schedule:  A schedule different from a standard or non-standard workweek where overtime is accrued after 40-hours.
- 80-hour Variable (Innovative) Work Schedule: A schedule different from a standard or non-standard workweek where overtime is accrued after 80-hours.

*See* Exhibit 11, AR 320, § 32.01, No. 5-6; Exhibit 9,  NDOC Payroll Procedures (Bates Nos. 9989-10011) at Bates Nos. 9992-9993.

32.     Regardless of the schedule, COs always work, and get paid for, 80-hours in a bi-weekly period of time.  *See* Exhibit 10, NDOC Payroll Procedures, Bates No. 9991 ("Most of us are exception reporters, which means that we are always going to be paid 80 hours in a bi-weekly pay period."); Exhibit 16, ESP Warden Baker Dep. at 76:3-76:12 ("If you didn't report your time at all, you would get paid 80 hours"); Exhibit 11, Chowanski Dep. at 21:20-21:22 ("Even if they did not submit a timesheet, they would be paid 80 hours whether they put a timesheet in or not.").

33.     As a result, any additional hours worked above and beyond their normal schedule are overtime hours.

**G.     NDOC Deems The Pre- and Post-Shift Activities Here As Non-Compensable**

34.     COs are only compensated for their regularly scheduled shift times when they are at their work stations.

35.     COs are told that they will not be paid for the pre- and post-shift activities at issue in this case.[17]

**H.     California's Department of Corrections Compensates Correctional Officers for the Time Spent Performing the Same Pre- and Post-Shift Activities Asserted Here**

36.     California pays up to one additional hour for pre- and post-shift activities performed by COs for every 40 hours worked.  *See* Exhibit 13, California Correctional Peace Officer Association Collective Bargaining Agreement, § 11.10 (B)(1)(b) and § 15.17 (B).

---

[17] *See* e.g., (Marked Confidential): Shift Sergeant Carlman Dep. at 77:1-77:6; *see also* Krol Dep. at 14:12-14:17, 70:18-71:2, 77:5-77:14; Kluever Dep. 64:10-65:3; Jones Dep. at 86:13-87:7, 101:3-101:4, 101:20-101:21; Hanski Dep. 122:21-123:8, 124:10-124:13.   Dicus Dep. at 39:1-39:11; Echeverria Dep. at 41:14-42:25; Everist Dep at 48:25-49:3; Ridenour Dep. at 35:6-35:10; Walden Dep. at 44:1-44:6; Zufelt 126:3-126:8; Allen Dep. at 24:1-25:2; Banks Dep. at 17:23-17:25, 18:1-18:4; Baros Dep. at 59:8-59:11; Day Dep. at 28:6-28:7; Hanski Dep. at 69:13-70:6; Jones Dep. at 31:25-32:8, 41:13-41:15; Natali Dep. at 21:21-21:24, 56:1:56:6; Rocho Dep. at 19:6-19:9; Tyning Dep. at 19:19-19:24.

37.     The one hour per week pre/post shift pay that California pays its COs is on top of the shift pay that COs receive.  *Id.* ("This section shall not result in changes to the shift start/stop times.").

## V.     ARGUMENT

### A.     Summary Judgment Legal Standard

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that "there is no genuine issues as to any material fact and that the movant is entitled to a judgment as a matter of law." FRCP 56(a-c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp.,* 477 U.S. 477 317, 323 (1986). A fact is material if it might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The purpose of summary judgment is to enable the trial court to readily dispose of cases on matters of law where it becomes evident no material controversy of fact remains. *Rohner v. Union Pac. R. Co.*, 225 F.2d 272, 274 (10th Cir. 1955); *see also Valdosta Livestock Co. v. Williams,* 31 F.R.D. 528, 531 (E.D.N.C. 1962) (appeal dismissed 316 F.2d 188.)).

### B.     As This Court Held In It's Order Denying Defendant's Motion to Dismiss, The Pre/Post Shift Activities In Question Here Are Compensable Under the FLSA, Federal Regulations, And Existing Case Precedent

#### 1.     The Pre/Post Shift activities are an intrinsic element of being a CO.

The Fair Labor Standards Act ("FLSA") provides that a covered employee who "is employed for a workweek longer than forty hours" must be paid for any hours in excess of forty at a rate at least one and one-half times his or her regular rate. 29 U.S.C. § 207(a); 29 U.S.C. § 203(g) ("Employ" is defined as "to suffer or permit to work."). The FLSA itself does not contain a definition of "workweek" or "work."

