1  Sheri M. Thome, Esq.
   Nevada Bar No. 008657
2  James T. Tucker, Esq.
   Nevada Bar No. 012507
3  Cara T. Laursen, Esq.
   Nevada Nar No. 014563
4  **WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP**
   300 South 4th Street - 11th Floor
5  Las Vegas, NV 89101-6014
   Telephone: (702) 727-1400
6  Facsimile: (702) 727-1401
   Sheri.Thome@wilsonelser.com
7  James.Tucker@wilsonelser.com
   CaraT.Laursen@wilsonelser.com
8  *Attorneys for Defendants The State of Nevada, ex rel.*
   *its Department of Corrections*

9

10                **UNITED STATES DISTRICT COURT**

11                    **DISTRICT OF NEVADA**

12  DONALD WALDEN, JR., et al., etc.,          CASE NO:   3:14-cv-00320-MMD-WGC

13              Plaintiffs,
                                                **DEFENDANT STATE OF NEVADA *EX***
14        v.                                    ***REL.* DEPARTMENT OF CORRECTIONS'**
                                                **MOTION TO EXCLUDE ALL EVIDENCE**
15  THE STATE OF NEVADA, EX REL. NEVADA         **FROM PLAINTIFFS' EXPERTS, THE**
    DEPARTMENT OF CORRECTIONS, and             **EMPLOYMENT RESEARCH**
16  DOES 1-50,                                  **CORPORATION, MALCOLM COHEN,**
                                                **AND LAURA STEINER**
17              Defendants.

18

19         Defendant The State of Nevada, *ex rel.* Nevada Department of Corrections ("NDOC"), by

20  and through its counsel, hereby moves to exclude the testimony of Plaintiffs' experts, the

21  Employment Research Corporation ("ERC") and its principals Malcolm Cohen, Ph.D. and Laura

22  Steiner.

23         The record evidence demonstrates that the reports prepared from ERC's survey, which was

24  designed and managed by Ms. Steiner on behalf of ERC in this litigation, fails to meet the reliability

25  and relevance requirements of Federal Rule of Evidence 702 and *Daubert v. Merrell*

26  *Pharmaceuticals*, 509 U.S. 579, 589 (1993),[1] as well as the requirements of the residual hearsay rule,

27  Federal Rule of Evidence 807.

28  _____
    [1]  *See generally United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005) ("At this point, Rule 702 has superseded
    *Daubert*, but the standard of review that was established for *Daubert* challenges is still appropriate.").

The survey at issue and the resulting ERC report are precisely the sort of "junk science" that the Court, as the gatekeeper for expert evidence, must keep out.  Indeed, both are textbook examples of marked departures from "generally accepted survey principles" which mandate exclusion as a matter of law.  *Keith v. Volpe*, 858 F.2d 467, 489 (9th Cir. 1988).  Those departures included:

1.     Ms. Steiner's survey failed to follow generally accepted survey principles used by the Ninth Circuit and Your Honor.

2.     Ms. Steiner, who designed the survey, is not qualified and has never been accepted by any court as a survey expert.

3.     Ms. Steiner's survey questions are unclear, imprecise, and biased, using language rejected that courts have rejected as inherently unreliable and generating responses infected by memory and self-interest biases.

4.     Due to the tight control Plaintiffs' counsel exercised over information, Ms. Steiner was ignorant of the underlying universe (or targeted population), which precluded any external validity through the generalization of findings to people who were not surveyed.

5.     Ms. Steiner's ignorance of the universe also kept her from measuring nonresponse bias, to determine whether certain populations of individuals declined to participate in her survey.

6.     The Thierman Buck law firm sent a cover letter informing self-interested respondents of the survey's purpose to support their overtime litigation, giving recipients a monetary incentive to respond and provide information that could enhance their own claimed damages.

The role that Plaintiffs' counsel played in the survey (highlighted by a cover letter from their firm) provides another reason for exclusion.  This is necessary to avoid disqualification of the Thierman Buck firm as material witnesses NDOC is entitled to call at trial if evidence from ERC and its principals are not excluded.  NDOC respectfully submits that its Motion to Exclude all evidence from Plaintiffs' experts ERC, Dr. Cohen, and Ms. Steiner should be GRANTED.  This Motion is supported by the accompanying Memorandum of Law, the exhibits attached hereto, the record evidence, and any further argument the Court may wish to entertain.

**I.    LAURA STEINER DESIGNED THE BIASED AND DEEPLY FLAWED SURVEY DESPITE NEVER BEING A SURVEY EXPERT, SOLELY RELYING UPON CHERRY-PICKED INFORMATION PROVIDED BY PLAINTIFFS' COUNSEL.**

Plaintiffs' counsel retained ERC and its principals, Dr. Cohen and Ms. Steiner, ostensibly "to conduct a survey for the purpose of determining whether or not employees of [NDOC] engaged in off-the-clock activities and the amount of time employees performed work activities for the defendant outside their regularly scheduled shift hours." (**Ex. G**, First ERC Report at 1; *see also* **Ex. J**, Steiner Dep. 102:11-16 (same)).  In Plaintiffs' original Complaint, filed in state court on May 9, 2014, Plaintiffs included the following allegation:

> Upon arriving to the correctional facility and passing through security, which Plaintiffs do not alleged [sic] to be compensable time, Plaintiffs and putative class members were required to report to the supervisor or sergeant on duty for roll-call/check-in, receive their assignments for the day, pass a uniform inspection, and collect any and all tolls that would be needed for their daily assignment (e.g. radios, keys, weapons, tear gas, handcuffs).... Plaintiffs and putative class members would then proceed to their designated work station, which, given the size of the correctional facilities involved, could take up to 15-minutes or more per employee per shift.  Once they arrived at their designated work station, Plaintiffs and putative class members would be briefed by the outgoing correctional officer.  Plaintiffs and putative class members were not compensated for any of this these [sic] pre-shift activities....

(ECF No. 1, Compl. ¶ 17).  Plaintiffs included similar allegations regarding work activities they alleged were unpaid after they completed their shift.  (*Id.* ¶ 18).

Shortly after filing the Complaint, Plaintiffs' counsel prepared one dozen declarations signed by putative class members in summer / fall 2014.  As the Second ERC Report explained in summarizing those declarations, "**All of these class members testified that their work activities before and after their scheduled shifts took at least __30 minutes per day__**.  The declarants shared common activities regardless of their posts, which included briefing/debriefing and walking to and from their posts, reporting to the sergeant on duty, reporting to the muster room, checking mail and picking up and returning equipment." (**Ex. H**, Second ERC Report at 10 (emphasis added)).

The survey mimics the original Complaint and the content of those 2014 declarations.  Although the survey report claims that it attempted "to reduce response bias" (*Id.* at 5), its questions

1586137v.2

"were discussed with Plaintiffs' counsel" before they were finalized (**Ex. J**, Steiner Dep. 125:6-9).[2] Consistent with the critical role that Plaintiffs' counsel played in the ERC report, its "findings" are a mere rubber stamp of the declarations prepared by Plaintiffs' counsel.   In its first report dated November 23, 2015, the ERC's conclusion is strikingly similar to the 30 minutes of time the 2014 declarants claimed was unpaid:

> Based on the survey data, at least 99% of respondents performed work activities before or after their shift.  Respondents spent an average of almost 16 minutes performing work duties before their shift began, and an average of over 12 minutes after their shift ended, **with an average of 28 minutes a day.**

(**Ex. G**, First ERC Report at 9 (emphasis added); *see also* **Ex. J**, Steiner Dep. 93:5-15 (Ms. Steiner admitted the survey finding was "in the ballpark" of the 30 minutes alleged in the declarations)). These two surveys track each other in various ways, stating, "the most common activities performed before work were reporting to supervisor or sergeant on duty/muster … receiving assignments for the day … and collecting tools needed for daily assignments…. [T]he most common activity performed after work was returning tools," followed by "debriefing with the oncoming correctional officer."  (**Ex. G**, First ERC Report at 6-7).

Even though ERC'S survey reports are signed by its two principals, Dr. Cohen and Laura Steiner (*See id.* at 1*;* **Ex. H**, Second ERC Report at 1), Ms. Steiner was the one "responsible for the design and management of the survey and the reporting of the survey" (**Ex. J**, Steiner Dep. 107:22-23) and she personally drafted the survey questions (*Id.* at 125:1-5).  Because of her central role in designing the survey instrument and preparing the ERC report, Ms. Steiner is the one who will be testifying at trial.  (*Id.* at 7:11-15, 12:25-13:4, 34:16-21; *see also id.* at 143:19-20 (representation by Plaintiffs' counsel, Joshua Buck, that "Miss Steiner is expected to personally testify at trial")).