Congress amended the FLSA with passage of the Portal-to-Portal Act.  61 Stat. 84 (1947). The Portal-to-Portal Act "narrowed the coverage of the FLSA slightly by excepting two activities that had been treated as compensable under [prior Supreme Court] cases: [1] walking on the employer's premises to and from the actual place of performance of the principal activity of the

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

employee, and [2] activities that are 'preliminary or postliminary' to that principal activity." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 27 (2005) (quoting 29 U.S.C. § 254(a)).  As with the FLSA, the Portal-to-Portal Act itself does not define "work." The Portal-to-Portal Act left unchanged the prior precedent relating to what constitutes "work" under the FLSA, *see IBP*, 546 U.S. at 28 ("[T]he Portal-to-Portal Act does not purport to change this Court's earlier descriptions of the terms 'work' and 'workweek', or define the term 'workday.'"), which is defined as any activity "controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business[.]" *see Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944); *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944).

The two exceptions from what would otherwise be considered compensable "work" under the FLSA are commonly known as the travel and postliminary/preliminary exceptions, respectively.  29 U.S.C. § 254(a)(1) and (2).  This case concerns the latter.  As such, the relevant inquiry is whether the pre-shift activities presented in this Motion are "integral and indispensable"[18] to the employees' primary job responsibilities. "An activity is therefore integral and indispensable to the principal activities that an employee is employed to perform *if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities*." *Integrity Staffing Solutions, Inc.*, 135 S. Ct. at 517 (emphasis added).  In her concurrence, Justice Sotomayor clarified the Court's standard that a preliminary and/or postliminary activity is compensable if an employee cannot dispense with it without impairing her ability to perform the principal activity "safely or effectively":

[18] The Supreme Court defined "integral" and "indispensable" as follows:

The word "integral" means "[b]elonging to or making up an integral whole; constituent, component; *spec*[*ifically* ] necessary to the completeness or integrity of the whole; forming an intrinsic portion or element, as distinguished from an adjunct or appendage." 5 Oxford English Dictionary 366 (1933) (OED); accord, Brief for United States as *Amicus Curiae* 20 (Brief for United States); see also Webster's New International Dictionary 1290 (2d ed. 1954) (Webster's Second) ("[e]ssential to completeness; constituent, as a part"). And, when used to describe a duty, "indispensable" means a duty "[t]hat cannot be dispensed with, remitted, set aside, disregarded, or neglected." 5 OED 219; accord, Brief for United States 19; see also Webster's Second 1267 ("[n]ot capable of being dispensed with, set aside, neglected, or pronounced nonobligatory").

*Integrity Staffing Solutions, Inc. v. Busk*, 135 S. Ct. 517, 190 L. Ed. 2d 410 (2014).

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

As both Department of Labor regulations and our precedent make clear, an activity is "indispensable" to another, principal activity only when an employee could not dispense with it without impairing his ability to perform the principal activity ***safely and effectively***.

*Id.* at 519-20 (emphasis added).

### 2.      DOL Regulations state that this time is compensable

The relevant Department of Labor Regulations make it clear that they have always considered the time spent reporting for duty and receiving assignments and briefings (i.e., "roll call") as a compensable because these activities could not be ignored without affecting the safety or effectiveness of their principal activities of maintaining security at state correctional facilities. As an initial matter, the practice of reporting for duty and receiving assignments is commonly referred to as "roll call." In "Prison and Jail Administration: Practice and Theory," Dr. Carlson describes "roll-call" as a process of reporting for duty, receiving assignments, and getting debriefed on recent activity at the facility:

> Regardless of the facility or shift, most correctional officers' days begin at roll call. **This often occurs approximately 15 minutes before officers can clock in and entails a general debriefing by the shift supervisor of anything that might have happened on the previous shift that warrants discussion:** this can be the number of fights/injuries that have occurred, discovery of dangerous contraband, or incoming/outgoing inmate transfers**. It is during roll call that officers will find out where they are working that day.** Most facilities keep officers on fairly consistent weekly post assignments, but this is rarely definite and is influenced by the number of officers working overtime from other shifts and institutional need. Some officers serve in a relief capacity, filling in on regular posts on others' off-days, and are rarely assured of where they will be working during that shift until they look at the roster. Once roll call is concluded, officers can begin checking out the gear they require, usually from the institutional control center. Items that most officers carry include flashlights for cell searches and counts, handcuffs, oleoresin capsicum (OC) or "pepper spray" and personal radios for communication.