Ms. Steiner's credentials as an expert in surveys are so thin they lack any credibility.  **She has never been approved of as an expert witness in any case, either for statistics or surveys.** (*Id.* at 69:18-22, 70:18-25).  Her education includes a B.A. degree in Comparative Literature and an

---

[2]   Ms. Steiner further testified that "we never let Plaintiffs' counsel draft our survey.  That would be completely unacceptable and a disaster."  (**Ex. J**, Steiner Dep. 125:19-21).  Nevertheless, the omnipresent involvement of Plaintiffs' counsel overwhelmed the process, with survey questions and responses parroting the Complaint and 2014 declarations that counsel provided, as well as playing a preeminent role in the pretest, confirming Ms. Steiner's fears that the bias of counsel's involvement could render the survey and report "completely unacceptable and a disaster." (*Id.*).

M.B.A.  (**Ex. D**, Steiner CV).  In her graduate work, she claimed she took "some courses that involved survey work, the research courses, so I had statistics courses."  (**Ex. J**, Steiner Dep. 40:7-10).  However, she has no publications, peer reviewed or otherwise, in the areas of either surveys or statistics.  (*Id.* at 104:5-11).  She has "only signed the reports in a handful of cases, maybe three to five."  (*Id.* at 71:13-14).  This is the first case in which she has prepared a survey for correctional officers, and only the second involving a state or governmental entity.  (*Id.* at 42:19-23, 109:8-16).  She has only been deposed twice and has never testified at trial (*Id.* at 43:7-20, 68:18-22, 71:14); only one of those cases involved a survey, which was excluded.[3]  There, *Hostetler v. Johnson Controls, Inc.*, 2016 WL 3662263 (N.D. Ind. July 11, 2016) (provided as **Exhibit "C"**), Ms. Steiner prepared the survey instrument that generated the report that was excluded.  (**Ex. J**, Steiner Dep. 45:21-22).  That court barred use of the ERC survey after Dr. Cohen "essentially admitted that he did not apply a reliable statistical methodology to reach his results."  2016 WL 3662263 at *15.  Ms. Steiner has repeated that error in this case.

In constructing the survey, Ms. Steiner failed to perform any meaningful investigation of her subject necessary to draft a valid survey.  She "didn't have a list of the [NDOC] facilities and their populations."  (*Id.* at 138:9-10; *see also id.* at 17:18-19 (same)).  She was unaware of the sizes and layouts of the various facilities (*Id.* at 121:6-11) because no ERC representative had ever been to any of them (*Id.* at 106:6-13).  She had no knowledge about the facilities, such as the operations at the NDOC transitional housing, conservation camps, and boot camps.  (*Id.* at 18:19-19:13, 20:7-10).  She had seen no images, or video of the facilities, such as where the mailboxes are located, to learn what it means when a respondent would "check the mail."  (*Id.* at 88:12-15).  She had not visited a single prison to learn how correctional officers "would come and go and perform their work functions."  (*Id.* at 110:16-20).  As she explained, "can I envision all of these things personally as I'm talking to you right now, probably not.  **I can just guess**."  (*Id.* at 116:10-12 (emphasis added)).

---

[3]  The second case "wasn't a survey case."  (**Ex. J**, Steiner Dep. 68:6-12).  There, the analysis Ms. Steiner performed on behalf of Lynda Howard was never considered by any court.  Plaintiff Howard voluntarily dismissed her claim to pursue binding arbitration.  *See Brister v. Michigan Bell Tel. Co.*, 705 Fed. Appx. 356, 358 n.2 (6th Cir. July 27, 2017).

1    Even the terms Ms. Steiner used in her survey instrument were alien to her, as she was

2    unable to define its terms.  (*See id.* at 117:19-118:13).  All she did was "review testimony and … the

3    complaint and **I assume** that the language that's used there is meaningful to people who are

4    answering the questions."  (*Id.* at 114:21-115:18 (emphasis added)).

5    Instead of conducting an independent investigation to prepare her survey, she relied

6    exclusively on information provided to her by Plaintiffs' counsel.  (*Id.* at 105:9-14).  The documents

7    included: Plaintiffs' 2014 Complaint; ECF No. 115; the 2014 declarations of a dozen Corrections

8    Officers; one NDOC regulation regarding posting of shifts/overtime; the third page of an operating

9    procedure for posting shifts/overtime at one NDOC facility; an e-mail forwarded by Plaintiff Dicus

10   that included a statement about the alleged walk time, once, at a single NDOC facility; and files with

11   contact information about the putative class members.  (*See* **Ex. G**, First ERC Report at 2-3).  Ms.

12   Steiner never spoke to any Corrections Officers before she created the survey.  (**Ex. J**, Steiner Dep.

13   102:8-10), nor did she verify how long it took to walk the distance described in the e-mail she was

14   provided by Plaintiffs' counsel, nor even the facility the e-mail referred.  (*Id.* at 34:8-23).  Simply

15   stated, she performed no investigation other than that which Plaintiffs' counsel had provided before

16   she created the survey.  (*Id.* at 105:9-14; *see also id.* at 20:7-22).

17   The combination of Ms. Steiner's lack of knowledge of correctional work and her reliance on

18   information provided by Plaintiffs' counsel has hurt the survey in many ways.  Survey Question 4

19   was intended to address whether the respondent allegedly performed pre- or postliminary work,

20   phrased the inquiry in a biased manner:

21
22   > Now thinking about your assignments at the Nevada Department of
     > Corrections since 2008, please … listen to … the following list of activities
23   > and … tell me … **each one you have <u>ever done</u>** *after going through the*
     > *security check* and <u>before</u> your scheduled shift start time … or <u>after</u> your
24   > scheduled shift end time …

25   (**Ex. E**, Steiner Survey Instrument at 3 (first emphasis added, remaining emphases in original)).  The

26   survey then asked, "Did you **<u>ever do</u>** any of the following *after* going through security and *before*

27   your scheduled shift start time," listing several activities.  (*Id.* (emphasis added)).  Ms. Steiner's

28   survey similarly asked, "Did you **<u>ever do</u>** any of the following *after* your scheduled shift end time,"

specifying two activities.  (*Id.* (emphasis added)).  The questions were "phrased in terms of did any of these things **<u>ever happen</u>**."  (**Ex. J**, Steiner Dep. 23:3-8 (emphasis added)).  Ms. Steiner explained that in asking the questions, she was "trying to get an incidence among the people of the class of whether these different individual work activities applied to them or not."  (*Id.* at 24:23-25).  Nonetheless, she admitted that the use of "ever" in the questions would have led to an affirmative response even if a claimant had only performed an activity once in their entire NDOC career: "**It is technically possible that a person could have done something <u>once</u>, I suppose that it's, you know, technically possible**."  (*Id.* at 25:1-26:14 (emphasis added)).

This error corrupted the questions asking about the amount of time spent on pre- and post-shift tasks.  If a respondent only performed such activities on one occasion, or even a handful of times, they were asked to identify how long it took.  For example, Question 5 inquired:

> Thinking about any work you did <u>before</u> your scheduled shift started, approximately how long do you think it **<u>typically</u>** took you between the time you passed security until the scheduled shift start time?  Please include any walking time after you checked in and received your assignment.  *Please provide your answer in minutes.*

(**Ex. E**, Steiner Survey Instrument at 3 (bold underlined emphasis added, emphases in original)).  That error was compounded by the use of the word "typically," which offered no explanation of tis meaning.  (*See id.*).  Indeed, Ms. Steiner herself offered a contradictory answer based on an unproven assumption of how a respondent might interpret what is "typical":

> I mean when we use a word like typically, **we assume** that someone is going to answer … it's not an average.  But there are three types of averages, you have medians, modes and means.  And typical is kind of like a mode.  So it's most often or what you usually do ….  So I wouldn't expect that someone would answer typically with something they only did half the time or, you know, rarely did.

(**Ex. J**, Steiner Dep. 53:6-21 (emphasis added)).

However, the language of her survey belies this assumption.  In using the word "typically," Question 5 did not ask what usually happened during the respondent's work day.  Rather, it explicitly directed the respondent to offer an estimate by only "Thinking about ***any work*** you did <u>before</u> your scheduled shift started …" (**Ex. E**, Steiner Survey Instrument at 3 (bold italics emphasis

added, remaining emphasis in original)).  The directions to focus on "any work" repeated the error of asking if a respondent had "ever done" the listed activities; if a respondent performed "any work" before a shift on just one occasion, the question directed the respondent to estimate "approximately how long … it typically took" to perform that work on a single occasion.  (*Compare id.* with **Ex. J**, Steiner Dep. 25:1-26:14).  The same flawed inquiry is found in Question 7, which asks about the "typical" amount of time spent on "any work" done after a shift ends.  (**Ex. E**, Steiner Survey Instrument at 3).  Ms. Steiner assumed the time was spent on that activity ***each work day***.