*See* Exhibit 14, attached, Christopher Newport University Peter M Carlson, Ph.D., Peter M. Carlson, Judith Simon Garrett, Ph.D, Prison and Jail Administration: Practice and Theory, p. 232 (3d ed. 2015) (emphasis added); *Aguilar v. Management & Training Corp.,* 948 F.3d 1270 (10th Cir. Feb. 4. 2020) (time spent by officers preshift is compensable under the FLSA and was so "integral and indispensable" to their principal activites that the activity served as beginning of

compensable workday; time spent postshift is compensable under the FLSA and was so "integral and indispensable" to their principal activites that the activity served as their last principal activity of the workday).   This is consistent with Defendant's own job descriptions for correctional lieutenants and sergeants which describes "roll-call" as a process of assigning work:

> [Correctional Lieutenants and Sergeants] Assign work by conducting roll call (verifying attendance) at the beginning of each shift to ensure sufficient employees are available and authorize or recommend overtime when necessary by assessing institution/facility's need and availability of personnel to provide adequate security staffing."

*See* http://hr.nv.gov/uploadedFiles/hrnvgov/Content/Resources/ClassSpecs/13/13-310spc.pdf (last visited Feb. 20, 2020).

Shift Sergeant Carlman describes precisely the same "roll call" process that Dr. Carlson sets forth in his treatise:

> And me and my sergeants will sit at a table about this long, and the officers will, say, come in through this door. Again, you make sure they're in proper uniform, give them a quick brief of what's going on -- excuse me -- if the yard is on lockdown or whatever. . . . If we had had a critical incident, if the place is on lockdown, or if I've changed your post. If you have a bidded post of Unit 1 and I don't need you in Unit 1 right now, I need you in Unit 6 – I mean, because you're always shuffling individuals through various post needs of the institution so --

Shift Sergeant Carlman Dep. at 54:16-54:19; *see also* Dep. at 61:16-61:19, 86:24-87:2.

DOL Regulation 29 C.F.R. § 553.221(b) states that the time participating in "roll call" is compensable:

> Compensable hours of work generally include all of the time during which an employee is on duty on the employer's premises or at a prescribed workplace, as well as all other time during which the employee is suffered or permitted to work for the employer. Such time includes all pre-shift and post-shift activities which are an integral part of the employee's principal activity or which are closely related to the performance of the principal activity, ***such as attending roll call***, writing up and completing tickets or reports, and washing and re-racking fire hoses.

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

29 C.F.R. § 553.221(b) (emphasis added).[19]

DOL Regulation 29 C.F.R. § 785.38 also states that an employee must be compensated when he/she is instructed to report for duty to "receive instructions":

> Where an employee is required to report at a meeting place **to receive instructions** or to perform other work there, or to pick up and to carry tools, the travel from the designated place to the work place is part of the day's work, and must be counted as hours worked regardless of contract, custom, or practice.

29 C.F.R. § 785.38 (emphasis added).

Although not explained by the Department of Labor, the reason such time is compensable is fairly apparent. A law enforcement entity cannot ensure the safety of the population it oversees without (1) knowing who is present at a given time and (2) dispatching those that are present to attend to the greatest need. This is precisely why NDOC requires all COs to report for duty to receive their assignments and briefings prior to the start of their regularly scheduled shift. Defendants must know who is present for work and then assign each officer to address the greatest need for the day, whether it be the transport of an inmate or maintaining a lock down in a particular building, and if any safety concerns are present.

**3.      Caselaw holds that this time is compensable.**

Federal case law further confirms that law enforcement employees must be compensated for reporting for duty and receiving assignments (*i.e.*, roll call). For example, in the post-*Integrity Staffing* case of *Berry v. Office of Fayette Cty. Sherriff*, the sheriff department employee plaintiffs were required to attend roll call. 2015 WL 9165905 at *1 (E.D. Ky. Dec. 16, 2015). The defendant employer moved for summary judgment, arguing that "time spent in roll call is not compensable 'work' under the FLSA." *Id.* at 4. The court rejected this argument, holding that "[t]his defense fails as a matter of law because the definition of work for law enforcement officers specifically includes "roll call" as an example." The court explained:

> "The Sheriff's Office argues that the afternoon roll call is a postliminary activity. [Record No. 89, p. 7-8] Even though the activity is mandatory, the

---

[19] Part 553 of the Department of Labor's regulations applies the FLSA to employees of state and local governments; subsection C of those regulations applies to law enforcement employees of public employees; and section 553.221 defines "compensable hours of work."