Ms. Steiner's failure to learn basic information about the activities she was supposed to measure also created question confusion among respondents.  For example, while 89.5 percent of respondents reported that prior to their shift, they received "assignments for the day," just 61.9 percent reported "Meeting with shift commanders for daily briefing."  (**Ex. I**, Appendix F: Work Activities Before and After Scheduled Shift (Final Wave)).  Ms. Steiner explained her error:

> At the time that I wrote the survey, I was thinking that these were two separate activities.  Having reviewed additional information, it's possible that people were thinking of receiving assignments ….  I guess there could be some overlap in these two categories, that they could receive, if they received their assignments for the shift commanders and had the daily briefing at the same time ….  I suppose that people could have considered meeting with the shift commanders into receiving assignments for the day and that could account for why it was lower.  They could have called that receiving assignments and not having a separate meeting with the shift commanders.

(**Ex. J**, Steiner Dep. 98:20-99:24).  Despite the far lower response for meeting with the shift commander raising concerns about confusion arising from the question error, Ms. Steiner does not "know why it's lower" and "didn't ask additional questions about it."  (*Id.* at 100:17-22).

Ms. Steiner erred again in describing these activities, and failing to grasp the idea that respondents might be aggregating time for tasks that were to be measured separately.  She included activities to make respondents "think of what all the different things are to make their estimate more accurate."  (*Id.* at 120:17-20)  However, due to her ignorance of the tasks performed, she failed to frame the questions or illustrative examples correctly:

> But I did not take into account if one person, you know, took two minutes to return pepper spray and one person took two minutes to return keys, I didn't take that into account and say, Did the two minutes, did that mean you were

> returning pepper spray or you were returning keys.  I don't have that level of
> detail in my survey other than in the comments.

(*Id.* at 120:21-121:2).  Even though the activities being measured were performed at the same time, respondents that treated them separately were given additional time included "in the average amount of time based on the responses." (*Id.* at 121:3-5).  Ms. Steiner's survey also failed to explore how much time might be spent on tasks at different NDOC facilities, while acknowledging that some of the respondents worked at multiple facilities.  (*Id.* at 128:21-23).  Indeed, Question 3 of her survey asked respondents to identify "your location and job post for each year you worked since May 12, 2008." (**Ex. E**, Steiner Survey Instrument at 2).  However, the survey had no mechanism to account for differences in tasks and the amount of time spent on those tasks at varying facilities.  (*See id.*).

Similarly, the survey did not account for respondents working at multiple facilities *at the same time*.  (*See id.*).  For example, two of the seven named Plaintiffs, Aaron Dicus and Daniel Tracy, each work at three different NDOC facilities.  (ECF No. 95, Am. Compl. ¶ 10; **Ex. L**, Deposition of Aaron Dicus, 14:19-25, 15:1-4).  The survey offers no way to identify pre- and post-shift activities and the time spent on those activities at each separate facility.  Instead, Ms. Steiner again assumed respondents would answer the questions without knowing how to address this issue:

> I would expect that they would average their time, and so they'd basically
> know what time they typically got to work and what time their shift typically
> started, and that's the kind of number that they would be giving me.  So that's
> what I would expect.

(**Ex. J**, Steiner Dep. 128:24-129:11).  Simply put, Ms. Steiner could have accounted for assignments of the Respondents to multiple facilities and allowed them to report separately, but failed to do so.

Ms. Steiner's survey also suffered from recall bias, as well.  In her words, "Recall bias refers to people having difficulty remembering things that happened a long time ago." (*Id.* at 128:2-5).  This bias permeated the survey in at least two ways.  First, recollection of specific events or activities, such as those identified in her survey, "decreases at a geometric rather than arithmetic rate (so passage of time has a *highly* distorting effect on recollection)."[4]  Second, it was present because

---

[4]  *Krist v. Eli Lilly & Co.*, 897 F.2d 293, 296-97 (7th Cir. 1990) (quoting findings made by Elizabeth Loftus) (emphasis in original).

1586137v.2

of Vierordt's Law: when respondents are asked to recall events retrospectively, they tend to overestimate short time intervals, such as the activities of shorter duration she purported to measure.[5] Nevertheless, in commenting on the respondents, **she admitted that her survey "relies on their memories and their experiences."** (*Id.* at 54:19-23).   At the same time, she conceded that in measuring overtime pay that might be owed, "… often, it's best not to ask respondents questions if the data is available" (*Id.* at 136:4-9), presumably because the respondents would overstate how much time they believed they had worked years earlier allegedly without getting paid for it.

**Yet, the most puzzling aspect of her survey is that lacked any external validity** (i.e, the extent to which survey findings may be generalized to those who either were not surveyed or did not respond): "To what populations, settings, treatment variables, and measurement variables" can the effect being measured be generalized.[6]  In other words, to have external validity, it must be capable of being generalized to the class of Respondents who did not complete a survey.

On the one hand, Ms. Steiner testified that her team "contacted a representative sample of class members and used standard sampling techniques" to produce "reliable information." (*Id.* at 67:10-12).  Yet, she also admitted that she had not been asked to extrapolate the survey data to apply it to the entire class. (*Id.* at 67:13-15; *see also id.* at 47:4-7).  Ms. Steiner testified that to do that, she "**would like to also receive information about the underlying universe, such as, for example, something that could be really helpful would be <u>a list of all of the potential class members and what facilities they worked in</u>** …" (*Id.* at 46:16-47:1 (emphasis added)).[7]  She also explained why having the data Plaintiffs' counsel kept from her is critical: "[I]t's not the people you survey … it's comparing the people that you survey to the people that you don't survey.  **So that's why you need it on an entire universe.**" (*Id.* at 66:12-23 (emphasis added)).

---

[5]   *See* Fortin & Rousseau, *Interference from Short-Term Memory Processing on Encoding and Reproducing Brief Durations*, 61 PSYCHOL. RES., 269-76 (1998).

[6]   D.T. CAMPBELL & J.C. STANLEY, EXPERIMENTAL AND QUASI-EXPERIMENTAL DESIGNS FOR RESEARCH 5 (Chicago: Rand-McNally 1963).

[7]   Ms. Steiner contradicted herself by testifying despite her lack of knowledge of the known universe, she nevertheless believed she could "draw conclusions about the class."  (**Ex. J**, Steiner Dep. 47:1-3).  As discussed below, this contention is contrary to generally accepted survey practices, which require knowledge of the universe (or targeted population) to be able to conduct a reliable survey.  *See infra* Parts V-VI.

Moreover, her failure to know the universe of people and places to be surveyed **left her unable to assess potential non-response bias**. The term "non-response bias" means that "[i]f persons who respond differ substantially from those who do not, the results do not directly allow one to say how the entire sample would have responded – certainly an important step before the sample is generalized to the population."[8] She explained the impact that a lack of data had on knowing whether the sampling overrepresented or underrepresented workers at NDOC facilities:

> And then another thing that's really helpful, we talked about data that hasn't been received. If I have underlying data on characteristics of the population, then I can, you know, I can take that into account in my survey design. So I can make sure that I have, you know, I can over sample if I'm concerned, if I wanted to report something about a particular subgroup.

(**Ex. J**, Steiner Dep. 64:11-17 (emphasis added); *see also id.* at 138:3-11 (same)). Because Ms. Steiner was not provided this data by Plaintiffs' counsel,[9] she did not conduct any bias testing. (*See* **Ex. G**, First ERC Report at 4).

**Ms. Steiner failed to even know what the "underlying universe" was, much less survey it properly, repeating her error in *Hoestetler*:** "there was an issue where they had said that the universe wasn't correctly defined and that's why our survey wasn't valid." (**Ex. J**, Steiner Dep. 58:18-21). Ms. Steiner did not learn from her mistake.

Moreover, all the survey purported to generate was that each respondent reported that they were not paid for 28 minutes of pre- and post-shift time worked, on average. (*See id.* at 83:15-84:6). It did not apply to every worker. (*See id.*). **Ms. Steiner's survey was "not meant to determine, by the way its language is formulated … the minutes being claimed for overtime apply to every worker on every day worked …"** (*Id.* at 54:3-7 (emphasis added)). To do so, she needed to examine whether "…Plaintiff had kept time cards or had written down somewhere exactly when they came in or if they had punched [a time clock] when they go to the gate …" (*Id.* at 54:3-12).

---

[8] J. Scott Armstrong & Terry S. Overton, *Estimating Nonresponse Bias in Mail Surveys*, 14 J. MKTG. RES. 396 (Aug. 1977). *Compare with* **Ex. J**, Steiner Dep., at 81:2-4 (describing the importance of non-response bias testing because "you want to make sure that the people who didn't answer aren't really different from the people who answered.").

[9] Plaintiffs' counsel had the data and information about the universe of Corrections Officers and the facilities at which they worked, but apparently did not provide it to Ms. Steiner or her team.