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

defendant maintains that it is not integral to the performance of the deputies' job duties and, therefore, is noncompensable under the Portal-to-Portal Act. *Id*. Nevertheless, the regulations implementing the FLSA and the Portal-to-Portal Act as to law enforcement employees define "compensable work" to include:

". . . attending ***roll call***. . ." [*citing* 29 C.F.R. § 553.221(b) (emphasis in original)].

In support of its position, the defendant relies on *Integrity Staffing*, 135 S. Ct. at 515-16, where a warehouse owner required its employees to undergo a security screening to check for stolen items before leaving the premises. The Supreme Court held that the mandatory screening was not "integral and indispensable" and, as a result, was a "noncompensable postliminary activity." *Id*. at 518. Notably, that case did not involve a roll call or law enforcement officers. ***In this case, a federal regulation specifically states that roll call is a compensable work activity for law enforcement officers like the plaintiffs***. See 29 C.F.R. § 553.211 (definition of "law enforcement activities"). Thus, the Sheriff's Office is not entitled to summary judgment based on its argument that roll call does not qualify as "work.""

*Id*. (Emphasis added).  Numerous other decisions affirm this conclusion. *See, Riggs v. United States*, 21 Cl. Ct. 664, 667 (1990) (recognizing compensable time where "[i]nformation essential to the proper conduct of the firefighters' mission is transmitted at roll call."); *Baylor v. United States*, 198 Ct. Cl. 331, 339 (1972) (same); *Albright v. United States*, 161 Ct. Cl. 356, 360 (1963) (same); "To the Sec'y of the Treasury," 44 Comp. Gen. 195, 197 (Oct. 8, 1964) (same); *Albright v. United States*, 161 Ct. Cl. 356 (1963) (same); *DeCosta v. United States*, 22 Cl. Ct. 165, 177 (1990), judgment entered, 23 Cl. Ct. 582 (1991), aff'd, 987 F.2d 1556 (Fed. Cir. 1993) (same); *L-889 AFSCME v. Louisiana*, #96-30982, 145 F.3d 280, 1998 U.S. App. Lexis 15054 (5th Cir.) (holding that correctional officers were entitled to be paid overtime for roll-call and meal periods).  As stated by the court in *Riggs*:

By convening a roll call and ordering plaintiffs to bring protective equipment, and ***by making roll call the occasion for passing on information*** which the Air Force apparently believes to be necessary for proper work performance, the Air Force is stating, in effect, that attendance at the roll call with protective equipment is a necessary, integral part of the day's principal activities.

21 Cl. Ct. at 677.

Even where the term "roll call" is not use, Courts also recognize the compensability of time where employees report at a time certain to receive assignments before leaving to complete work at another location. *See, e.g.*, *Dole v. Enduro Plumbing, Inc.*, 1990 WL 252270, at *5 (C.D. Cal. Oct. 16, 1990) (where "an employee is required to report to a designated meeting place (such as the shop in this case) to receive instructions before he proceeds to another work place (such as the jobsites in this case), the start of the workday is triggered at the designated meeting place, and subsequent travel is part of the day's work and must be counted as hours worked for purposes of the FLSA, regardless of contract, custom, or practice."); *Chao v. Akron Insulation & Supply, Inc.*, 184 F. App'x 508, 510 (6th Cir. 2006) ("Examples of activities during 'shop time' that are integral to principal activities include reporting to a designated meeting place, ***receiving assignments***, and loading equipment.").[20] In *Chao*, the court explained: "employees were required to report to the shop before 7:30 and spent at least some of that time working-either preparing for the day's work or waiting for Lombardi to give them their assignment for the day. Both activities are compensable under the Fair Labor Standards Act." *Id.* at 512.

Similarly, in cases involving farm workers who are required to meet at a given location to receive assignments and instructions for the day's work, courts have likewise concluded that the time spent receiving instructions is compensable. *See, e.g.*, *Guzman v. Laredo Sys., Inc.*, No. 10 CV 1499, 2012 WL 5197792, at *4 (N.D. Ill. Oct. 19, 2012) ("***the time the plaintiffs spent receiving instructions***, gathering together the required tools, and traveling to the job site ***is compensable***") (emphasis added).