Nevertheless, she still offered an opinion of how much unpaid overtime was owed through a "damages illustration" that was "[b]ased on the survey answers."  (**Ex. G**, First ERC Report at 8).  Here, she assumed that all 220 survey respondents[10] were not paid an average of 28 minutes of overtime each day they worked for 50 weeks each year and that all of that time was owed at 1.5 times the respondent's regular hourly rate.  (*See id.* at 8-9; *see also* **Ex. J**, Steiner Dep. 49:21-51:5).

     **Ms. Steiner's ignorance of "the underlying universe … of all of the potential class members and what facilities they worked in"** (**Ex. J**, Steiner Dep. 46:16-47:1), **prevented her from securing a reliable sampling using her flawed survey.**  Additionally, the sample she used was drawn from "the time period … from May 12, 2008 to the present."  (**Ex. G**, First ERC Report at 3; *see also* **Ex. J**, Steiner Dep. 74:19-20 (same)).  Also, she was unaware that discovery in this matter was limited to the three-year limitations period covered by the Fair Labor Standards Act ("FLSA"),[11] (i.e., those employed on or after May 12, 2011.)  (*Id.* at 36:13-38:2 & Ex. 8).  Similarly, she surveyed people who opted out of the collective action: "The universe of people who answered the survey is including people … who did not opt into the case."  (*Id.* at 90:3-8).  Thus, she relied upon the responses of non-participating respondents to make her findings.  (*Id.* at 94:2-8).

     Ms. Steiner also sampled claimants who worked at small NDOC facilities (*Id.* at 130:6-9), even though Plaintiffs now seek to remove them from this action (*See* ECF No. 129).[12]  The people she surveyed were drawn solely from contact information that Plaintiffs' counsel provided her.  (*See* **Ex. G**, First ERC Report at 2, item 7 under "Documents reviewed"; **Ex. J**, Steiner Dep. 105:9-14).

     Because Plaintiffs' counsel did not provide her with "a list of the facilities and their populations," she could not have known whether those who were randomly selected were typical of

---

[10]  The 220 respondents referred to by Ms. Steiner included 39 respondents in the "pretest" of the survey and 181 respondents in the "final wave" of the survey.  (*See* **Ex. G**, First ERC Report at 4).  For the reasons discussed below, Plaintiffs' counsel's involvement in the pretest biased the results of all the survey respondents.

[11]  The FLSA provides for a two-year limitations period for "unpaid overtime compensation, or liquidated damages" except in cases in which it is alleged that there is a "willful violation," which has a three-year limitations period.  29 U.S.C. § 255(a).

[12]  Ms. Steiner claimed that she could resolve the inclusion of workers who were not in the class by "just go[ing] into my survey, find who worked at a conservation camp, and recalculate the statistic based without those people."  (**Ex. J**, Steiner Dep. 129:12-22; *see also id.* at 130:6-10 ("it's easy enough to remove it and recalculate.")).

all of class members, much less what that universe even was.  (*Id.* at 137:13-138:11).  "The survey was conducted in two waves, a pretest and final wave." (**Ex. G**, First ERC Report at 3).

Plaintiffs' counsel manufactured the "pretest wave," infusing bias into Ms. Steiner's flawed survey.  ERC randomly selected 200 people from the contact list provided by Plaintiffs' counsel, of whom 39 responded.  (*See id.* at 2-4). "These individuals were sent a mail survey and cover letter …" (*Id.* at 3).  **The cover letter went out under the letterhead for the Thierman Buck Law Firm and was signed by Plaintiffs' counsel, Mark Thierman.**  (**Ex. F**, Thierman Buck Survey Cover Letter; *see also* **Ex. J**, Steiner Dep. 13:22-14:6 (same); *id.* at 55:3-9 (Ms. Steiner was unsure if the letter from Plaintiffs' counsel's firm was the first communication respondents received "because … I'm only familiar with … what's sent out by the process I was involved in.")).  The content of this letter left no question that the survey was being conducted by an interested party:

> We are contacting current and former employees of the Nevada Department of Corrections in order **to conduct research regarding overtime hours worked during the time period from May 12, 2008 to the present**.  The research is being carried out by Employment Research Corporation of Ann Arbor, Michigan, **in conjunction with a lawsuit regarding unpaid overtime.**

(**Ex. F**, Thierman Buck Survey Cover Letter (emphasis added)).

This passage shows that respondents could receive a financial gain by providing answers that are favorable to a "lawsuit regarding unpaid overtime."  (*See id.*).  The letter goes on to state that, "By carefully and honestly answering the survey questions, you will provide important information about the hours you worked for the Nevada Department of Corrections from 2008 to present." (*Id.*).

The letter included contact information for the Thierman Buck law firm, which raises the possibility that its attorneys could be material witnesses in this action if any evidence about the survey is not struck.  (*See id.*).

**Thus, correspondence with potential respondents came directly from Plaintiffs' counsel, emphasizing the importance of accurately reporting hours to be used "in conjunction with a lawsuit regarding unpaid overtime" against NDOC is <u>antithetical to a double-blind study that reveals neither the litigation purpose nor the survey proponent to respondents</u>.**[13]

---

[13]  Ms. Steiner did not address that implementation error other than by rationalizing that if any of those surveyed were

Ms. Steiner explained that the "pretest wave" was done "to make sure that the questions, the program is working properly." (**Ex. J**, Steiner Dep., 28:25-29:3). Yet, despite the flaws in her survey, she made no changes to the content of the form thereafter. (*Id.* at 30:13-20; 76:11-16). The only change made for the "final wave" was that the survey was conducted via telephone because of the low response rates for the mail and Internet options. (*See id.* at 55:24-56:8; **Ex. H**, Second ERC Report at 5; *see also id.* at 6 (in pretest, only one response received online and six by mail)).

For the "final wave," **ERC used Bennett Research, the same Ann Arbor, Michigan company that conducted Ms. Steiner's excluded survey in *Hostetler*.** (*See* **Ex. G**, First ERC Report at 3 n.1; **Ex. J**, Steiner Dep. 57:16-58:1). The protocols used by Bennett ultimately have no bearing here because the company used the same defective survey Ms. Steiner prepared to conduct its phone interviews. (*See* **Ex. E**, Steiner Survey Instrument).

In the "final wave," 886 current and former officers were contacted, 181 of whom completed a survey. (*See* **Ex. G**, First ERC Report at 4). Ms. Steiner contends in this "final wave" that "[n]o compensation was offered or provided for answering the survey." (*Id.* at 4). However, the "final wave" came after Plaintiffs' counsel already had contacted 200-plus Officers in the "pretest wave," asking them to "provide important information about the hours you worked" for use "in conjunction with a lawsuit regarding unpaid overtime." (**Ex. F**, Thierman Buck Survey Cover Letter).

It is safe to conclude that at least some employees who received the letter from Plaintiffs' counsel told other putative class members that their participation in the survey could lead to financial gain. Indeed, **the results of Ms. Steiner's survey show a strong correlation between whether a respondent opted into the lawsuit for those financial gains and their time estimates**. Among the 220 respondents in both waves, 49 were plaintiffs who had opted into the litigation and 171 were respondents who had not opted in. (**Ex. K**, Crandall Rebuttal Decl. at 14). The data for those respondents show that for pre-shift activities, "zero opt-ins reported 5 minutes or less versus 15.2% of non-opt-ins." (*Id.*). Equally profound, **30.6 percent of opt-ins reported unpaid pre-shift time of less than 15 minutes, compared to 69 percent of non-opt-ins**. (*See id.*). A similar bias

---

current employees who might be "worried about retaliation, justified or not, then I don't feel comfortable to not disclose who's conducting the survey." (**Ex. J**, Steiner Dep. 62:7-22). She did not provide any response to the letter's reference to overtime litigation or its bias in suggesting a financial incentive for responding to the survey. (*See id.*).

emerged in how respondents reported unpaid post-shift time, with only 32.7 percent of opt-ins reporting 10 minutes or less, compared to 55.9 percent of non-opt-ins.  (*See id.*).  This bias held true even among those working at the same NDOC facility.  (*See id.* at 15).  When respondents believed they could get se a monetary recovery through this case, their time estimates increased dramatically.

In summary, these facts show that Ms. Steiner's survey is deeply flawed and biased and that all evidence pertaining to it must be excluded.

## II.   MS. STEINER'S SURVEY DID NOT FOLLOW GENERALLY ACCEPTED SURVEY PRINCIPLES USED BY THE NINTH CIRCUIT AND YOUR HONOR.