Finally, in actions under the Federal Employees Pay Act (the FEPA) in which courts have performed their analysis under the Portal-to-Portal Act, courts have found time spent receiving instructions and shift information to be compensable.  *See, e.g.*, *Albright v. United*

[20] *Accord*, *Hodgson v. Am. Concrete Constr. Co.*, 471 F.2d 1183, 1185-86 (6th Cir.1973); *Herman v. Rich Kramer Constr., Inc.*, No. 97-4308WMS, 1998 WL 664622 (8th Cir. Sept.21, 1998) (per curiam); *Dunlop v. City Elec., Inc.*, 527 F.2d 394, 400 (5th Cir.1976); *Russano v. Premier Aerial & Fleet Inspections*, LLC, No. 14-CV-14937, 2016 WL 4138231, at *3 (E.D. Mich. Aug. 4, 2016); *Hodgson v. Frisch Dixie, Inc.*, No. 6641, 1971 U.S. Dist. LEXIS 12029, at *11 (W.D. Ky Aug. 16, 1971), aff'd, 469 F.2d 82 (6th Cir.1972) (per curiam); *O'Brien v. Encotech Constr.*, No. 00-CV-1133, 2004 WL 609798 (N.D.Ill. Mar.23, 2004); *Breen v. Concrete by Wagner, Inc.*, No. 98 C 3611, 1999 WL 1016267, at *3 (N.D. Ill. Nov. 4, 1999); *Marshall v. Boyd*, 1979 WL 1922 (E.D.Ark.1979).

*States*, 161 Ct. Cl. 356, 360 (1963) (recognizing compensable time under FEPA where naval shipyard guards were required to "stand muster for attendance, physical inspection, and ***receipt of special instructions and assignments*** (the latter being posted a week in advance but being subject to change because of absentees, emergencies, etc.), and then proceed to their assigned posts either on foot or by vehicle depending on the distance and the nature of the assignment"); "To the Sec'y of the Treasury," 44 Comp. Gen. 195, 197 (Oct. 8, 1964) (Since it reasonably appears that the guards were notified to report early for roll call ***for the purpose of receiving specific assignments*** and instructions and for the purpose of drawing badges, weapons, etc., our opinion is that they are entitled to overtime compensation under the principle enunciated in *Albright v. United States*, 161 Ct. Cl. 356, and *Baker v. United States*, 161 Ct. Cl. 356.").

As the above authorities recognize, reporting for duty and receiving shift assignments and daily instructions and briefings are "integral and indispensable to the principal activities that an employee is employed to perform" because they are "an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Integrity Staffing Solutions, Inc. v. Busk*, 135 S. Ct. at 517. Such time is compensable.

## C.   The Continuous Workday Begins When COs Report For Duty And Receive Their Assignments

Under the continuous workday doctrine, once an individual performs a principal activity, his/her workday starts and he/she will be compensated for his activities performed thereafter, until the end of his/her shift. *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 28 (2005) ("The continuous workday rule ... means that the 'workday' is generally defined as 'the period between the commencement and completion on the same workday of an employee's principal activity or activities." (citing 29 C.F.R. § 790.6(b)).   *In IBP, Inc.*, the United States Supreme Court recognized the Continuous Workday Doctrine, stating that "during a continuous workday, any walking time that occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity is excluded [from the travel exemption], ***and as a result is covered by the FLSA.*** 546 U.S. at 37 (emphasis added); *See also* 29 C.F.R. §§ 778.223 (providing that an employer must compensate an employee for "(a) All time during which an

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

1    employee is required to be on duty or to be on the employer's premises or at a prescribed

2    workplace and (b) all time during which an employee is suffered or permitted to work whether

3    or not he is required to do so"), 785.18 (providing that "[r]est periods of short duration, running

4    from 5 minutes to about 20 minutes, are common in the industry" and "must be counted as hours

5    worked") & 790.6 (defining "workday" as "the period between the commencement and completion

6    on the same workday of an employee's principal activity or activities" "includ [ing] all time within

7    that period whether or not the employee engages in work throughout all of that period").