F.R.E. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provide principles for admission of expert evidence.  Under *Daubert*, the Court performs a "gatekeeping function" to find whether F.R.E. 702 has been met.  *See id.* at 597; *see also* F.R.E. 104(a) ("Preliminary questions concerning the qualification of a person" to be an expert witness "or the admissibility of evidence shall be determined by the court.").  This role includes assessing whether the "expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  F.R.E. 702(a).  The testimony must be "based on sufficient facts or data."  and must be "the product of reliable principles and methods" that have been "reliably applied … to the facts of the case."  F.R.E. 702(b), (c), (d).

Survey results may be admissible "if relevant, either as nonhearsay or through a hearsay exception."  *Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp. of Cal.*, 694 F.2d 1150, 1155 (9th Cir. 1982).  Ms. Steiner's survey is "unquestionably hearsay"[14] because it is being offered for the truth of the matter asserted; namely, "for the purpose of determining whether or not employees of … NDOC… engaged in off-the-clock activities and the amount of time employees performed work activities…"  (**Ex. G**, First ERC Report at 1; *see also* **Ex. J**, Steiner Dep. 102:11-16 (same)).   As such, the survey must be analyzed under the residual hearsay rule.  *See Schering Corp. v. Pfizer, Inc.*, 189 F.3d 218, 231-39 (2d Cir. 1999); Fed. R. Evid. 807.

---

[14]   *Pittsburgh Press Club v. United States*, 579 F.2d 751, 757 (3d Cir. 1978).  *Pittsburgh Press* is a seminal decision for admission of survey evidence.  For the Court's convenience a copy of that decision has been provided as **Exhibit "B."**

Federal courts evaluate hearsay survey evidence with FRE 702, which requires that the proponents of a survey "show that the survey was conducted in accordance with generally accepted survey principles and that the results were used in a statistically correct manner." *Keith*, 858 F.2d at 489. "In the context of … surveys, the circumstantial guarantees of trustworthiness are for the most part satisfied if the poll is conducted in accordance with generally accepted survey principles, and if the results are used in a statistically correct way, since proper survey and statistical methods are intended to assure … reliability." *Pittsburgh Press*, 579 F.2d at 758; *see also* Fed. R. Evid. 807(a)(1) (listing "circumstantial guarantees of trustworthiness" as one of the requirements under the residual hearsay rule). Where there are large design defects in the survey or its execution is deficient, then the survey should be excluded in its entirety. *See Pittsburgh Press*, 579 F.2d at 758.

The Ninth Circuit has not adopted a standard test for determining whether a survey has been conducted reliably. However, the Ninth Circuit[15] and Your Honor[16] routinely evaluate survey evidence through factors outlined in a publication of the Federal Judicial Center. *See* Shari Seidman Diamond, *Reference Guide on Survey Research*, *in* FEDERAL JUD. CTR., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 359-423 (3d ed. 2011) ("*Reference Guide*") (provided as **Exhibit "A"**). Ms. Steiner acknowledged her familiarity with the *Reference Guide*, although she could not identify its publisher or source publication. (*See* **Ex. J**, Steiner Dep., 46:1-15). She has "seen it before," but there is no indication that she has read it or understands its contents, much less that she has ever employed the methodology it describes. (*Id.*).

The *Reference Guide* provides a detailed elaboration of the standards for admissibility of surveys long followed by Federal Courts:[17] The proffered expert who designed, conducted, or analyzed the survey must qualify and be recognized as a survey expert. *Reference Guide* at 375. Survey questions must be designed so they are clear, precise, and unbiased. *Id.* at 387-95. An

---

[15] *See, e.g.*, *Elliott v. Google, Inc.*, 860 F.3d 1151, 1160 (9th Cir. 2017).

[16] *See, e.g.*, *United States v. 400 Acres of Land*, 2017 WL 4797517 at *6 (D. Nev. Oct. 24, 2017) (Du, J.); *Sanchez v. Cegavske*, 214 F. Supp.3d 961, 970 n.4 (D. Nev. 2016) (Du, J.).

[17] *See* Judicial Conference of the United States, *Handbook of Recommended Procedures for the Trial of Protracted Cases*, 25 F.R.D. 365, 429 (1960) ("*Handbook*") (summarizing several of the factors in a single paragraph). The standards from the *Reference Guide* closely track those identified in the *Handbook*.

appropriate target population (or universe) must be identified and examined. *See id.* at 376-77. The sampling frame from which the survey sample is drawn must approximate the target population, with selection of a sample that accurately represents that population. *See id.* at 377-83. "[A]n attorney should have no part in carrying out the survey" and should be excluded from having any communications with respondents in the survey process. *Id.* at 374. "[I]t is standard interview practice in surveys conducted for litigation to do double-blind research whenever possible: Both the interviewer and the respondent are blind to the sponsor of the survey and its purpose." *Id.* at 410-11. The surveyor must evaluate biases in the survey, particularly nonresponse bias "to determine as much as possible the extent to which nonrespondents differ from the respondents" to see if those differences would affect generalization of the findings to the target population. *Id.* at 383-87.

Plaintiffs, as the party offering the proposed testimony and report by Ms. Steiner and ERC, bear the burden of establishing their admissibility. *See Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). Yet, Plaintiffs utterly fail to meet it. Ms. Steiner falls far short in qualifying as a survey expert, as is apparent from her myriad departures from "generally accepted survey principles," *Keith*, 858 F.2d at 489, outlined in the *Reference Guide*. The key survey questions she asked about performing pre- and post-shift work were biased and flawed for the reasons outlined above. Ms. Steiner's questions also suffered from recall bias, where respondents were asked to provide estimates of short duration activities often occurring years earlier.

Although Ms. Steiner purported to use standard sampling techniques, she could not have applied them appropriately because she did not even know what she was trying to measure. Indeed, her ignorance precluded her from identifying non-response bias. Thus, she failed to determine if her survey findings could even be reliably applied to anyone who was not surveyed.

Moreover, the critical role that Plaintiffs' counsel played in concocting "supportive" results is seen in the tight control over the information they provided to Ms. Steiner and their firm's cover letter that accompanied all of the pretest survey information. Plaintiffs' counsel effectively made themselves witnesses in this case through their communications with those who received the survey and their cover letter. The bias that counsel injected into the survey is the antithesis of a double-blind study; both interviewers and respondents knew about the litigation purpose of the survey and

the monetary incentive they had to inflate the estimates provided they provided in response. Consequently, any evidence offered about the survey and the ERC report must be excluded for failing to comply "with generally accepted survey principles" producing "results … used in a statistically correct manner." *Keith*, 858 F.2d at 489.

### III.   MS. STEINER, WHO DESIGNED THE SURVEY, IS NOT QUALIFIED AND HAS NEVER BEEN ACCEPTED BY ANY COURT AS A SURVEY EXPERT.

"[T]he persons conducting the survey must be experts." *Pittsburgh Press*, 579 F.2d at 758. That inquiry focuses on the qualifications of the person designing, conducting, and analyzing the survey. Information regarding the qualifications of the firm employing the surveyor is irrelevant. *See, e.g.*, *Warner Bros. Entm't v. Global Asylum, Inc.*, 2013 WL 12114836 at *7 (C.D. Cal. Jan. 29, 2013) (citation omitted); *M2 Software, Inc. v. Madacy Entm't*, 2003 WL 25667611 at *4 (C.D. Cal. Jan. 3, 2003) (proffered witness "may not defeat the expert qualifications requirements by reference to the alleged expertise" of others including survey research firms). Therefore, any qualification data Plaintiffs may seek to introduce regarding Dr. Cohen and ERC are irrelevant. By her own admission, Ms. Steiner was "responsible for the design and management of the survey and the reporting of the survey," including personally drafting the survey questions. (**Ex. J**, Steiner Dep. 107:22-23, 125:1-5). Thus, Ms. Steiner is unqualified to be a survey expert.

"Experts prepared to design, conduct, and analyze a survey generally should have graduate training in psychology … sociology, political science, marketing, communication sciences, statistics, or a related discipline…" *Reference Guide* at 375. Ms. Steiner has a B.A. degree in Comparative Literature and an M.B.A. Formal "training should include courses in survey research methods, sampling, measurement, interviewing, and statistics." *Id.* All Ms. Steiner could identify taking was "some courses that involved survey work" and "statistics" when she pursued her graduate degree some 27 years ago.[18] (**Ex. J**, Steiner Dep. 40:7-10; *see also* **Ex. D,** Steiner CV). Thus, while Ms. Steiner is seemingly well educated, she lacks any training qualifying her to be a survey expert.