8            As stated in the previous section, reporting for duty with the Shift Sergeant and receiving

9    assignments and briefings is COs' first principal activity of the workday.  After reporting for

10   duty and receiving assignments and briefings, COs then proceed to pick up their mail and other

11   gear that is necessary for their post (e.g., radio, keys, weapons, restraints), travel to their assigned

12   post, verify the equipment at their assigned post and, if they are relieving an outgoing officer,

13   engage in a direct debriefing.  All of these activities occur after the first principal activity and

14   without compensation prior the start of COs' regularly scheduled shifts.

15           While some COs may have to collect keys and radios prior to proceeding to their assigned

16   post, and others exchange those items at the post, these minor procedural differences do not alter

17   the fact that the workday has begun for all COs because all COs engage in the same first principal

18   activity at each of the seven Prison at issue here.  Any difference in the place where certain gear

19   is retrieved or the length of the  time spent traveling to an assigned post is irrelevant to the

20   question of whether COs should be paid from the time when they report to the Shift Sergeant

21   and get their assignment/briefing.  These perceived "differences" only go to the actual amount

22   of damages that may be recovered, which does not affect the determination of liability or the

23   determination of whether this case should proceed as a collective action under the FLSA. *See*

24   *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 194 L. Ed. 2d 124 (2016); *Vaquero v. Ashley*

25   *Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016) (recognizing that "*Tyson Foods* and

26   our precedent, therefore, the rule is clear: the need for individual damages calculations does not,

27   alone, defeat class certification."); *Adams v. Inter-Con Sec. Sys., Inc.*, 242 F.R.D. 530, 537 (N.D.

28   Cal. 2007) ("The threshold inquiry does not require that the extent of the potential plaintiffs'

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

1   damages be identical or even similar. Whether each plaintiff is due a different amount in damages

2   does not affect whether they were "together the victims of a single decision, policy or plan."

3   (citing *Thiessen*, 267 F.3d at 1102.)).

4       Since NDOC has failed to keep any records on the amount of time COs spent engaging

5   in the activities at issue here, the Supreme Court's decision in *Tyson Foods* dictates that damages

6   can and should be resolved on a collective or class basis.  In *Tyson Foods, Inc.,* the district court

7   had certified a class of employees who claimed that their employer had violated wage and hour

8   laws by failing to pay overtime compensation for time spent donning and doffing protective gear.

9   The employer had failed to keep records of such time, so employees relied on "representative

10  evidence," including employees' testimony, video recordings, and an expert's statistical analysis,

11  to establish both liability *and damages* on a class-wide basis. *Id.* at 1043. The employer

12  challenged the certification of the class, in that case (and likely here), contending that individual

13  inquiries predominated over common questions. *Id.* at 1046. The use of expert statisticians and

14  statistical surveys, it claimed, could not defeat the need for individualized liability

15  determinations for each class member. *Id.* The employer sought a "broad rule against the use in

16  class actions of what the parties call representative evidence." *Id.* The Court declined to establish

17  such a rule. *Id.* It held that a "representative or statistical sample, like all evidence, is a means to

18  establish or defend against liability. Its permissibility turns not on the form a proceeding takes—

19  be it a class or individual action—but on the degree to which the evidence is reliable in proving

20  or disproving the elements of the relevant cause of action." *Id.* The Court held that class

21  certification was appropriate even though class members might have to prove *damages* through

22  representative sampling.  *Id.*

23      **D.      Damages Are Disputed And Will Be Tried**

24      Ultimately, the question of damages is not before the Court at this time.  At trial, Plaintiffs

25  will present (1) testimony of all the named-Plaintiffs, (2) testimony of a representative sample

26  of Opt-In Plaintiffs from each of the seven (7) Prison facilities, (3) video footage of the process

27  to report for duty to the Shift Sergeant and receive instructions/briefings, and (4) testimony from

28

an expert who conducted a random scientific survey of COs, to the trier of fact to make a factual determination as to the amount of time spent engaging in the unpaid activities at issue in this case.

## VI.    <u>CONCLUSION</u>

Based on the aforementioned, the facts are undipsuted that Defendant suffered or permitted Plaintiffs to perform pre- and post-shift work without compensation.  Accordingly, this Motion should be granted so that the question of damages can proceed to trial.

DATED: February 24, 2020.                    Respectfully Submitted,

THIERMAN BUCK LLP

<u>/s/Joshua D. Buck</u>
Joshua D. Buck

Attorneys for Plaintiffs

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com