---

[18] *Compare with Fish v. Kobach*, 2018 WL 276767 at *7 (D. Kan. Jan. 3, 2018) ("A single undergraduate class thirty years ago and a policy paper critical of another survey is simply insufficient" to qualify as a survey expert), and *Madacy Entm't*, 2003 WL 25667611 at *4 (Witness failed to qualify as a survey expert where his education included "an MBA from Wharton," his "only training relating to consumer surveys consisted of one marketing course with some survey content," his statistics training "consists merely of an introductory statistics course" he completed as an undergraduate,

Ms. Steiner's credentials, when combined with her involvement in this survey, fail to "demonstrate an understanding of foundational, current and best practices in survey methodology," particularly in the arena of sampling and survey design. *Reference Guide* at 375. She has no publications on surveys or statistics, nor any credentials on any appointed panels or advisory panels in either area, of any kind. *See id.* "Work[ing] on at least two dozen survey-related cases" and signing – at best – "three to five" survey reports "in a handful of cases" (**Ex. J**, Steiner Dep. 70:22-71:20), simply falls short of demonstrating the "appropriate qualifications for creating a survey." *Ameritox, Ltd. v. Millennium Labs., Inc.*, 2014 WL 12623025 at *3 (M.D. Fla. May 29, 2014).

Her lack of qualifications also explain why she has never testified at trial or been accepted by any federal court as an expert. Her lone foray into federal court resulted in the exclusion of the evidence from a facially deficient survey. *See Hostetler*, 2016 WL 3662263 at *16 (the "expert report is inadmissible under Rule 702 because it failed to reliably apply a reliable methodology"). Because Ms. Steiner is not qualified as an expert statistician or survey expert, her creation of a survey that neither complied with accepted survey research methods nor produced reliable results requires its complete exclusion from this matter.

## IV.   MS. STEINER'S SURVEY QUESTIONS ARE UNCLEAR, IMPRECISE, AND BIASED, WHICH REQUIRES EXCLUSION OF ALL SURVEY EVIDENCE.

"As with any scientific research, the usefulness of the information obtained from a survey depends on the quality of research design." *Reference Manual* at 367. That requires survey questions to be clear, precise, and unbiased. *Id.* at 387. "When unclear questions are included in a survey, they may threaten the validity of the survey by systematically distorting responses if respondents are misled in a particular direction, or by inflating random error if respondents guess because they do not understand the question." *Id.* at 388. Proper survey questions are critical.

Ms. Steiner's lack of knowledge of the respondents' work assignments led to fatal errors in her questions. She was completely unfamiliar with NDOC terminology and information about the respondents, other than what Plaintiffs' counsel fed her. *See supra* pages 8-14 (summarizing Ms. Steiner's detailed admissions of her ignorance of NDOC terminology, facilities, job responsibilities,

---

and he identified no publications or precious court acceptance of him as an expert).

1586137v.2

and Plaintiffs' duty assignments).  That, in turn, led her to follow the direction Plaintiffs' counsel wanted.  As a result, Ms. Steiner's questions departed from generally accepted norms for survey design, rendering all of the results from her survey inadmissible.

A.     **Ms. Steiner's ambiguous use of "ever" in her two core questions and improperly interpreting answers to those questions to mean "always," requires exclusion.**

Ms. Steiner's two core questions do not comport with generally accepted survey methods, requiring exclusion of the data they produced.  Questions 4a and 4b were only supposed to measure whether the respondent allegedly performed pre- or post-shift work, not the frequency that they did so.  Nevertheless, ERC analyzed the responses to those questions to assume that a "yes" answer to either question meant that unpaid work always occurred during each shift.

Specifically, both questions ask with respect to a series of activities before or after the respondent's start time whether the respondent has "**ever done**" or will "**ever do**" those activities (**Ex. E**, Steiner Survey Instrument at 3), and whether those activities "**ever happen**." (**Ex. J**, Steiner Dep. 23:3-8).  She admitted that a respondent would answer these questions "yes" if they performed a pre- or post-shift activity just one time in their entire career.  (*See id.* at 25:1-26:14).  Ms. Steiner's error in using the word "ever" in her foundational questions, leads to unreliable and biased results.[19]

Courts routinely exclude surveys that use similar questions.  For example, in one matter, evidence of a survey was barred because it asked the question, "have you ever ordered anything from one of the following … companies" and it improperly assumed – as is the case here – that even if something happened once, the response applied to each occurrence.  *UPS*, 2016 WL 4735368, at *7 n.11.  The *UPS* Court explained why her error in using the word "ever" in her screening questions requires exclusion of the survey:  Through the use of "ever," it was "clear that if a respondent received more than one package and only one of the two in fact contained cigarettes, the second package should not have been assumed to have contained cigarettes, yet it was."  *Id.* at *8.

---

[19]  The need to avoid absolute questions is well accepted in the survey community.  Even online survey tools inform novice surveyors not to use them.  *See generally* Surveytown, *10 Examples of Biased Survey Questions*, "#4: The Absolute Question," *available at* https://surveytown.com/10-examples-of-biased-survey-questions/ ("Yes or no answers can keep respondents from leaving unbiased feedback.… The absolute question usually only has the option of a yes or no answer. It also commonly includes words such as 'all,' 'always,' '**ever**' and 'every'") (emphasis added).

The same is true here:  **Ms. Steiner's use of "ever" wrongly assumes that if a respondent performed pre- or postshift activities once or just a handful of times, that they *always* performed those activities**.  In other words, the built-in bias treats a single instance as if it happened every time – even in the presence of cues it did not – greatly inflating Plaintiffs' damages.

    **B.**    **Ms. Steiner's questions asking for "typical" time estimates are ambiguous and produce answers routinely excluded by federal courts as inherently unreliable.**

Questions 5 and 7 of Ms. Steiner's survey exacerbate the bias in Question 4 by asking the respondent to estimate "for **any** work" performed before or after a shift, "how long do you think it **typically** took" to perform those tasks.  (**Ex. E**, Steiner Survey Instrument at 3 (emphasis added)).  Again, these questions ask for a time estimate for a work task, even if performed on one occasion.

In a recent decision from this Circuit, a court found that a survey questionnaire using the same language "was not conducted according to 'accepted principles.'"  *Casey v. Home Depot*, 2016 WL 7479347 at *20 (C.D. Cal. Sept. 15, 2016).  The *Casey* court explained that it found "the survey's **questions about the 'typical' amount of time devoted to work and specific work activities was out of step with established survey methodology… [V]arious studies hold that such questions <u>carry a high risk of eliciting erroneous answers</u>**."  *Id.* (emphasis added).

Other Ninth Circuit courts agree, especially when the word "typical" is used in survey questions asking for time worked.  For example, in an FLSA case, a survey asked, "How many hours did you work in the ***typical*** week when you worked as an Account Executive for [Defendants] between January 20, 2002 and December 31, 2004?"  *Wallace v. Countrywide Home Loans, Inc.*, 2012 WL 11896333 at *5 (C.D. Cal. Aug. 31, 2012) (emphasis in original).  The court agreed with the assessment that "'typical' is an ambiguous term that may mean 'most frequently occurring' rather than a mathematical average, which is the metric at issue in this case."  *Id.*  Even the drafter of the survey admitted this ambiguity, explaining that "'typical' only elicits 'an estimate that probably is going to be near the average,' but theoretically could be double or triple the average."  *Id.*

The ambiguous nature of the word of "typical" was something Ms. Steiner acknowledged in this case, explaining that she "expected" that respondents "would average their time."  (**Ex. J**, Steiner Dep. 128:24-129:11).  But that does not resolve the ambiguity.  **A respondent who**

**"considers 'typical' to be the same as 'average' says nothing about whether his answer to the question regarding a 'typical' workweek elicited information about his mathematically average workweek."** *Wallace*, 2012 WL 11896333 at *5 (emphasis added). Here, her feeble response that she could only "assume" that respondents would decipher her confusing questions (**Ex. J**, Steiner Dep. 53:6-21), confirms that all information about the survey must be excluded through the distorting effects the questions had on the answers. *See Casey*, 2016 WL 7479347 at *20-21; *Wallace*, 2012 WL 11896333 at *5. "If the crucial question is sufficiently ambiguous or unclear, it may be a basis for rejecting the survey." *Reference Manual* at 388.

> **C.    Activities reported by respondents working at multiple NDOC facilities were assumed to be the same even when they differed, requiring exclusion.**

Question 3 of Ms. Steiner's survey asked respondents to identify "your location and job post for each year you worked since May 12, 2008." (**Ex. E**, Steiner Survey Instrument at 2). However, the survey did not provide a way to account for differences in the tasks and the amount of time spent on those tasks across different facilities. (*See id.*). She conceded that no instructions were given to respondents who worked at more than one facility on how they should answer Questions 4, 5, and 7, which asked for time estimates for pre- and post-shift activities. Instead, in another departure from generally accepted survey standards, Ms. Steiner left it to the respondents to figure it out and "assumed they would average their time" between facilities. (**Ex. J**, Steiner Dep. 128:24-129:11).

This error was avoidable if Ms. Steiner simply had become familiar with the assignments of the Corrections Officers she was surveying and provided a way for respondents to report separate responses for each facility at which they worked. By not providing that option, her ambiguous questions "systematically distort[ed] responses … or … inflat[ed] random error" by making respondents "guess because they do not understand" how to answer. *Reference Manual* at 388. It is yet another mistake that renders these survey results unusable. *See UPS*, 2016 WL 4735368 at *8.

> **D.    Activities performed simultaneously were assumed to be performed separately to inflate Plaintiffs' estimated damages, requiring exclusion of the survey.**

Ms. Steiner also treated all activities that respondents performed simultaneously as if they were discrete acts, which inflated the time estimates provided. Although Ms. Steiner was aware of

this bias, she took no action to correct it.   (*See* **Ex. J**, Steiner Dep. 98:20-99:24, 100:17-121:2; *supra*

pages 9-10).   As a result, if an Officer received a briefing and equipment while checking in with his

or her supervisor, Ms. Steiner treated these as three activities that each added time to unpaid wage

estimates. (**Ex. J**, Steiner Dep. at 120:21-121:2).   Even though the activities being measured may

have been performed at the same time, respondents that treated them separately may have had that

additional time included "in the average amount of time based on the responses."  (*Id.* at 121:3-5).

This basic error also requires that all evidence from the survey be excluded.  *See Reference Manual*

at 387-88; *see also id.* at 393-94 (questions are biased if "choices are not constructed properly").

### E.   Memory bias infected Ms. Steiner's survey, requiring exclusion of its results.

"Memory" surveys, which are "designed to collect information about a past occurrence based

on the recollections of the survey respondents," are unreliable, as compared with other evidence.

*Reference Manual* at 363-64 n.13.   Ms. Steiner acknowledged the danger that recall bias posed

because it required "remembering things that happened a long time ago."  (**Ex. J**, Steiner Dep. at

128:2-5).  She also admitted that "often, it's best not to ask respondents questions" about how many

hours they worked if other data "is available."  (*Id.* at 136:4-9). Yet, that is precisely what she did in

her survey, asking the respondents to rely "**on their memories and their experiences**."  (*Id.* at

54:19-23).

Federal courts have repeatedly derided survey results based on answers subject to recall bias

and self-serving answers.  The court in *Pittsburgh Press* explained these infirmities:

> It therefore appears that [the] survey suffers from a severe dearth of any
> circumstantial guarantees of trustworthiness.  Both hearsay dangers faulty
> memory and insincerity loom large in the … poll.  The respondents were not
> asked for a present impression; rather they were being asked for details about
> banquets which had taken place years before.  In fact the covering letter,
> recognizing that the members' memories might be "dimmed or imperfect,"
> nevertheless asked for a "best recollection…"  The respondents were all
> interested in [the plaintiff] prevailing in the lawsuit.  Yet they were expressly
> advised about the nature of the litigation and the survey, as well as which
> answers would benefit [the plaintiff].

579 F.2d at 759.

Those same barriers to reliability are even more prevalent in this matter.  It is undisputed that many survey respondents knew about its litigation-related purpose and their self-interest in providing favorable responses.  *See infra* Part VII.  **Respondents who were surveyed in the fall of 2015 were asked to recall events occurring each day they worked going back to May 12, 2008, *as much as 90 months earlier*.**  (**Ex. F**, Thierman Buck Survey Cover Letter; **Ex. E**, Steiner Survey Instrument at 2; *see also* **Ex. J**, Steiner Dep. 75:8-76:4 (survey conducted from September to November 2015)).  **Respondents were asked to remember how much time they spent on the most banal daily events as "receiving assignments," "checking mailbox," and "collecting tools" literally years later**.  (**Ex. E**, Steiner Survey Instrument at 3).  The survey makes no effort to provide "memory aids" other than the respondent's "guesses" because no aid to improve accuracy could be used.  (*See id.*).

In summary, Ms. Steiner not only knew about – but explicitly relied upon – the recall bias of self-interested respondents to support Plaintiffs' pre-determined results and inflate their damages. Accordingly, all evidence from the Steiner survey must be excluded for this reason.  *See Pittsburgh Press*, 579 F.2d at 759.

## V.     MS. STEINER'S UNAWARENESS OF THE FACTUAL UNIVERSE PRECLUDED MEANINGFUL SAMPLING AND ANY EXTERNAL VALIDITY.

"'The first step in designing a survey … is to determine the 'universe' to be studied,' that is, the segment of the population whose perceptions and state of mind are relevant in this case." *Valador, Inc. v. HTC Corp.*, 242 F. Supp.3d 448, 459 (E.D. Va. 2017) (quoting 6 MCCARTHY ON TRADEMARKS § 32:159); *Pittsburgh Press*, 579 F.2d at 758 ("A proper universe must be examined and a *representative* sample must be chosen") (emphasis in original).  "This first step is crucial – even asking 'proper questions' in a 'proper manner' is likely to render irrelevant results if the survey probes the 'wrong persons.'"  *Valador*, 242 F. Supp.3d at 459.

Here, Ms. Steiner admitted that she had no information about the target population or universe.  In particular, she conceded that it would have been "really helpful" to formulating her survey if she had "a list of all of the potential class members and what facilities they worked in …" (**Ex. J**, Steiner Dep. at 46:16-47:1).  Without that data, any random sampling she conducted from the

limited information Plaintiffs' counsel provided to her was meaningless.  There was simply no way for Ms. Steiner's incomplete sampling frame to approximate a target population she did not have. *See Reference Manual* at 377.  Her error in not identifying "the proper target population or universe" violates a principle that "is recognized uniformly as a key element in the development of a survey." *Id.* at 376 n.76.  Without knowing the universe, her survey has no external validity and must be excluded.  *See generally id.* at 377-78 ("A survey that provides information about a wholly irrelevant population is itself irrelevant" and courts "are likely to exclude the survey or accord it little weight").

## VI.    MS. STEINER'S UNAWARENESS OF THE FACTUAL UNIVERSE PRECLUDED MEASURING NONRESPONSE BIAS, REQUIRING THE SURVEY'S EXCLUSION.

"[T]he point of the survey evidence is to allow the trier of fact to draw classwide inferences from the information obtained from the respondents.  In order to ensure that such inferences are valid, not only must the survey begin with a random sample, but nonresponses must also be random." *Wallace*, 2012 WL 11896333 at *4.  Here, Ms. Steiner admitted that no classwide inferences could be drawn from her survey.  (**Ex. J**, Steiner Dep. at 54:3-7.)  But even if that was not the case, **Ms. Steiner admitted that she conducted no bias testing, including for nonresponse bias.**  (*See* **Ex. G**, First ERC Report at 4; **Ex. J**, Steiner Dep. 64:11-17, 138:3-11).  She could not do so because she did not even know the universe underlying her sample.  (*See supra* Part V.)

Measuring nonresponse bias is critical to any survey to determine whether nonrespondents differ from the respondents such that any findings cannot be generalized to the universe or target population.  *Reference Manual* at 383-87.  "A survey that 'begins with a random sample,' but does not 'take measures to assure that nonresponses are random and provide analysis of the reasons of nonresponse,' is not 'the product of reliable principles and methods.'"  *Wallace*, 2012 WL 11896333 at *4 (quoting *Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 485 (C.D. Cal. 2008)).  "[I]t is the survey proponent's burden to assure that the nonresponses are random."  *Wallace*, 2012 WL 11896333 at *4.

Plaintiffs, through Ms. Steiner and ERC, have not – and cannot – meet their burden of showing the absence of disqualifying nonresponse bias.  Like *Wallace*, this basic error precludes any consideration of Ms. Steiner's survey.  "Indeed, in light of the problem regarding self-interest bias,

described below [in Part VII, *infra*], it would be more accurate to assume that those who chose to respond had a particular experience or motivation that those who failed to respond did not have." 2012 WL 11896333 at *4.  The survey results themselves establish that self-interested bias.  (**Ex. K**, Crandall Rebuttal Decl. at 14).  Consequently, Ms. Steiner's survey must be excluded.

## VII.   THIERMAN BUCK INFORMED SELF-INTERESTED RESPONDENTS OF THE SURVEY'S LITIGATION PURPOSE FOR THEIR LAW FIRM, REQUIRING EXCLUSION OF THE SURVEY AND ALL ITS RESULTS.

Double-blind research requires that neither the interviewer nor the respondent know the survey's sponsor or its purpose.  *Reference Manual* at 410-11; *Pittsburgh Press*, 579 F.2d at 755-60. All efforts should be made to avoid communicating that information to ensure that respondents do not know the "expectations or what they believe are the preferred responses of the survey's sponsor." *Reference Manual* at 410.  For those reasons, attorneys should have no involvement with a survey or communicating their involvement to its recipients.  *Id.* at 374.  Where attorneys are involved in the administration of a survey, "Not surprisingly, courts have refused to allow surveys made under such circumstances, usually rejecting them on grounds of being unreliable hearsay." *Dukes v. Wal-Mart, Inc.*, 222 F.R.D. 189, 197 (N.D. Cal. 2004) (collecting cases).

Here, the Thierman Buck law firm directly violated the "important" tenet that "the survey must be conducted independently of the attorneys involved in the litigation."  *Pittsburgh Press*, 579 F.2d at 758.  Plaintiffs' counsel injected themselves into this survey by communicating directly to respondents their involvement and its litigation purpose.  **Two hundred current and former NDOC Corrections Officers were sent a mail survey accompanied by a cover letter from the Thierman Buck law firm signed by Plaintiffs' counsel, Mark Thierman.**  (**Ex. G**, First ERC Report at 3; **Ex. F**, Thierman Buck Survey Cover Letter; *see also* **Ex. J**, Steiner Dep. 13:22-14:6). In his letter, Thierman informed survey recipients it was being conducted "**in conjunction with a lawsuit regarding unpaid overtime.**"  (**Ex. F**, Thierman Buck Survey Cover Letter (emphasis added)).  He encouraged a response regarding "overtime hours worked during the time period from May 12, 2008 to the present."  (*Id.*).  This was not a subtle request, informing respondents of the financial gain they could receive by providing answers favorable to a "lawsuit regarding unpaid

overtime." (*See id.*).  This letter even included contact information for his firm, which allowed recipients to contact the attorneys directly if they decided to participate in the case.  (*See id.*).

**Courts addressing the bias injected by the sponsoring attorney into a survey have found that sufficient by itself to exclude all findings from the survey as unreliable.**  Plaintiffs' counsel went through the façade of Ms. Steiner preparing the survey, but controlled all information provided to her to arrive at the results they desired.  *See supra* pages 8-14.  Yet, even absent that bias, the Thierman Buck letter alone requires exclusion of all evidence about the survey.   In *Hurt v. Commerce Energy, Inc.*, 2015 WL 410703 (N.D. Ohio Jan. 29, 2015), the court encountered an attorney's communication strikingly similar to the Thierman Buck cover letter:

> The cover email alerted every individual who received it that it was from Plaintiffs' counsel for use in a "lawsuit for unpaid wages and unpaid overtime" and that the responses would be used "to properly seek recovery for [the recipient]."  This enhanced the likelihood that the respondents would inflate the hours they worked in order to increase the damages they would recover.

*Id.* at *4; *compare with* **Ex. F**, Thierman Buck Survey Cover Letter.

Similarly, in *Pittsburgh Press*, the Third Circuit found a survey was inadmissible where the respondents were all interested in pending litigation and "were told the precise nature of the litigation and the purpose of the survey," allowing the respondents to know "which responses would be helpful."  579 F.2d at 751.  Other courts have reached the same conclusion where confronted with counsel's communications that biased any findings and rendered them unreliable.  *See*, *e.g.*, *Gibson v. County of Riverside*, 181 F. Supp.2d 1057, 1069 (C.D. Cal. 2002) (attorney communications with respondents informed them "before filling out the survey that responding to the survey could help" litigation in which they had an interest, which were "substantial and fundamental" deficiencies that lacked "guarantees of trustworthiness required by Rule 807"); *Dukes*, 222 F.R.D. at 197-98 (same); *Blakey v. Continental Airlines, Inc.*, 1997 WL 1524797 at *7 (D.N.J. Sept. 9, 1997) (excluding results of questionnaire that identified the sponsor and told respondents about biased litigation purpose).  Thus, Ms. Steiner's survey is inadmissible as a matter of law, based on the bias inflicted upon it by the Thierman Buck letter.

The bias caused by the Thierman Buck letter is demonstrable from the survey results. Respondents who opted into the litigation consistently gave much higher estimates of how much time they contended they were not paid during each shift.  For example, **30.6 percent of opt-ins reported unpaid pre-shift time of less than 15 minutes, compared to 69 percent of non-opt-ins**. (**Ex. K**, Crandall Rebuttal Decl. at 14).  That self-interested bias was evident even when comparing opt-ins and non-opt-ins who worked at the same NDOC facility.  (*See id.* at 15).  When respondents believed they could get money from NDOC through the litigation, their time estimates increased dramatically.  *See generally Casey*, 2016 WL 7479347 at *21 ("complete exclusion" was required for survey that informed respondents "that they could receive money from the lawsuit and may have given biased responses to the survey's questions").

Ms. Steiner cannot avoid the consequences of the Thierman Buck firm's communication by simply disregarding responses from the 200 recipients of the Thierman letter.  The Pandora's box already had been opened to bias their survey.  Thus, there is no way to know how many of those contacted by telephone in the "final wave" were unaware of the Thierman Buck letter and the litigation-related purpose of the survey.  The damage has been done by the Thierman Buck law firm. Their direct communications with survey recipients requires exclusion of all evidence of the survey.

## VIII.   THE SURVEY RESULTS MUST BE EXCLUDED TO AVOID DISQUALIFICATION OF THIERMAN BUCK ATTORNEYS, WHO ARE MATERIAL WITNESSES NDOC IS ENTITLED TO CALL AT TRIAL.

Exclusion of the survey and its results is the only option for the Court to avoid disqualifying the Thierman Buck law firm as Plaintiffs' counsel in this case.  If evidence of the survey is not excluded, then attorneys from the Thierman Buck law firm are material witnesses in this case whose testimony would be needed to impeach the survey.  The Thierman Buck law firm injected itself into the survey through their letter informing recipients about the potential monetary recovery to be had in this matter (**Ex. F**, Thierman Buck Survey Cover Letter).  Mr. Thierman personally signed the letter, which bore the firm's letterhead and provided his law firm's contact information. (*See id.*).

NDOC is entitled to examine attorneys from the Thierman Buck law firm to explore their administration of the survey, including all communications stemming from the survey cover letter. Unfortunately, the only way for Thierman Buck law firm to avoid the consequences of its decision to

inject itself into the survey is for the Court to exclude all evidence from it in all respects.   Other courts have found that to avoid disqualification, exclusion is appropriate.   *See generally Elliott v. Google Inc.*, 45 F. Supp.3d 1156, 1168 (D. Ariz. 2014) ("Even if the surveys were admissible, their introduction at trial would require the testimony of [Plaintiffs' counsel], which would preclude him from acting as an advocate").   To mitigate this damage, exclusion is the best option available.

/ / /

/ / /

/ / /

1    **IX.    NDOC'S MOTION TO EXCLUDE SHOULD BE GRANTED TO BAR ALL EVIDENCE OF MS. STEINER'S BIASED AND UNRELIABLE SURVEY.**

2

3        Plaintiffs have failed to meet their burden of showing that Ms. Steiner's "survey was

4    conducted in accordance with generally accepted survey principles and that the results were used in

5    a statistically correct manner."  *Keith*, 858 F.2d at 489.  Because of the defects in the survey and its

6    execution, it must be excluded.  *See id.* at 480.  Accordingly, NDOC respectfully submits that its

7    Motion to Exclude all evidence from Plaintiffs' experts, ERC, Dr. Cohen, and Ms. Steiner, must be

8    GRANTED.

9

10        DATED this 8th day of April, 2020.

11                                          **WILSON ELSER MOSKOWITZ**
                                           **EDELMAN & DICKER** LLP

12

13                              BY:  */s/ James Tucker*
                                    James T. Tucker
14                                   Nevada Bar No. 12507
                                    300 South 4th Street - 11th Floor
15                                   Las Vegas, NV 89101-6014
                                    *Attorneys for Defendants The State of Nevada,*
16                                   *ex rel. its Department of Corrections*

17

18

19

20

21

22

23

24

25

26

27

28

1586137v.2

**CERTIFICATE OF SERVICE**

Pursuant to FRCP 5(b), I certify that I am an employee of WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP and that on the 8th day of April, 2020, I electronically filed and served a true and correct copy of the foregoing **DEFENDANT STATE OF NEVADA EX REL. DEPARTMENT OF CORRECTIONS' MOTION TO EXCLUDE ALL EVIDENCE FROM PLAINTIFFS' EXPERTS, THE EMPLOYMENT RESEARCH CORPORATION, MALCOLM COHEN, AND LAURA STEINER** to all parties on file with the CM/ECF:

Mark R. Thierman, Esq.
Joshua D. Buck, Esq.
Leah L. Jones, Esq.
THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
Tel: 775-284-1500
Fax: 775-703-5027
*Attorneys for Plaintiffs*

Christian Gabroy, Esq.
Kaine Messer, Esq.
GABROY LAW OFFICES
The District at Green Valley Ranch
170 South Green Valley Parkway, Suite 280
Henderson, NV 89012
Telephone: (702) 259-7777
Fax: (702) 259-7704
*Attorneys for Plaintiffs*

By:     */s/ Lani Maile*
        An Employee of WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

1586137v.2