1
2
3
4
5
6
7
8
9
10
11

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

NATHAN ECHEVERRIA, *et al.*,

                              Plaintiffs,

        v.

STATE OF NEVADA, *et al.*,

                              Defendants.

Case No. 3:14-cv-00320-MMD-CSD

ORDER

I.      **SUMMARY**

        Plaintiffs, who are current and former guards and other employees at Nevada state prisons, sued the State of Nevada, *ex rel.* the Nevada Department of Corrections ("NDOC") in this collective action primarily brought under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA") to recover compensation for time spent allegedly preparing for, or wrapping up, their work shifts. (ECF No. 95.) Before the Court for decision are several motions: (1) NDOC's refiled motion to seal (ECF No. 397);[1] (2) NDOC's motion to decertify this FLSA collective action (ECF No. 343);[2] (3) Plaintiffs' motion for partial summary judgment on liability for unpaid wages under FLSA (ECF No. 346);[3] (4) NDOC's motion for summary judgment (ECF No. 355);[4] (5) NDOC's motion to dismiss all non-participating Plaintiffs (ECF No. 354);[5] and (6) NDOC's refiled motion to

---

[1]Plaintiffs do not oppose the motion. (ECF No. 402.)

[2]Plaintiffs filed a response (ECF No. 367); NDOC filed a reply (ECF No. 376).

[3]NDOC filed a response (ECF No. 363); Plaintiffs filed a reply (ECF No. 370).

[4]Plaintiffs filed a response (ECF No. 366); NDOC filed a reply (ECF No. 373).

[5]Plaintiffs filed a response (ECF No. 360), and NDOC filed a reply (ECF No. 379).

1  exclude all evidence from Plaintiffs' experts employed by the Employment Research
2  Corporation (ECF No. 395).[6] As further explained below, this case will proceed towards
3  trial as a FLSA collective action, but the Court will narrow it in certain ways because of
4  the Court's rulings on the pending motions.

5  **II.    BACKGROUND**

6  As this case was filed in 2014, the Court first describes its procedural history
7  before discussing the factual background pertinent to the pending motions.

8  **A.    Procedural History**

9  Plaintiffs filed this case in Nevada state court in May 2014. (ECF No. 1 at 7-21.)
10  NDOC removed the case to this Court the following month. (*See generally id.*) Plaintiffs
11  filed a motion for conditional certification of this case as a FLSA collective action on
12  August 6, 2014. (ECF No. 7.) United States District Judge Larry R. Hicks granted that
13  motion on March 16, 2015. (ECF No. 45.) The notice that Judge Hicks approved to be
14  sent to prospective collective action members specified that "'Consent to Join form[s
15  must be returned by] by June 30, 2015, [or] you may not be able to participate in this
16  lawsuit." (ECF No. 48 at 6.)[7] The Court subsequently granted the parties' stipulated
17  request in October 2015 to allow Plaintiffs' counsel to send out notice to 131 employees
18  at Northern Nevada Correctional Center ("NNCC") because the initial mailing had
19  inadvertently excluded them, which gave those people up to 55 days from the date of the
20  order to file their opt-in consents to join the collective action. (ECF No. 75 at 3.)

21  In April 2015, NDOC moved for judgment on the pleadings. (ECF No. 49.)
22  However, the Court denied that motion without prejudice in the event the parties were
23  unable to resolve this dispute (ECF No. 81) when it approved their stipulation to stay the
24  case pending mediation (ECF No. 80). Mediation was unsuccessful. (ECF No. 343 at 3.)

25

26  _____

27  [6]Plaintiffs filed a response (ECF No. 404); and NDOC filed a reply (ECF No. 406).

28  [7]Judge Hicks recused shortly after approving the notice (ECF No. 50), and this
case was reassigned to the Court (ECF No. 51).

Thus, in April 2016, the parties asked the Court to continue the stay of the case (ECF No. 83) until the Court ruled on NDOC's refiled motion for judgment on the pleadings (ECF No. 86). The Court granted that request. (ECF No. 85.)

The Court then granted NDOC's refiled motion for judgment on the pleadings in March 2017, but gave Plaintiffs leave to amend their claims. (ECF No. 94.) Plaintiffs timely filed an amended complaint in April 2017 (the "FAC") that remains the operative complaint in this case. (ECF No. 95.)

NDOC filed a motion to dismiss the FAC in May 2017 along with a motion to strike some of Plaintiffs' claims. (ECF Nos. 98, 99.) The Court denied the motion to strike, but granted in part, and denied in part, the motion to dismiss in March 2018.[8] (ECF No. 166.) As pertinent here, the Court held that, based on the allegations in the FAC, the following preliminary, required activities were compensable work under the FLSA, in part because they are integral to Plaintiffs' job duties as correctional officers: (1) "check-in and receipt of assignments" (*id.* at 13); (2) "retrieving tools and gear" (*id.*); (3) "uniform inspection" (*id.*); and (4) "walking from check-in, receipt of assignment, and tool collection to an officer's assigned post for the day" under the continuous workday doctrine (*id.* at 14). Similarly, the Court held that the postliminary activities of walking back from the officer's post and returning any tools or gear are also compensable work under FLSA. (*Id.*)

For further background as to this case's procedural history, the Court also ruled in that same order (*id.*) that NDOC had waived sovereign immunity by removing this case (*id.* at 1-2). NDOC appealed that decision. (ECF No. 176.) In October 2018, the Court granted NDOC's unopposed motion to stay pending NDOC's appeal and denied several motions pending at that time, substantively similar to the currently pending motions, without prejudice to refiling upon resolution of the appeal. (ECF No. 215.)

In October 2019, the Ninth Circuit affirmed the Court's holding that NDOC's decision to remove this case waived its sovereign immunity but clarified that it was only

---

[8]The Court incorporates by reference its description of the allegations in the FAC from that order here. (ECF No. 166 at 3-5.)

holding that Nevada waived its sovereign immunity from suit by removing the case. (ECF No. 224.) The Ninth Circuit amended its opinion in December 2019.[9] (ECF No. 240.) In any event, following issuance of the Ninth Circuit's mandate (ECF No. 241), and the Court's order on the mandate (ECF No. 242), the Court lifted the stay again (ECF No. 243).

In April 2020, the Court granted Plaintiffs' motion to voluntarily dismiss certain opt-in Plaintiffs who only worked at NDOC conservation camps and transitional housing facilities, along with any claims based on time worked at those locations. (ECF No. 271.) The scope of this case narrowed significantly following that order because only Plaintiffs who worked at any of the seven following NDOC prisons have claims remaining in this case: "(1) Ely State Prison [("ESP")], (2) Florence McClure Women's Correctional Center [("FMWCC")], (3) High Desert State Prison [("HDSP")], (4) Lovelock Correctional Center [("LCC")], (5) [NNCC], (6) Southern Desert Correctional Center [("SDCC")], and (7) Warm Springs Correctional Center [("WSCC")]." (*Id.* at 2 n.3.) Similarly, any claims remaining are now only based on time that a particular plaintiff worked at one of those seven prisons. (*Id.* at 4-5.)

In April and May of 2020, the parties essentially refiled the dispositive motions that the Court had previously denied without prejudice while the Ninth Circuit appeal was pending. However, in an order issued in July 2020, the Court again denied all of those motions without prejudice and stayed the case after deciding to certify a question to the Nevada Supreme Court as to whether Nevada had waived its sovereign immunity from damages when it removed this case. (ECF No. 321.)

The Nevada Supreme Court answered the certified question in an opinion dated September 16, 2021. (ECF No. 335.) *See also Echeverria v. State*, 495 P.3d 471 (Nev. 2021) ("*NSC Opinion*"). In that opinion, the Nevada Supreme Court held as a matter of first impression that "Nevada has waived the defense of sovereign immunity to liability

---

[9]NDOC later sought to appeal this decision to the United States Supreme Court but the Court denied NDOC's petition for a writ of certiorari. (ECF No. 324.)

4

under the FLSA." *Id.* at 473. The court noted that NRS § 41.031(1) "provides for certain exceptions to, and limitations on" Nevada's waiver of sovereign immunity. *Id.* at 476. The court then interpreted the statute as waiving "the State's immunity from liability unless an express exception to the waiver applies." *Id.* However, the court noted that NDOC "disclaimed any argument that an express exception to the waiver applies[,]" and accordingly did not address the applicability of any exceptions to the waiver. *Id.* The balance of the opinion addresses and rejects NDOC's argument that the waiver was limited to only tort liability, and not statutory liability such as that premised on FLSA. *See id.* at 476-77.

The Court again lifted the stay in late September 2021 following issuance of the *NSC Opinion.* (ECF No. 337.) The parties then filed the pending motions in November 2021.

However, the Court has issued two orders since November 2021. (ECF Nos. 392, 400.) One order denied in pertinent part NDOC's motions to seal and motion to exclude all evidence from Plaintiffs' experts who work for the Employment Research Corporation without prejudice to refiling for noncompliance with the Court's Local Rules and applicable law. (ECF No. 392.)[10] The other denied Plaintiffs' motion to reassert their claim for failure to pay overtime in violation of NRS § 284.180. (ECF No. 400.)

In sum, despite the advanced age of this case, several partially dispositive motions are now before the Court for decision for the first time.

### B.    Factual Background

The following facts are undisputed unless otherwise noted. As mentioned, remaining Plaintiffs are correctional officers at seven prisons operated by NDOC. (ECF No. 346 at 8.) All Plaintiffs must undergo a security screening before entering each prison. (*Id.*)

///

---

[10]Pursuant to this order, NDOC refiled compliant versions of these motions that the Court discusses herein. (ECF Nos. 395, 397.)

NDOC shift sergeants are responsible for staffing the prisons, and they are required to 'post shifts,' or tell individual employees where they will be working that shift, up to 30 minutes before the beginning of each scheduled shift. (*Id.* at 8-10.) Per their job descriptions, shift sergeants must also conduct roll call (verify attendance) at the beginning of each shift to make sure the prisons are adequately staffed. (*Id.* at 10.)

Plaintiffs must report to duty before their scheduled shift starts and check in, in-person, with their shift sergeant. (*Id.* at 10-12.) If the shift sergeant has any pertinent information to share with Plaintiffs, the shift sergeant will pass that information on at check in. (*Id.* at 11-12.) Plaintiffs must also arrive for work in a uniform that complies with administrative regulations, and the shift sergeant can inspect their uniform and ask them to make any necessary changes at the time of check in, or at any point during their shift. (*Id.* at 12.)

After checking in, Plaintiffs must check their mailboxes and then gather any required tools and gear before proceeding to their assigned post for their shift. (*Id.* at 12-17.) Plaintiffs must then walk to their assigned post. (*Id.* at 17.) If Plaintiffs are relieving someone at their assigned post, the outgoing officer debriefs the incoming Plaintiff (this is called 'pass down') with any information the incoming Plaintiff will need for that shift. (*Id.*) Once pass down occurs, the relieved officer may have to return tools and gear (if they picked them up at the beginning of their shift), walk back to the main control, and go back through security to leave the prison and return home. (*Id.* at 17-18.)

NDOC maintains a system of shift and pay reporting known as NEATS ("Nevada Employee Action and Timekeeping System"). (*Id.*) NEATS is an "exception" reporting system, which means that an employee only reports when he/she does not work. (*Id.*) Because NDOC uses NEATS, NDOC only pays correctional officers for their assigned shift time (unless there is an exception such as reported and approved overtime). (*Id.*) NDOC does not require correctional officers to record their time worked by clocking-in/out of a timekeeping system. (*Id.*) And while it is disputed as to whether Plaintiffs requested overtime for the pre and postliminary tasks at issue in this case and described

1  above, as well as why they may not have, there is no dispute that they were not paid for

2  the time at issue here. (ECF No. 366 at 8-16; *see also* 363 at 4.) Relatedly, there is no

3  dispute that at least some Plaintiffs received overtime at least some of the time they

4  requested it, when they followed NDOC's required process, which involves filling out a

5  form called a "DOC-100." (*Id.*)

6  **III.   DISCUSSION**

7  The Court first addresses the motions filed in the following order: NDOC's refiled

8  motion to seal; NDOC's motion to decertify; the parties' motions for summary judgment;

9  NDOC's motion to dismiss non-participating Plaintiffs; and NDOC's motion to exclude

10  Plaintiffs' survey and testimony from the experts hired to administer and then present it.

11  **A.  Motion to Seal**

12  NDOC filed a consolidated motion to seal in line with the Court's order denying its

13  prior motions to seal without prejudice to refiling those motions as a consolidated motion

14  that applied the proper legal standard and included the requisite particularized showing

15  as to why each document sought to be filed under seal should be filed under seal. (ECF

16  No. 397 at 1-2.) NDOC identified a number of exhibits at the end of its consolidated

17  motion to seal that it no longer wishes to file under seal. (*Id.* at 14-17.) The Court will

18  accordingly direct the Clerk of Court to unseal those docket entries.[11]

19  As to the remainder of the documents NDOC sought—and seeks—to file under

20  seal, NDOC explains that they directly implicate prison safety and security, because they

21  reveal "'sources and methods' taken to enter a facility, the layout of certain facilities, the

22  processes utilized to pick up equipment, the location of certain security equipment, and

23  locations within buildings that are not meant for entry or exit by offenders." (*Id.* at 3.) The

24

25

26

27

28

[11]The fact that NDOC narrowed its sealing request also tends to show that NDOC scrutinized its original sealing requests under the appropriate standard before refiling the motion to seal. Separately, the Court was unable to locate the ECF references for the documents listed in the tables under section headings III and IV (ECF No. 397 at 16-17). It is therefore ordered that NDOC must file a new motion if it determines additional documents should be unsealed, specifying by ECF reference (*e.g.*, ECF No. 378-1) which documents should be unsealed.

Court agrees that prison safety and security are compelling reasons justifying the filing of these documents under seal. *See, e.g.*, *Kennedy v. Watts*, Case No. 3:17-cv-0468-MMD-CLB, 2019 WL 7194563, at *2 (D. Nev. Dec. 23, 2019) (granting motion to seal, noting, "[c]ourts generally defer to the judgement of prison officials in the matters of security[,]" and concluding that "[b]alancing the need for the public's access to information regarding plaintiff's records against the need to promote plaintiff's confidentiality and institutional safety and security weighs in favor of sealing these exhibits.").

Moreover, NDOC included a helpful series of tables in its consolidated motion to seal that make particularized showings as to why each document should be filed under seal. (ECF No. 397 at 4-12.) This is an additional factor weighing in favor of finding that NDOC met the compelling reasons standard to support sealing. *See, e.g.*, *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (requiring that the compelling reasons be "supported by specific factual findings") (citation omitted). Further, Plaintiffs do not oppose NDOC's sealing requests because making the documents NDOC now seeks to file under seal publicly available could create a security risk. (ECF No. 402 at 2-3.) This too weighs in favor of granting the consolidated motion to seal.

In sum, NDOC's consolidated motion to seal (ECF No. 397) is granted.

## B.    NDOC's Motion to Decertify

As noted *supra*, Judge Hicks conditionally certified a class in this collective action back in 2015 for the purpose of sending out notice to potential class members. (ECF No. 45.) NDOC now moves to decertify this collective action. (ECF No. 343.) However, as an initial matter, NDOC relies on the wrong standard in its motion to decertify. (*Id.*) NDOC specifically relies on *Sargent v. HG Staffing, LLC*, 171 F. Supp. 3d 1063, 1072 (D. Nev. 2016) (ECF No. 343 at 4-5), but *Sargent* was expressly abrogated by the Ninth Circuit in *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1119-10, 1113-20, 1113 n.17, 1118

n.22 (9th Cir. 2018).[12] The Court will accordingly evaluate NDOC's decertification arguments under the correct standard provided in *Campbell*.

For purposes of NDOC's motion to decertify, the key question is whether Plaintiffs are similarly situated. "'[P]arty plaintiffs are similarly situated, and may proceed in a collective, to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims.'" *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 948 (9th Cir. 2019), *disapproved of on other grounds by Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (quoting *Campbell*, 903 F.3d at 1117). "Significantly, as long as the proposed collective's "factual or legal similarities are material to the resolution of their case, dissimilarities in other respects should not defeat collective treatment."' *Id.* (quoting *Campbell*, 903 F.3d at 1114). Moreover, "to the extent decertification and summary judgment on the merits present the same question, it should be the ordinary summary judgment standard, rather than a preponderance-of-the-evidence standard, that applies." *Campbell*, 903 F.3d at 1119. The Court is accordingly prohibited from weighing evidence going to the merits under those circumstances. *See id.*

This is also the case here, where NDOC's arguments as to why decertification is appropriate overlap with its arguments as to why it is entitled to summary judgment, and why Plaintiffs are not entitled to partial summary judgment on their FLSA claim. (*Compare* ECF No. 343 with ECF Nos. 355 and 363.) But the Court will nonetheless address NDOC's two primary arguments raised in its motion to decertify in this Section. First, NDOC argues that Plaintiffs are all subject to and repeatedly must acknowledge an exception-reporting policy where they only get paid for overtime if they fill out a form. (ECF No. 343 at 7-12.) Similarly, NDOC argues, the named Plaintiffs requested and

_____

[12]NDOC acknowledges *Campbell* in a footnote relatively early on in its motion but nonetheless presses ahead, with the rest of its motion based primarily on *Sargent*. (ECF No. 343 at 4 n.1.) NDOC otherwise argues that the Court could still decertify this case even under *Campbell* because the collective action mechanism is truly infeasible here. (*Id.*) As further explained below, the Court disagrees.

were paid overtime on various occasions, so they knew how to use the system. (*Id.*
Second, NDOC argues that Plaintiffs are not similarly situated because they work in
different prisons with different sizes and layouts, leading to different amounts of walking
and requiring Plaintiffs to engage in different tasks. Similarly, NDOC argues each
Plaintiff is subject to individualized defenses because they have different managers who
might not have known whether that particular Plaintiff was working off the clock. (ECF
No. 343 at 13-21.)

*Campbell* renders both arguments unpersuasive. Like Plaintiffs here, the plaintiffs
in *Campbell* were all subject to written policies that required them to record all overtime
they worked, and there was no dispute that the officers understood it. *See Campbell*,
903 F.3d at 1102. Moreover, the defendant in *Campbell* submitted a report with its
motion to decertify showing that many officers like the plaintiffs submitted overtime
reports, including for amounts of time less than one hour. *See id.* at 1103. Again, NDOC
makes a similar proffer here. But the police officer plaintiffs' argument in *Campbell* was
that, despite the written policy requiring them to report overtime, there was a tacit,
unwritten, department-wide policy discouraging them from doing so, particularly for
relatively short preliminary and postliminary activities. *See, e.g.*, *id.* at 1116. And "[i]f that
allegation were adequately supported by the record, the 'similarly situated' requirement
would have been met." *Id.*

However, it was not, so the *Campbell* court ultimately affirmed the district court's
decision to decertify the collective action. *See id.*; *see also id.* at 1120-21. The *Campbell*
court explained that there was no "evidence of any directives, incentives, conversations,
emails, or actions (such as denials of promotions) by Department leadership that could
have communicated to local supervisors, implicitly or otherwise, a uniform policy against
reporting small amounts of overtime." *Id.* at 1120. Thus, *Campbell* involved some similar
facts, and those facts would not have prevented the Ninth Circuit from deciding that case
should have proceeded as a collective action if the plaintiffs had some evidence that
there was another policy requiring them to complete work they were not paid for. This

might be that case. More specifically, this case is different from *Campbell* because there are written NDOC policies (further discussed *infra*) that require correctional officers to both show up to their shifts early and perform certain tasks before their shifts start—and NDOC argues those tasks are non-compensable under FLSA. (ECF No. 363 at 9-14.) There is also no dispute that at least some Plaintiffs performed those tasks but were not paid for them. But regarding the written policies present here though missing in *Campbell*, consider the written Administrative Regulation ("AR") and Operating Procedures ("OP(s)") Plaintiffs proffered in support of their motion for summary judgment.

AR 326.03(6)(E) requires all correctional officers to report to their shift supervisor upon arrival to check to see if they will be required to work mandatory overtime. (ECF No. 348-1 at 5.) And representative OP 322 from ESP requires the shift supervisor to begin posting shift assignments 30 minutes before a particular shift is scheduled to start in the muster room. (ECF No. 348-2 at 3.) Correctional officers at ESP are also required to check in with the shift supervisor in the muster room before proceeding to their posts. (*Id.* at 5.) Further, "[s]taff will report to the staff sergeant in the muster room early enough to be on their post by the starting time of their shift[.]" (*Id.*) Staff should also check their mailboxes before proceeding to their posts. (*Id.* at 6.) Thus, per OP 322 from ESP, NDOC has a written policy at ESP requiring correctional officers like Plaintiffs to show up to their shifts early and perform certain tasks. Moreover, at the end of their shifts, correctional officers who work at ESP "may depart their assigned posts after being properly relieved at the end of the shift[.]" (*Id.* at 5.) Thus, if the relieving officer is late, the officer on duty must stay late.

What's more, Plaintiffs also proffered OP 326 from SDCC, which imposes substantially similar requirements to those described above as to ESP. (ECF No. 348-3.) In addition, Plaintiffs proffered OP 326 from NNCC. (ECF No. 348-4.) That policy also imposes substantially similar requirements to the written policy at ESP described above. (*Id.*) Plaintiffs further represent that substantially similar policies are in effect at FMWCC

1   and WSCC, though they did not file copies of those policies under seal because

2   Plaintiffs' counsel, like NDOC's counsel (*see* ECF Nos. 192 at 5 n.4, 392 at 2-4),

3   apparently do not understand how to file documents under seal under the Court's Local

4   Rules.[13] *See* LR IA 10-5. In any event, for purposes of this discussion, Plaintiffs have

5   proffered the crucial evidence missing from *Campbell*—written policies requiring

6   Plaintiffs to arrive early and stay late. *See* 930 F.3d at 1120-21.

7       But like in *Campbell*, Plaintiffs also proffer deposition testimony and declarations

8   to the effect that they were instructed not to request overtime for their pre-and-post shift

9   activities required by the written policies described above. (*See* ECF No. 346 at 7-20

10  (citing to such evidence).) Thus, this case appears to be the sort of case that the

11  *Campbell* court described as suitable for resolution as a collective action—where there

12  are written policies that corroborate the plaintiffs' statements to the effect that the time

13  system used by the defendant did not tell the whole story. Said otherwise, Plaintiffs[14] are

14  similarly situated here because they are all subject to these written policies that

15  corroborate their allegations that they are required to show up early and work late

16  without pay.

17  ///

18

_____

19      [13]The Court elects to waive Plaintiffs' counsel's noncompliance with LR IA 10-5,
20  *see* LR IA 1-4 (permitting the Court to *sua sponte* waive compliance with local rules), so
    that it may address the merits of the parties' arguments. As explained *supra*, the Court
21  denied motions very similar to the pending motions multiple times without prejudice to
    allow for NDOC's appeal and then to present a certified question to the Nevada
22  Supreme Court. Thus, the Court seeks to give the parties some additional guidance on
    its views regarding the substance of this case after much delay. In addition, the Court
23  gave NDOC a third chance to begin complying with the Court's sealing procedures in
    one of its recent orders (ECF No. 392), so it seems only fair to extend a similar courtesy
24  to Plaintiffs. In other words, the Court waives Plaintiffs' noncompliance with LR IA 10-5 to
    move this case along after years of delay.

25      [14]Again, because the Court dismissed all of Plaintiffs' claims based on most of
26  NDOC's facilities, NDOC's arguments about any facilities no longer part of this case,
    such as the minimum security camps, are irrelevant. (ECF No. 376 at 6-7.) NDOC's
27  argument that the fact that Plaintiffs moved to voluntarily dismiss claims based on
    working in facilities other than the seven prisons somehow supports their argument that
28  this case is unworkable as a collective action is also unpersuasive. (*Id.* at 2.)

And *Campbell* more explicitly renders unpersuasive NDOC's other primary argument in its motion to decertify—that Plaintiffs work in different prisons with different sizes and layouts, leading to different amounts of walking and requiring Plaintiffs to engage in different tasks. (ECF No. 343 at 13-19.) Those arguments boil down to an argument that it takes different Plaintiffs different amounts of time to perform different tasks. "But those distinctions go to the individualized calculation of damages or the individualized application of defenses." *Campbell*, 903 F.3d at 1116.[15] Noting that such individualized calculations of damages and application of defenses are not inconsistent with the collective action mechanism, the *Campbell* court went on to state that district courts must first resolve the common questions of law and fact that do exist. *See id.* at 1116. And as further explained *infra* in Section VI, there are some questions of law and fact common to all Plaintiffs here on which Plaintiffs are entitled to summary judgment. But, for now, the Court denies NDOC's motion to decertify under *Campbell* because Plaintiffs are similarly situated under FLSA. Specifically, they have alleged—and offered evidence to support those allegations—that they are required to perform certain preliminary and postliminary activities that are integral to their job duties and that they have not been compensated for under the FLSA.[16]

### C.   Motions for Summary Judgment

The parties' arguments in their respective motions for summary judgment substantially overlap. The Court will accordingly address the two motions together in this

---

[15]This also forecloses NDOC's individualized defenses argument. (ECF No. 343 at 19-21.)

[16]As further described *infra*, in responding to Plaintiff's motion for partial summary judgment, NDOC focuses on whether certain preliminary and postliminary activities are compensable instead of presenting summary-judgment-type evidence that Plaintiffs did not do these preliminary or postliminary activities, or that Plaintiffs were paid for them. This too tends to suggest that it is appropriate for this case to proceed as a FLSA collective action. Moreover, NDOC's reply in support of its motion to decertify does not discuss the OPs addressed in this Section. (ECF No. 376.) That renders NDOC's argument in its reply that there is no evidence of a common policy or practice regarding the purportedly uncompensated preliminary and postliminary activities at issue in this case unpersuasive. (*Id.* at 6-12.)

1    section, beginning with NDOC's arguments that could have entitled NDOC to summary

2    judgment on this whole case if they were persuasive (as explained *infra*, they are not),

3    then Plaintiffs' arguments raised in their motion for summary judgment organized by

4    task, and then NDOC's arguments, which, broadly speaking, attempt to trim the size of

5    the class and otherwise limit NDOC's potential liability. And again, the Court notes that

6    the parties' arguments in their summary judgment motions overlap somewhat with their

7    arguments discussed *supra* in Section V, so the Court will not extensively discuss

8    NDOC's arguments based on its exception-reporting timekeeping system and the

9    differences between prisons in this section—because the Court already addressed those

10   arguments in Section V. But first, the Court recites the legal standard governing its

11   review of summary judgment motions.

12              **1.        Legal Standard**

13              "The purpose of summary judgment is to avoid unnecessary trials when there is

14   no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,

15   18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). Summary judgment is appropriate

16   when the pleadings, the discovery and disclosure materials on file, and any affidavits

17   "show there is no genuine issue as to any material fact and that the movant is entitled to

18   judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An

19   issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-

20   finder could find for the nonmoving party and a dispute is "material" if it could affect the

21   outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

22   242, 248-49 (1986). Where reasonable minds could differ on the material facts at issue,

23   however, summary judgment is not appropriate. *See id.* at 250-51. "The amount of

24   evidence necessary to raise a genuine issue of material fact is enough 'to require a jury

25   or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral

26   Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Service Co.*,

27   391 U.S. 253, 288-89 (1968)). In evaluating a summary judgment motion, a court views

28   all facts and draws all inferences in the light most favorable to the nonmoving party. *See*

*Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986) (citation omitted).

The moving party bears the burden of showing that there are no genuine issues of material fact. *See Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient[.]" *Anderson*, 477 U.S. at 252.

## 2.     NDOC's Immunity Argument

NDOC argues that either discretionary act immunity or the immunity that comes from acting with due care under state statute or regulation under NRS § 41.032 entitles it to summary judgment on Plaintiffs' FLSA claims. (ECF No. 355 at 11-12.) Plaintiffs counter that NDOC has waived this argument, or alternatively that NDOC has not shown it is entitled to summary judgment that either of these immunities applies to this case. (ECF No. 366 at 2-3.) The Court agrees with Plaintiffs.

First, NDOC has waived its ability to rely on these two types of immunity under NRS § 41.032. "[W]aiver is the intentional relinquishment or abandonment of a known right." *United States v. Mercado-Moreno*, 869 F.3d 942, 959 n.9 (9th Cir. 2017) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). NDOC argued that it was not asserting either type of immunity described in NRS § 41.032 in the proceedings before the Nevada Supreme Court on the question this Court certified. "The State, however, has disclaimed any argument that an express exception to the waiver applies. Rather,

1    the State contends that NRS 41.031(1) waives immunity from tort liability only, so the

2    State retains immunity from statutory liability such as that created by the FLSA." *NSC*

3    *Opinion*, 495 P.3d at 476 (footnote omitted). The Nevada Supreme Court relied on this

4    waiver in the balance of its opinion, never addressing the potential applicability of these

5    two types of immunity. *See generally id*. Thus, NDOC waived any rights it had based on

6    the immunities provided in NRS § 41.032 when it expressly abandoned any reliance on

7    them in the proceedings on the certified question. The Nevada Supreme Court relied on

8    the waiver, and that waiver accordingly has influenced how this case has proceeded

9    since them. It would be unduly prejudicial to Plaintiffs to allow NDOC to raise potentially

10   case dispositive arguments like these that it already waived with no consequence.

11        Second, even assuming in the alternative that NDOC had not waived its ability to

12   assert the immunities in NRS § 41.032, the Court agrees with Plaintiffs that they do not

13   appear to apply to this case in any event. (ECF No. 366 at 2-3.) Both subsections (1)

14   and (2) are written to shield individuals from liability, and this case is not against an

15   individual. *See* NRS § 41.032. Plaintiffs sued the State of Nevada *ex rel* NDOC. (ECF

16   No. 95 at 1.) Similarly, Plaintiffs' theory of the case is not based on the action or

17   omission of any individual NDOC officer or employee, which further seems to render

18   NRS § 41.032(1) inapplicable here. In sum, neither immunity described in NRS § 41.032

19   seems as though it would apply to this case if NDOC had not waived reliance on them in

20   any event.

21                    **3.    NDOC's *Forrester* Argument**

22        NDOC also argues that Plaintiffs' claims are barred under *Forrester v. Roth's I. G.*

23   *A. Foodliner, Inc.*, 646 F.2d 413 (9th Cir. 1981) and its progeny. (ECF No. 355 at 12-18.)

24   Said otherwise, NDOC argues Plaintiffs' claims are barred "by their own admissions that

25   they violated NDOC's comprehensive policies and procedures by failing to accurately

26   and timely report the hours they claimed they worked, including any alleged overtime."

27   (*Id.* at 13.) Plaintiffs counter that NDOC's argument misunderstands the pertinent test

28   under *Forrester*, which does not focus on Plaintiffs' failure to report overtime worked

through NDOC's system, but instead on NDOC's knowledge as to whether Plaintiffs were working overtime without reporting it. (ECF No. 366 at 4-21, 4 n.1.) Indeed, Plaintiffs rely on *Forrester* for the proposition that, "[a]n employer who is armed with this knowledge [that an employee has been working overtime] cannot stand idly by and allow an employee to perform overtime work without proper compensation, even if the employee does not make a claim for the overtime compensation." 646 F.2d at 414. (*See also* ECF No. 366 at 4.) The Court agrees with Plaintiffs.

NDOC has not shown it is entitled to summary judgment that Plaintiffs' claims are barred because they did not fill out DOC-100 forms for each instance of overtime for which they seek compensation in this suit. To start, NDOC's argument that it had no knowledge Plaintiffs were working the overtime for which they seek compensation in this suit is rendered unpersuasive by the operating procedures described *supra* in Section V to the effect that Plaintiffs must show up early for their shifts and complete a few tasks before they start their shifts; and that employees cannot leave their posts at the end of their shifts until they are relieved. It is indeed telling that NDOC does not address its written OPs in its motion for summary judgment because they significantly undermine NDOC's arguments that it had no knowledge any pre-or-post shift work was occurring for which Plaintiffs had not been seeking compensation by completing DOC-100 forms. But in any event, NDOC's argument that it lacked knowledge of any pre-or-post shift work not reflected in DOC-100 forms is unpersuasive in light of the written OPs consistent with Plaintiffs' allegations in this case. (ECF No. 366 at 4-7 (making this argument).)

The Court also finds the United States Court of Appeals for the Tenth Circuit's decision in *Aguilar v. Mgmt. & Training Corp.*, 948 F.3d 1270, 1287 (10th Cir. 2020)—upon which Plaintiffs rely (ECF No. 366 at 4-7)—persuasive on this point. NDOC "cannot simultaneously require an activity and claim to be unaware that employees are engaging

1  in that activity." *Aguilar*, 948 F.3d at 1287. Holding otherwise—as NDOC argues the

2  Court should (ECF No. 373 at 8-9)—would be illogical.[17]

3       Moreover, NDOC affirmatively moved for summary judgment on this argument in

4  addition to raising it in response to Plaintiffs' motion for summary judgment, so the Court

5  must construe the facts pertinent to this argument in the light most favorable to Plaintiffs

6  to the extent NDOC raised this argument in its motion. Plaintiffs present at least a

7  genuine dispute of material fact as to NDOC's knowledge that at least some Plaintiffs

8  complained to their superiors about not being compensated for the pre-and-post shift

9  work they seek compensation for here. (ECF No. 366 at 17-21 (citing to deposition

10  testimony).) And NDOC does not respond to this argument based on deposition

11  testimony in its reply with any contrary evidence. (ECF No. 373 at 8-10.) Thus, to the

12  extent NDOC even disputes its knowledge that employees were working

13  uncompensated time (NDOC's non-response in its reply creates the question) there is at

14  least a genuine dispute of material fact precluding summary judgment to NDOC on this

15  argument.

16       **4.    Plaintiffs' Motion**

17       Plaintiffs move for partial summary judgment as to liability under FLSA,

18  anticipating a trial only on damages, and arguing they are entitled to summary judgment

19  that certain specified tasks are compensable work under FLSA. (ECF No. 346.) NDOC

20

21  _____

22       [17]NDOC's argument is based on out-of-circuit cases that the Court finds less
persuasive than *Aguilar*. (ECF No. 373 at 8-9.) *Aguilar* involved prison guards seeking
compensation for pre-and-post shift activities that they were required to perform per
23  written policies. *See* 948 F.3d at 1287. Further, like this case, the defendant in *Aguilar*
argued that "it did not know the officers were working outside of their scheduled shifts
24  because the officers (1) did not complete time-adjustment forms to request overtime pay
and (2) signed an acknowledgement form included with each paycheck stating that they
25  submitted such a form for any overtime work conducted before or after their shift." *Id.*
Thus, the facts are similar here, and NDOC is making the same argument as the
26  Defendant in *Aguilar*. What's more, the defendant in *Aguilar* relied on the same cases
that NDOC is relying on here. *Compare id.* with ECF No. 373 at 8-9. "These cases are
27  not relevant here because, as the officers point out, this case involves [the
defendant's] *actual* knowledge that the officers are engaging in these activities. In
28  particular, [the defendant] *requires* both the security screening and the passdown
briefing." *Aguilar*, 948 F.3d at 1287 (emphasis in original).

structures its response by task. (ECF No. 363 at 9-14.) The Court adopts a similar structure below for convenience, discussing pre-shift activities and then post-shift activities.

### a.    Pre-Shift Activities

Plaintiffs more specifically move for partial summary judgment as to four pre-shift activities. Notably, NDOC does not argue that it pays Plaintiffs for these activities. (ECF No. 363.) Instead, and as further discussed below, NDOC argues these activities are not compensable under FLSA.

### i.    Security Screenings

Plaintiffs argue the first compensable activity they are required to undergo every workday is a security screening. (ECF No. 346 at 29.) NDOC points out in its response that Plaintiffs did not allege this activity was compensable in their FAC, and indeed expressly disclaimed it as a compensable activity. (ECF No. 363 at 10.) NDOC is correct. (ECF No. 95 at 6 ("Upon arriving to the correctional facility and passing through security (which Plaintiffs do not allege to be compensable time) . . .").) And Plaintiffs do not directly refute NDOC's assertion that Plaintiffs did not allege security screenings as a compensable activity in the FAC in their reply. (ECF No. 370.) Thus, Plaintiffs are not entitled to summary judgment that the security screenings are compensable time because they expressly disclaimed that allegation in their operative FAC. *See, e.g.*, *Wasco Prod., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("[T]he necessary factual averments are required with respect to each material element of the underlying legal theory.... Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings.") (citation omitted).

### ii.    Muster or Roll Call

Plaintiffs also seek summary judgment that muster, which they sometimes refer to as a component of roll call, is a compensable activity under FLSA. (ECF No. 346 at 22-31.) The Court accordingly addresses the activities of muster and roll call together in this section, as both basically mean checking in with a supervisor and receiving instructions,

where the supervisor may also inspect the correctional officer's uniform and ask them to make changes. NDOC first argues that Plaintiffs do not provide a definition of their principal activity but defines their principal activity as "maintain[ing] and supervis[ing] inmates in State correctional facilities in a controlled humane environment." (ECF No. 363 at 9.) The Court will use this definition as well—both because NDOC does not dispute it and it is reasonable.

In any event, as to checking in, NDOC counters that it is not a compensable activity under FLSA because it sometimes only takes a few seconds, checking in is not compensable under federal regulations, and while roll call is compensable under federal regulations, roll call as defined under those regulations consists of all officers meeting at a precise time to listen instructions for several minutes in a group setting—unlike NDOC policy and practice, which is a quick and informal conversation with a supervisor. (ECF No. 363 at 11-12.) NDOC further, and similarly, argues that NDOC's required uniform inspection does not change the analysis because it is short, informal, and could happen at any point throughout the day. (*Id.* at 12.) The Court agrees with Plaintiffs.

Plaintiffs are entitled to summary judgment that muster and/or roll call are compensable activities under FLSA, and that Plaintiffs were required to engage in them.[18] Again taking ESP's OP 322 as a representative example, correctional officers like Plaintiffs are required to report to their shift sergeant in the Muster Room outside the Sergeant's Office for posting of their assignment early enough to be on their post by the starting time of their shift. (ECF No. 348-2 at 5.) Plaintiffs also point out that part of shift sergeants' job is to conduct roll call. (ECF No. 348-5 at 2.) Correctional officers are required to report for muster/roll call in person. (ECF No. 348-2 at 6.) Their uniform and personal appearance must be in accordance with administrative regulations and OP 350 at the time they arrive. (*Id.* at 5.) And the Court can reasonably infer from these regulations that a shift sergeant could require a correctional officer to bring their uniform

_____

[18]As noted, NDOC does not dispute that correctional officers are required to engage in these activities, only that the time is not compensable.

20

into compliance with regulations before that correctional officer can proceed to their post because the correctional officers must report to the staff sergeant in person before their shift is scheduled to start. Thus, the Court finds that Plaintiffs are required to complete muster/roll call before starting their shifts, consistent with Plaintiffs' allegations.

The Court further finds that muster/roll call are compensable activities under FLSA because they are an integral and indispensable part, *see Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 33 (2014), of Plaintiffs' principal activities of maintaining and supervising inmates in a controlled and humane environment. As the Court explained in its order denying in pertinent part NDOC's motion to dismiss, Plaintiffs need to know where to go before they start their shift, along with knowing about any potentially dangerous situation present at their post during their shift. (ECF No. 166 at 12.) Without that information, Plaintiffs could not effectively maintain or supervise inmates. And as the Court also noted in its prior order on NDOC's motion to dismiss (*id.* at 13), uniform inspection is part of muster (ECF No. 348-2 at 5), so even if time spent on that task is de minimus, it is part of the continuous workday that at least begins with muster and/or roll call.[19]

NDOC's arguments to the contrary are unpersuasive. NDOC first argues that muster is a seconds-long process, presumably suggesting that it is therefore de minimus and thus not compensable. (ECF No. 363 at 11.) However, the evidence NDOC relies on does not exactly support that proposition. (*Id.* (citing ECF Nos. 364-5 at 10-12, 364-8 at 3-4).) Indeed, the pertinent deposition testimony NDOC relies on suggests that muster takes a variable amount of time depending on the circumstances—not a few seconds in every instance. (ECF No. 364-5 at 12 (explaining that the length and content of muster

---

[19]NDOC argues that the Court cannot simply adopt its prior order on NDOC's motion to dismiss because this case is now at the summary judgment phase. (ECF No. 363 at 14-15.) The Court of course agrees with that argument. But that is not what the Court is doing here. Instead, the Court is finding that Plaintiffs' proffered, unrebutted evidence consisting in pertinent part of NDOC's operating procedures supports Plaintiffs' allegations in the FAC. Said otherwise, though the Court is now considering evidence, its legal findings remain the same—that muster and/or roll call are compensable activities under FLSA.

conversations vary); ECF No. 346-8 at 3-4 (explaining that muster normally takes between a few seconds and three to five minutes, but sometimes can take a lot longer than five minutes if there is a problem).) Thus, even the evidence NDOC proffers does not establish that muster always takes a few seconds. And as discussed *supra* as to NDOC's motion to decertify, to the extent muster takes differing amounts of time depending on the circumstances, that is a question of damages that does not necessarily preclude this case from proceeding as a collective action.

NDOC next argues that the federal regulation regarding 'checking in' suggests that muster and/or roll call are not compensable under FLSA and attempts to distinguish the federal regulation declaring 'roll call' compensable from what happens at NDOC facilities. (ECF No. 363 at 11-12.) But the Court finds that the muster and/or roll call at issue in this case is closer to the 'roll call' described as compensable in 29 C.F.R. § 553.221(b) than the 'checking in' described as not compensable in 29 C.F.R. § 790.7(g). This is because Plaintiffs are corrections officers whose principal activities are maintaining and supervising inmates in a controlled and humane environment. The information they receive from their supervisors before they are allowed to proceed to their posts is integral to effectively performing these principal activities. Plaintiffs' jobs are simply unlike those of the factory workers employed through a temporary staffing agency in the nonbinding *Sanford v. Preferred Staffing Inc.*, 447 F. Supp. 3d 752, 755 (E.D. Wis. 2020), and the "welding foreman and a pipefitter" who filed the case that produced the also non-binding *Bennett v. McDermott Int'l, Inc.*, 855 F. App'x 932, 933 (5th Cir. 2021).[20] (ECF No. 363 at 11 (relying on these cases).) Instead, like the law enforcement and fire protection employees referred to in 29 C.F.R. § 553.221, Plaintiffs' job is dangerous. That makes roll call an integral part of their principal activities. *See* 29 C.F.R.

---

[20]The security guards at the nuclear power plant in the nonbinding *Haight v. The Wackenhut Corp.*, 692 F. Supp. 2d 339 (S.D.N.Y. 2010) had jobs more like Plaintiffs here, but in *Haight*, the district court did not discuss the exchange of information from supervisor to line employee that the Court finds integral to Plaintiffs' principal activities here. The Court accordingly finds *Haight* unpersuasive. (ECF No. 363 at 11 (citing *Haight*).)

§ 553.221(b). Sending a prison guard into a riot without telling him about it first is like sending a firefighter into a surprise burning building. It would be difficult for the employee to do an adequate job in either case. And that is likely why NDOC has a series of written policies requiring Plaintiffs to check in with their supervisors before proceeding to their posts.

And finally, as to the uniform inspection portion of muster, NDOC argues that it may not add any time to muster. (ECF No. 363 at 12.) But even that argument leaves open the possibility that it might add significant time to muster if the particular correctional officer's uniform does not comply with the pertinent Ars and OPs. Indeed, because pertinent operating procedures require correctional officers to be wearing compliant uniforms before they proceed to their post (*see, e.g.*, ECF No. 348-2 at 5), the uniform inspection component of muster could take some time.

In sum, Plaintiffs are entitled to summary judgment that muster and/or roll call, including the uniform inspection component, is compensable under FLSA. Indeed, the Court finds that Plaintiffs' continuous workday begins when they check in with their supervisor for their shift. (ECF No. 346 at 28-31.) *See also IBP, Inc. v. Alvarez*, 546 U.S. 21, 37 (2005) ("[D]uring a continuous workday, any walking time that occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity is excluded from the scope of that provision, and as a result is covered by the FLSA."). Plaintiffs may proceed to trial on the question of damages only for time spent on these activities.

### iii.    Collecting Mail and Gear

Plaintiffs further seek summary judgment for the required steps of collecting any mail they have received along with necessary gear (*e.g.*, restraints, radios) before proceeding to their posts to start their shifts. (ECF No. 346 at 3.) Plaintiffs rely on OPs to support the mail-checking requirement and deposition testimony from prison wardens to support the collecting gear requirement. (*Id.* at 15, 17.) Plaintiffs argue that the Court's prior order on NDOC's motion to dismiss, federal regulations, caselaw, and the

continuous workday doctrine all support their argument that they are entitled to summary judgment that these activities are compensable under FLSA. (*Id.* at 23-31.)

NDOC leads off by countering that Plaintiffs have not cited any authority to support the proposition that collecting mail and gear is integral or indispensable to Plaintiffs' principal activities. (ECF No. 363 at 12.) NDOC then argues, as a matter of law, that these activities are not compensable. (*Id.*) NDOC finally argues that individualized issues preclude summary judgment as to these activities. (*Id.* at 12-13.) The Court agrees with Plaintiffs.

First, Plaintiffs have proffered written OPs stating that correctional officers like Plaintiffs should check their mail before proceeding to their posts. (*See, e.g.*, ECF No. 348-2 at 6.) Second, Plaintiffs have pointed to deposition testimony from the wardens of the prisons still at issue in this lawsuit that Plaintiffs must collect gear (radios, duty belts, pepper spray, etc.) before proceeding to their posts. (ECF No. 346 at 17 (citing compendiums of deposition testimony apparently not filed due to the previously-noted lack of awareness about how to file documents under seal under the Court's Local Rules on both sides).) Plaintiffs have accordingly met their initial summary judgment burden to show that they are required to engage in these activities before their shifts start. The Court accordingly may—and does—build upon its prior finding in the order on NDOC's motion to dismiss that these activities are compensable. (ECF No. 166 at 13-14.) Moreover, these activities are alternatively compensable under the continuous workday doctrine because NDOC does not appear to dispute that these activities occur between when Plaintiffs check in with their supervisors and when their shift starts—or after the muster/roll call activities upon which the Court has already determined Plaintiffs are entitled to summary judgment that these activities are compensable under FLSA.

What's more, Defendants do not respond to this portion of Plaintiffs' motion for summary judgment with any evidence that would create a material dispute of fact. While NDOC argues there are other ways that NDOC can communicate with employees, NDOC does not dispute that employees are required to check their mail. (ECF No. 363

at 12.) NDOC also argues some employees do not need firearms and pepper spray for their shifts but does not dispute that all employees have to pick up necessary gear for their shifts before reporting to their posts. (*Id.*) Thus, NDOC does not point to any genuine disputes of material fact, leaving the Court no choice but to grant summary judgment that these activities are compensable.

NDOC's argument is also legally unpersuasive. To start, the argument that Plaintiffs have not pointed to any authority to support their argument is simply incorrect. (*Id.*) Plaintiffs argued in their summary judgment motion that the continuous workday begins during roll call/muster, and collecting mail and gear happens after that, so collecting mail and gear is compensable. (ECF No. 346 at 29-31.) And Plaintiffs offered legal support for that argument. (*Id.*) NDOC otherwise relies on *Haight*, but the Court finds that nonbinding decision unpersuasive. (*Id.*) The *Haight* court was purportedly applying a categorical rule that exists in the Second Circuit, *see* 692 F. Supp. 2d at 344-46, but NDOC does not even try to explain whether that rule also exists in the Ninth Circuit, or if it has changed in the approximately 12 years since *Haight* was decided (ECF No. 263 at 12). Moreover, and as mentioned *supra*, the *Haight* court's reasoning is unpersuasive because it ignores the importance of passing information on to an employee before they are sent to their post, which seems integral to the principal activities of the security guards at issue in that case, and even more integral for the correctional officers at issue here. Finally, NDOC misreads *Campbell* to suggest that individualized issues preclude summary judgment here. (*Id.* at 12-13.) Again, as explained *supra*, the Court reads *Campbell* to strongly suggest this case should proceed as a collective action. As pertinent here, the "individualized calculation of damages or the individualized application of defenses" "go to the individualized calculation of damages or the individualized application of defenses" and "do not preclude collective treatment for the purpose of resolving the common issue that *does* exist, and that must be answered in the first instance." *Campbell*, 903 F.3d at 1116.

///

1    In sum, Plaintiffs are entitled to summary judgment that collecting mail and gear

2    are compensable activities under FLSA.

3                              *iv.        Pass Down*

4    Plaintiffs also seek summary judgment that pass down is compensable. (ECF No.

5    346 at 3.) NDOC primarily responds that pass down is de minimus and therefore non-

6    compensable. (ECF No. 363 at 13-14.) But NDOC does not dispute that pass down

7    happens after the initial check in with supervisors during muster. (*Id.*) Thus, pass down is

8    compensable under the continuous workday doctrine. *See IBP, Inc.*, 546 U.S. at 37

9    (describing the continuous workday doctrine). And NDOC does not address the

10   continuous workday doctrine in the pertinent portion of its response brief. (ECF No. 363

11   at 13-14.) Plaintiffs are accordingly entitled to summary judgment that the pass down

12   that occurs before the beginning of a Plaintiff's shift is a compensable activity under

13   FLSA.

14                        **b.      Post-Shift Activities**

15   Plaintiffs also move for summary judgment as to the pass down and gear return

16   they must perform—and security screening they must undergo—on their way out after

17   their shifts. As explained *supra* as to the pre-shift activities, the Court finds that pass

18   down and returning gear are both compensable activities to the extent they happen after

19   the end of a particular Plaintiff's shift,[21] but that security screening is not compensable

20   because Plaintiffs disclaimed that they were contending the security screening was

21   compensable in their FAC.

22   In sum, this case will proceed towards a trial on damages as a FLSA collective

23   action, and Plaintiffs are entitled to partial summary judgment on some of their FLSA

24   claims as provided above. The Court now turns to NDOC's arguments generally seeking

25   to trim the size of the class and otherwise limit NDOC's liability.

26

27   _____

28        [21]NDOC argues for this limitation (ECF No. 363 at 13-14), and the Court finds it
     reasonable as there is no dispute that Plaintiffs are compensated for time they are
     working during their shift.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 5.     Statute of Limitations

In its summary judgment motion, NDOC seeks a ruling that a two-year statute of limitations applies to this case—instead of three years—because any violations of FLSA it committed were not willful. (ECF No. 355 at 18-19.) Depending on how the Court rules on that issue, NDOC moves for summary judgment that certain lists of Plaintiffs' claims are time barred. (*Id.*) NDOC more specifically argues that Plaintiffs cannot present any admissible evidence that NDOC willfully disregarded FLSA requirements, and that nothing in FLSA bars the exception reporting time system that NDOC uses. (*Id.*) Plaintiffs counter that NDOC's FLSA violations were willful because NDOC did not pay Plaintiffs for the pre and postliminary activities at issue in this case despite caselaw and federal regulations suggesting these activities were compensable, along with referring to deposition testimony to the effect that NDOC supervisors told Plaintiffs the time at issue in this case was not compensable. (ECF No. 366 at 22-23.) The Court finds that Plaintiffs have created a genuine dispute of material fact precluding summary judgment on the statute of limitations issue in NDOC's favor.

"[T]he two-year statute of limitations for actions under the FLSA may be extended to three years if an employer's violation is deemed 'willful.'" *Flores v. City of San Gabriel*, 824 F.3d 890, 906 (9th Cir. 2016) (citation omitted) "An employer's violation of the FLSA is willful when it is on notice of its FLSA requirements, yet takes no affirmative action to assure compliance with them." *Id.* (citations, internal quotation marks, and internal punctuation omitted). Said otherwise, "[t]he employer must take 'affirmative action to assure compliance[.]'" *Haro v. City of Los Angeles*, 745 F.3d 1249, 1258 (9th Cir. 2014) (citation omitted).

To start, NDOC has not met its initial summary judgment burden because it has not presented any evidence about the affirmative action it took to ensure compliance with FLSA. (ECF No. 355 at 18-19.) Nor does it address affirmative compliance in its reply. (ECF No. 373 at 10-11.) Moreover, and contrary to NDOC's argument in its reply (*id.*), Plaintiffs proffer some evidence tending to show that NDOC made a willful decision

not to compensate employees for the activities the Court finds compensable under FLSA *supra*—though Plaintiffs incorporate by reference evidence they presented in their own motion for summary judgment instead of providing specific citations or particularized argument in response to NDOC's summary judgment motion. (ECF No. 266 at 22-23.)

But even though Plaintiffs could have been more thorough and precise in presenting this evidence, NDOC does not acknowledge this evidence in its reply at all. (ECF No. 373 at 10-11.) If NDOC had followed Plaintiffs' incorporation by reference (ECF No. 266 at 22-23), the evidence creating a genuine dispute of material fact is there. (ECF No. 370 at 9-14 (citing deposition testimony submitted with Plaintiffs' summary judgment motion to the effect that at least some Plaintiffs asked for overtime for the activities at issue in this case and were told those activities were not compensable).) Thus, while neither side did a particularly effective job of presenting or refuting this evidence in the briefing on NDOC's summary judgment motion, this evidence nonetheless shows that disputes of fact remain precluding summary judgment to NDOC that it did not willfully violate FLSA. Moreover, and as discussed *supra*, at least one federal regulation states that roll call is a compensable activity—suggesting that NDOC knew it was running some risk by not paying employees for roll call. In any event, NDOC has not shown it is entitled to summary judgment on the statute of limitations issue at this time.[22]

Plaintiffs also dispute the inclusion of certain names on the list that NDOC represents consists of Plaintiffs whose claims are fully barred by the three-year statute of limitations. (ECF No. 366 at 23 n.14.) NDOC does not address that dispute in its reply.

---

[22]In NDOC's reply it also argues that it could not have willfully violated FLSA because the Nevada Supreme Court stated in an order preliminary to *NSC Opinion* that no clearly controlling Nevada precedent existed as to whether NDOC was subject to FLSA liability before this case. (ECF No. 373 at 11.) That argument is unpersuasive because it does not speak to whether NDOC made any "affirmative action to assure compliance" with FLSA. *Haro*, 745 F.3d at 1258. Moreover, the *NSC Opinion* also makes clear that no clearly controlling precedent had previously established that NDOC was not subject to FLSA. In sum, NDOC's argument, the gist of which is that it is not required to comply with federal law until a court orders it to, is unpersuasive.

1   (ECF No. 373 at 10-11.) The Court will accordingly defer resolving this factual dispute. In

2   any event, NDOC's summary judgment motion is denied to the extent it seeks a

3   declaration that the two-year statute of limitations applies here, and to the extent it seeks

4   summary judgment on the claims of the lists of Plaintiffs in the exhibits cited in the

5   pertinent section of NDOC's briefing.

6   **6.    Liquidated Damages**

7   NDOC also argues it is entitled to summary judgment that Plaintiffs are not

8   entitled to liquidated damages here because it did not willfully violate FLSA, so NDOC

9   acted in good faith sufficient to shield it from a possible liquidated damages award. (ECF

10  No. 355 at 19.) But that logic fails because the Court denies NDOC's motion for

11  summary judgment that it did not willfully violate FLSA. *See supra*. Indeed, the same

12  logic works both ways. *See, e.g.*, *Walsh v. Wellfleet Commc'ns*, Case No. 20-16385,

13  2021 WL 4796537, at *2 (9th Cir. Oct. 14, 2021) ("Because [the defendant's] FLSA

14  violations were willful, they could not have been committed in good faith."). Thus,

15  NDOC's summary judgment motion is denied to the extent it seeks a declaration that

16  Plaintiffs are not entitled to liquidated damages here. That issue remains for future

17  adjudication as well.

18  **7.    Late Joinders**

19  NDOC finally argues in its summary judgment motion that it is entitled to summary

20  judgment on the claims of all Plaintiffs who filed their joinders to this lawsuit after June

21  30, 2015 (ECF No. 355 at 19-26), the date in the initial notice to prospective collective

22  action members (ECF No. 48 at 6). Plaintiffs counter that notice did not set a firm

23  deadline, and that judicial efficiency concerns along with the remedial purposes of the

24  FLSA weigh in favor of the Court allowing all the late-filed joinders. (ECF No. 366 at 24-

25  31.) NDOC replies that ignoring deadlines does not serve judicial efficiency or the

26  remedial purposes of FLSA, and that Plaintiffs who filed joinders after June 30, 2015,

27  have not shown good cause for their delay. (ECF No. 373 at 12-15.) The Court agrees

28  with Plaintiffs that, on balance, it should allow the late-filed joinders, but will set new and

1   firm limits on any additional joinders that may be filed. *See Hoffmann-La Roche Inc. v.*

2   *Sperling*, 493 U.S. 165, 171 (1989) (explaining that district courts have broad discretion

3   over the notice process in cases "where written consent is required by statute").

4       The parties agree that the Court should use a five-factor test developed by the

5   Northern District of New York in *Ruggles v. Wellpoint*, Inc., 687 F.Supp.2d 30, 37

6   (N.D.N.Y. 2009) to determine whether to accept the many joinders filed in this case since

7   June 30, 2015.[23] (ECF Nos. 355 at 21 (citing *Browder v. Peninsula Grill Assocs., LLC*,

8   Case No. 2:14-CV-4135-PMD, 2015 WL 4389502, at *3 (D.S.C. July 15, 2015) (relying,

9   in turn, on *Ruggles*)), 366 at 24-25 (citing *Ruggles*).) The test is: "(1) whether 'good

10  cause' exists for the late submissions; (2) prejudice to the defendant; (3) how long after

11  the deadline passed the consent forms were filed; (4) judicial economy; and (5) the

12  remedial purposes of the FLSA." *Ruggles*, 687 F. Supp. 2d at 37 (citation omitted). As

13  the Court was not able to locate a better test in its own research, and the parties agree

14  this is the appropriate test, the Court will use it here.[24]

15      The first three factors tend to favor NDOC's position, but the final two *Ruggles*

16  factors determinatively favor Plaintiffs' position. To start, Plaintiffs do not really argue that

17  there is good cause for the late-filed joinders, instead arguing that the good cause factor

18  is not as important as the fourth and fifth factors. (ECF No. 366 at 29-31.) Moreover, the

19  Court reviewed some of the late-filed joinders and they do not contain any explanation

20  as to why they were filed when they were, much less show good cause. (*See, e.g.*, ECF

21  No. 405 (filed May 5, 2022).) Plaintiffs do point out that the notice said, "[i]f you do not

22  return the 'Consent to Join' form by June 30, 2015, you **may** not be able to participate in

23  this lawsuit." (ECF No. 366 at 27 (quoting ECF No. 48 at 6) (emphasis added by

24  _____

25      [23]NDOC initially argues there are 169 late-filed joinders. (ECF No. 355 at 20.)
    Plaintiffs put the number at about 190. (ECF No. 366 at 26.) But Plaintiffs have been
26  continuing to file joinders until recently. (*See, e.g.*, ECF No. 405.) Thus, the number
    grows as time passes.

27
    [24]In addition, the Northern District of California has used the *Ruggles* test. *See,*
28  *e.g.*, *Helton v. Factor 5, Inc.*, Case No. C 10-04927 SBA, 2014 WL 1725734, at *3 (N.D.
    Cal. Apr. 29, 2014).

1    Plaintiffs).) But to the extent Plaintiffs argue the use of "may" is good cause to file a

2    joinder after the deadline, the Court is unpersuaded. The deadline in the notice was

3    clear. And the wording indicates that prospective plaintiffs may lose their right to

4    participate in this lawsuit if they did not file their joinders by the deadline—which lines up

5    with what NDOC is arguing here. In sum, the good cause factor does not favor permitting

6    the late-filed joinders.

7        Neither do the second and third factors. As to the third factor, for example,

8    Plaintiffs filed a joinder on May 5, 2022, or nearly seven years after the deadline and

9    after the dispositive motions the Court addresses in this order were fully briefed. (ECF

10   No. 405.) As to the second, the Court agrees with NDOC it will be prejudiced if the Court

11   permits these late-filed joinders because permitting the joinders means that NDOC's

12   potential liability increases in this case (though opt-in Plaintiffs not permitted to join could

13   simply file one or more new cases). However, the prejudice factor does not weigh so

14   strongly in NDOC's favor because this case has not yet gone to trial, some of the claims

15   filed by the late-filed opt-in Plaintiffs may ultimately be barred by the statute of

16   limitations, and NDOC retains its defenses against the late-filed opt-in Plaintiffs in any

17   event. *See, e.g.*, *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, Case No. MDL 06-

18   01770MHP, 2008 WL 4712769, at *2 (N.D. Cal. Oct. 23, 2008) ("True prejudice in this

19   context might, for instance, consist of 'allow[ing] new plaintiffs to join and share the

20   spoils after the battle is won, but sit on the sidelines and remain free from the

21   consequences of an unfavorable outcome.'").

22       However, the fourth and fifth factors determinatively weigh in favor of permitting

23   the late-filed joinders here. The fourth factor is judicial economy. *See Ruggles*, 687 F.

24   Supp. 2d at 37. This factor favors allowing the late-filed joinders filed up to this point

25   because the parties agree that any prospective plaintiffs not permitted to join this lawsuit

26   could simply file their own or file another collective action against NDOC substantially

27   similar to this one. (ECF Nos. 355 at 24, 366 at 26-27.) Multiple lawsuits on the same

28   issues are inefficient, particularly considering that the Court could agree to take the new

1   cases and consolidate them back into this one under the Local Rules. *See* LR 42-1.

2   Thus, while the Court agrees with NDOC that it would have been cleaner from a case

3   management perspective if Plaintiffs had timely filed opt-ins or attempted to show good

4   cause for those they filed late, preventing the late filed opt-ins from joining this lawsuit

5   would likely be less efficient than keeping all the opt-ins filed up to this point in this

6   lawsuit. *See In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 2008 WL 4712769, at

7   *2 ("The maintenance of several actions would partially frustrate the underlying rationale

8   for using the class action mechanism."); *but see id.* (noting that court's finding could

9   have been different if that case was more advanced, and this case is admittedly more

10  advanced then that one).

11          The fifth factor, the broad, remedial purpose of FLSA, also favors allowing the opt-

12  in Plaintiffs with the late-filed joinders to join this case. *See Helton*, 2014 WL 1725734, at

13  *4 ("the Court will allow the opt-in plaintiffs to join the FLSA collective action given the

14  broad remedial purpose of the FLSA"); *Randolph v. Centene Mgmt. Co., LLC*, Case No.

15  C14-5730 BHS, 2015 WL 5794326, at *4 (W.D. Wash. Oct. 5, 2015) ("allowing the late

16  opt-in plaintiffs to join this case is consistent with the FLSA's broad remedial purpose.").

17  Indeed, the Court's review of the caselaw the parties cite in the pertinent portions of their

18  briefs suggest that this factor tends to swallow the others when combined with the fourth

19  factor, as generally speaking, the courts in the cases the parties rely on as to this late

20  joinder issue tended to allow late-filed opt-in plaintiffs to join the case. *See, e.g., id.* That

21  said, more time has elapsed here, and this case is farther along, than many of those

22  cases. Nonetheless, the Court finds that allowing the opt-ins filed up to the date of entry

23  of this order into this case is the best course of action here. *See Hoffmann-La Roche*,

24  493 U.S. at 171 (explaining that district courts have broad discretion over the notice

25  process in cases "where written consent is required by statute").

26          However, the Court exercises that broad discretion to impose a new procedure

27  that applies in this case going forward. This case is proceeding towards trial on

28  damages, so as a practical matter, the Court cannot allow Plaintiffs to continue to file

unlimited joinders without attempting to show good cause. The Court accordingly adopts the following procedures. Any opt-ins filed between now and the date the parties file the proposed joint pretrial order must: (1) be filed by Plaintiffs' counsel on the docket in the form of a regularly noticed motion; and (2) include as an exhibit an affidavit from the prospective plaintiff who wishes to join the action establishing good cause for filing a joinder so late; along with (3) a second exhibit consisting of a document substantially similar to the joinders prospective plaintiffs have filed up to this point. The proposed joint pretrial order must list all Plaintiffs proceeding to trial and who have not been dismissed from this case. That list will bind the parties for purposes of trial.

The Court will not accept or even consider any joinders or motions to join this litigation after the parties file the proposed joint pretrial order. The Court will immediately strike any joinders or motions to join this case filed after the parties file the proposed joint pretrial order without any further advance warning.

But all of that said, NDOC's summary judgment motion is denied to the extent it seeks summary judgment against, or dismissal of, any Plaintiffs who have filed opt-in joinders up to this point in this case. As explained *supra*, the Court will permit them to participate in this litigation. However, NDOC's summary judgment motion is granted to a very limited extent reflective of the fact that the Court now imposes the procedures described above regarding joinders going forward. The Court agrees with NDOC that it would not be judicially efficient to allow prospective plaintiffs to submit joinders unconstrained by any procedure in the immediate run-up to, during, and after, trial.

### D. NDOC's Motion to Dismiss Non-Participating Plaintiffs

That brings the Court to a conceptually similar—though separate—motion that NDOC filed. NDOC moves for an order dismissing, with prejudice, 16 Plaintiffs who did not respond to NDOC's written discovery and/or appear for their depositions as a sanction for their failure to participate in discovery. (ECF No. 354 at 2.) NDOC more specifically argues that the applicable factors weigh in favor of dismissing the non-participating Plaintiffs. (*Id.* at 7-9.) Plaintiffs counter in pertinent part that these Plaintiffs

are interchangeable with other Plaintiffs who Plaintiffs' counsel substituted in for purposes of providing NDOC with representative discovery because representative discovery is generally appropriate in FLSA cases and is the sort of discovery the parties have engaged in here. (ECF No. 360 at 1-2, 6.) Plaintiffs alternatively argue that dismissal is too harsh a sanction should the Court decide to sanction the Plaintiffs identified in NDOC's motion, and the Court may instead "disallow the violating opt-in plaintiff from testifying at trial" as a lesser, but more appropriate sanction. (*Id.* at 12 n.5.) The Court agrees with NDOC because Plaintiffs' view that Plaintiffs are interchangeable in this case conflicts with governing law.

"The FLSA leaves no doubt that 'every plaintiff who opts in to a collective action has party status.'" *Campbell*, 903 F.3d at 1104 (citation omitted). "Under the FLSA, an opt-in plaintiff's action is deemed 'commenced' from the date her opt-in form is filed with the district court." *Id.* (citing 29 U.S.C. § 256). "From that point on, there is no statutory distinction between the roles or nomenclature assigned to the original and opt-in plaintiffs." *Id.* It accordingly cannot be—as Plaintiffs argue—that Plaintiffs in this case are interchangeable. Like any parties to a case, the Plaintiffs identified by NDOC in this motion were obligated to participate in discovery. And Plaintiffs do not dispute that these particular Plaintiffs failed to participate in discovery. (ECF No. 360 at 6.) The Court accordingly rejects Plaintiffs' argument that they are interchangeable.

But in determining whether to dismiss a party as a sanction for failure to participate in discovery, the Court must consider: (1) the public's interest in expeditious resolution of litigation; (2) the Court's need to manage its docket; (3) the risk of prejudice to the defendants; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic alternatives. *See In re Phenylpropanolamine Prod. Liab. Litig.*, 460 F.3d 1217, 1226 (9th Cir. 2006) (quoting *Malone v. U.S. Postal Serv.*, 833 F.2d 128, 130 (9th Cir. 1987)).

The fifth factor requires the Court to consider whether less drastic alternatives can be used to correct the party's failure that brought about the Court's need to consider

dismissal. *See Yourish v. Cal. Amplifier*, 191 F.3d 983, 992 (9th Cir. 1999) (explaining that considering less drastic alternatives *before* the party has disobeyed a court order does not satisfy this factor); *accord Pagtalunan v. Galaza*, 291 F.3d 639, 643 & n.4 (9th Cir. 2002) (explaining that "the persuasive force of" earlier Ninth Circuit cases that "implicitly accepted pursuit of less drastic alternatives prior to disobedience of the court's order as satisfying this element[,]" *i.e.*, like the "initial granting of leave to amend coupled with the warning of dismissal for failure to comply[,]" have been "eroded" by *Yourish*). But courts "need not exhaust every sanction short of dismissal before finally dismissing a case, but must explore possible and meaningful alternatives." *Henderson v. Duncan*, 779 F.2d 1421, 1424 (9th Cir. 1986).

NDOC argues the first two factors favor dismissal because Plaintiffs undisputedly did not participate in discovery, including in the several years since NDOC initially filed this motion in 2018. (ECF No. 354 at 7.) Plaintiffs respond that NDOC has caused delays in discovery, not Plaintiffs. (ECF No. 360 at 7-9.) However, Plaintiffs do not dispute that the particular Plaintiffs identified in NDOC's motion simply never participated in discovery and have had years to reconsider that decision at this point. (*Id.*) Moreover, Plaintiffs do not propose reopening discovery or some other method to allow them to participate in discovery now, years later. (*Id.*) Plaintiffs seem to ask the Court to allow these particular Plaintiffs to remain in the case without ever participating in discovery—without really addressing their substantial delay, and the impact on this case waiving their delay would have. (*See generally id.*) The Court accordingly agrees with NDOC that the first two factors favor dismissing the specified Plaintiffs with prejudice.

As to the third factor, NDOC argues it is prejudiced by these Plaintiffs' failure to participate in discovery because NDOC chose to propound discovery upon them for strategic reasons and was instead required to propound discovery on other Plaintiffs chosen by Plaintiffs' counsel—and the delays led to additional expense. (ECF No. 354 at 7-8.) Plaintiffs respond that NDOC is not prejudiced at all, but again do not dispute that these particular Plaintiffs never participated in discovery. (ECF No. 360 at 10.) Plaintiffs'

argument again ignores that each Plaintiff is a party to this case under *Campbell*, with the rights and obligations of any party in litigation. The Court accordingly finds that the third factor also favors dismissing these Plaintiffs with prejudice.

NDOC argues the remaining factors favor dismissal because Plaintiffs "cannot prosecute a case and simply refuse to participate." (ECF No. 354 at 8-9.) Plaintiffs counter that even NDOC concedes that public policy favors the disposition of cases on their merits. (ECF No. 360 at 10-11.) The Court agrees with Plaintiffs on that point. The fourth factor favors denying NDOC's motion.

As to the fifth factor, Plaintiffs proffer the less drastic alternative of precluding these particular Plaintiffs from testifying at trial. (*Id.* at 12 n.5.) However, Plaintiffs' argument about the representative nature of FLSA collective actions—made elsewhere in response to this motion—undermines the persuasiveness of this argument. Prohibiting these particular Plaintiffs from testifying at trial would not affect their ability to win any money from this lawsuit, despite their refusal to participate in discovery, or attempt to remedy that non-participation at any point in the last several years. Thus, the Court finds Plaintiffs' proposed alternative sanction too lenient. The Court instead agrees with NDOC that dismissing these nonparticipating Plaintiffs with prejudice is the appropriate sanction for their failure to participate in any discovery in this case—especially given their party status. Having rejected the only lesser, alternative sanction proposed by Plaintiffs, and because this case is finally approaching trial after years of litigation, the Court finds that no lesser sanction short of dismissal is appropriate for these non-participating Plaintiffs.

In sum, NDOC's motion is granted. The Court dismisses the Plaintiffs specified in NDOC's motion from this case with prejudice.

### E.    NDOC's Motion to Exclude Expert Testimony and Survey

NDOC finally moves to exclude the testimony of Plaintiffs' experts the Employment Research Corporation, including its principals Malcolm Cohen, Ph.D., and Laura Steiner, though NDOC's refiled motion focuses on excluding Ms. Steiner and a

survey that she developed, administered, and wrote a report about. (ECF No. 395.) NDOC more specifically argues that Ms. Steiner is insufficiently qualified to serve as an expert witness on surveys, the survey should be excluded because it did not follow accepted principles and contains certain flaws, and the survey should be excluded because some mailed copies of it were sent with a cover letter on Plaintiffs' counsel's letterhead. (*Id.*) Plaintiffs generally counter that Ms. Steiner is sufficiently qualified through her experience, the survey meets the admissibility standard under Fed. R. Evid. 702, and the cover letter sent with some of the surveys does not invalidate the survey. (ECF No. 402.) The Court generally agrees with Plaintiffs. The Court addresses each of NDOC's three main arguments below after first describing the applicable law.

### 1. Applicable Law

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

The Supreme Court provided additional guidance on Rule 702 and its application in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). In *Daubert*, the Court held that scientific testimony must be reliable and relevant to be admissible. *Daubert*, 509 U.S. at 589. *Kumho Tire* clarified that *Daubert's* principles also apply to technical and specialized knowledge. *See Kumho*, 526 U.S. at 141. The trial court has "considerable leeway" in deciding how to determine the reliability of an expert's testimony and whether the testimony is in fact reliable. *Id.* at 152. The "test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id.* at 141.

///

1    The Ninth Circuit has emphasized that "Rule 702 is applied consistent with the
2    liberal thrust of the Federal Rules and their general approach of relaxing the traditional
3    barriers to opinion testimony." *Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1004
4    (9th Cir.), *opinion amended on denial of reh'g*, 272 F.3d 1289 (9th Cir. 2001) (citations
5    and internal quotation marks omitted). "An expert witness—unlike other witnesses—is
6    permitted wide latitude to offer opinions, including those that are not based on firsthand
7    knowledge or observation, so long as the expert's opinion has a reliable basis in the
8    knowledge and experience of his discipline." *Id.* (citations and internal quotation marks
9    omitted). Shaky but admissible evidence should not be excluded but instead attacked by
10   cross-examination, contrary evidence, and attention to the burden of proof. *See*
11   *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir.), *as amended* (Apr. 27, 2010).

12        Surveys are admissible if they are relevant, conducted according to accepted
13   principles, and set upon a proper foundation for admissibility. *See Clicks Billiards, Inc. v.*
14   *Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001). As long as surveys "'are
15   conducted according to accepted principles,' survey evidence should ordinarily be found
16   sufficiently reliable under [*Daubert*, 509 U.S. 579]." *Southland Sod Farms v. Stover Seed*
17   *Co.*, 108 F.3d 1134, 1143 n.8 (9th Cir. 1997) (quoting *E. & J. Gallo Winery v. Gallo*
18   *Cattle Co.*, 967 F.2d 1280, 1292 (9th Cir. 1992)). The proponent bears the burden of
19   showing "that the survey was conducted in accordance with generally accepted survey
20   principles and that the results were used in a statistically correct manner." *Keith v. Volpe*,
21   858 F.2d 467, 480 (9th Cir. 1988). In the absence of evidence that the surveys were
22   conducted in accordance with generally accepted principles, surveys have been deemed
23   inadmissible when their creators were not qualified to design or interpret surveys, *see*
24   *Elliott v. Google, Inc.*, 860 F.3d 1151, 1160 (9th Cir. 2017); *M2 Software, Inc. v. Madacy*
25   *Entm't*, 421 F.3d 1073, 1087 (9th Cir. 2005); *see also United States v. 0.59 Acres of*
26   *Land*, 109 F.3d 1493, 1496 (9th Cir. 1997) (noting that an "unscientific" survey "prepared
27   by a non-witness of unknown qualifications" violated Fed. R. Evid. 703 and would not
28   meet the *Daubert* standards for scientific evidence), and when the experts introducing

1   the surveys did not actually conduct them, *see F.T.C. v. Commerce Planet, Inc.*, 642 F.

2   App'x 680, 682 (9th Cir. 2016).

3   "Once the survey is admitted, however, follow-on issues of

4   methodology, survey design, reliability, the experience and reputation of the expert,

5   critique of conclusions, and the like go to the weight of the survey rather than its

6   admissibility." *Clicks Billiards, Inc.*, 251 F.3d at 1263 (citation omitted). "Unlike novel

7   scientific theories, a jury should be able to determine whether asserted technical

8   deficiencies undermine a survey's probative value." *Southland Sod Farms*, 108 F.3d at

9   1143 n.8. "Technical inadequacies in the survey, including the format of the questions or

10  the manner in which it was taken, bear on the weight of the evidence, not its

11  admissibility." *Keith*, 858 F.2d at 480 (citations omitted). Thus, even surveys with

12  technical problems such as improper participant pools, biased questions, *see Southland*

13  *Sod Farms*, 108 F.3d at 1143, or flawed coding of responses, *see E. & J. Gallo Winery*,

14  967 F.2d at 1292, are admissible.

15                    **2.    Analysis**

16          The Court first addresses NDOC's arguments regarding Ms. Steiner's

17  qualifications, then its arguments regarding the survey itself, and its arguments then

18  regarding the cover letter.

19                    **a.    Qualifications**

20          NDOC explains that it focuses on Ms. Steiner in its Motion because she designed

21  the survey NDOC seeks to exclude and is the person expected to testify at trial about the

22  survey. (ECF No. 395 at 5-6.) NDOC first argues Ms. Steiner is not a survey expert

23  because her educational background consists of a BA in Comparative Literature and an

24  M.B.A. (*Id.* at 6.) NDOC further argues Ms. Steiner is not qualified because she has not

25  published any academic work on surveys or statistics—working on two-dozen survey-

26  related cases and signing three to five survey reports is not enough. (*Id.*) NDOC finally

27  argues that Ms. Steiner has never been qualified as an expert on statistics or surveys or

28  testified as a survey expert at trial. (*Id.* at 7.) NDOC specifically points out that a survey

1  Ms. Steiner worked on was excluded in *Hostetler v. Johnson Controls, Inc.*, Case No.
2  3:15-CV-226 JD, 2016 WL 3662263, at *9-*16 (N.D. Ind. July 11, 2016). (ECF No. 395 at
3  7.)

4        NDOC bases several of its arguments on the *Reference Guide on Survey*
5  *Research*, *in* FEDERAL JUD. CT. REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 359-423 (3d
6  ed. 2011) ("Reference Guide"). (ECF No. 395 at 4.) NDOC attached a copy of the
7  Reference Guide as an exhibit. (ECF No. 395-2.) As pertinent here, NDOC relies on the
8  Reference Guide for its argument that Ms. Steiner lacks the requisite educational
9  background to be considered a survey expert. (ECF No. 395 at 6 (citing Reference
10  Guide at 375).) However, the page of the Reference Guide upon which NDOC relies
11  goes on to state, "[i]n some cases, professional experience in teaching or conducting
12  and publishing survey research may provide the requisite background." (ECF No. 395-2
13  at 18.) NDOC omitted that qualifier from its argument in its motion.

14        And indeed, qualification through experience is expressly contemplated by Fed.
15  R. Evid. 702, which states that an expert may be qualified to offer opinion testimony
16  because of their "knowledge, skill, experience, training, or education" in a given field. *Id.*
17  As Plaintiffs argue, Ms. Steiner has been working in the field of survey design and
18  administration for over 20 years and designed and administered a survey in a similar
19  case involving the off-the-clock work experience of police officers. (ECF No. 404 at 10,
20  10 n.7.) Ms. Steiner also states in her CV that she designed and administered surveys
21  for the United States Postal Service for two years, during and just after earning her MBA.
22  (ECF No. 395-5 at 2.) And other than a two year period where she worked as a
23  consultant regarding user interfaces, she has worked the rest of her career from 1992
24  through the present either designing and administering surveys or performing other work
25  involving surveys, economic analysis, and damages. (*Id.* at 2-3.) The Court agrees with
26  Plaintiffs that Ms. Steiner is sufficiently qualified by experience as a survey expert such
27  that it would be inappropriate use the Court's gatekeeping function to exclude her
28  testimony now. And in any event, because—as further explained below—the Court finds

1  the survey admissible, Ms. Steiner's reputation goes "to the weight of the survey rather

2  than its admissibility." *Clicks Billiards, Inc.*, 251 F.3d at 1263.

3  The Court also finds NDOC's argument that Ms. Steiner is unqualified to serve as

4  an expert because she has never before been qualified as one or testified at trial

5  unpersuasive because every expert witness must have a first case where they are

6  qualified, and many cases do not go to trial. (*Id.*) As Ms. Steiner stated in her deposition,

7  for example, "[a]t Employment Research I've designed quite a few surveys for

8  employment cases, but they're not all listed in my resumé because a lot of those cases

9  settled." (ECF No. 395-11 at 43.) And as discussed above, Ms. Steiner appears to have

10  ample professional experience in the design and administration of surveys. (ECF No.

11  395-5 at 2-3; *see also* ECF No. 395-11 at 41-44 (describing her experience with surveys

12  during her deposition).) Thus, while this might be the first case where Ms. Steiner

13  testifies at trial as a survey expert in her career, the Court does not find that fact

14  disqualifying.

15  NDOC is correct that a survey Ms. Steiner designed and administered was

16  excluded in *Hostetler*, 2016 WL 3662263, at *9-*16, but the Court does not find this

17  disqualifying either, for reasons that overlap with the reasons it also finds the survey

18  NDOC seeks to exclude admissible under Fed. R. Civ. P. 702 and applicable law

19  interpreting it. To start, the *Hostetler* court did not exclude Ms. Steiner—it excluded a

20  report prepared by her colleague also retained by Plaintiffs for this case, Dr. Cohen,

21  primarily because Dr. Cohen uncritically used an unrepresentative initial data set of

22  prospective survey respondents assembled by the plaintiffs' counsel and performed

23  statistical analysis the *Hostetler* court found unreliable. *See* 2016 WL 3662263, at *9-

24  *16. Ms. Steiner only got a passing reference in a footnote, where the *Hostetler* court

25  referred to her as a survey expert:

26  Dr. Cohen co-authored his report with Laura Steiner, an expert on survey
     design and implementation. Since the issues in dispute mostly pertain to

27  the report's statistical analysis, not the design or implementation of the
     survey, the Court refers primarily to Dr. Cohen, as he was responsible for

28  that aspect of the report.

1    *Id.* at *10 n.6. Thus, the *Hostetler* court was not directly critical of Ms. Steiner, or the

2    design or implementation of the survey at issue there. *See id.* The Court accordingly

3    does not find that *Hostetler* categorically disqualifies Ms. Steiner or her survey in this

4    case.

5               **b.      The Survey**

6         NDOC then challenges the survey itself. (ECF No. 395 at 7-18.) NDOC

7    specifically argues that the wording of particular questions in the survey renders its

8    results inadmissibly unreliable and then argues that the survey is unreliable because Ms.

9    Steiner lacked awareness of 'the factual universe.' (*Id.*) While the Court finds neither

10   argument persuasive, it addresses both below.

11        The Court begins with NDOC's arguments regarding particular questions in the

12   survey and Ms. Steiner's discussion of responses to those questions in the report she

13   prepared based on the survey responses. (*Id.* at 7-14.) NDOC first argues that she erred

14   in designing the survey because she used the phrase "ever done" in two key survey

15   questions regarding particular pre or postliminary activities Plaintiffs allege they were

16   required to engage in without pay and because she interpreted those questions to mean

17   "always" in her report. (*Id.* at 9-10.) But from reading Ms. Steiner's report proffered with

18   NDOC's motion, Ms. Steiner does not draw the conclusion that respondents meant

19   'always' when they responded to questions asking them if they had 'ever done' anything.

20   (ECF No. 395-8 at 6 ("indicate activities they had ever done"), 7 ("at least one work

21   activity"), 8 ("at least one work activity").)

22        Moreover, looking at the survey instrument NDOC proffered with its motion,

23   question four and its subparts are independent from questions five and seven. (ECF No.

24   395-6 at 4.) Question four prompts respondents to check boxes for any activities they

25   performed before or after their shift at least once, but questions five and seven ask for an

26   approximation of all time spent between passing through security and starting their shift,

27   and after ending their shift. Thus, question four may remind respondents about pre and

28   post shift work they may have performed, but questions five and seven ask them for an

approximate, total time spent that is not the sum of anything respondents may have reported in response to question four. (*Id.*) And in *Southland Sod Farms*, the Ninth Circuit expressly contemplated "leading questions" and determined that such bias bears on "the weight, and not the admissibility, of the survey." 108 F.3d at 1143 (citing *E. & J. Gallo Winery*, 967 F.2d at 1292). Thus, the Court is unpersuaded it should exclude the survey because question four uses the phrasing 'ever does,' or because of the relationship between questions four, five, and seven.

The same goes for NDOC's argument that the Court should exclude the survey because questions five and seven use the word 'typically.' (ECF No. 395 at 10-12.) This argument is based on the same premise rejected above—that "these questions ask for a time estimate for a work task, even if performed on one occasion." (*Id.* at 11.) They do not. Moreover, the Court does not find questions five and seven fatally unclear despite NDOC's argument to the contrary. Using the words typically and approximately is appropriate when asking respondents to estimate how much time they spent before or after their shifts on required work activities years earlier, and over a span of years. NDOC does not, for example, explain how using the terms 'mathematical average' or 'mode' in the survey would have somehow made the results more accurate. And the Court cannot abandon all common sense here—the survey was asking respondents about how much time they worked before and after their shift over a seven year period. The Court does not expect respondents to know a precise number of minutes for each day. And there is no dispute here that Plaintiffs were not paid for the activities at issue in this case. Nor is there any dispute that nobody kept records of this time—per Plaintiffs' deposition testimony because they were told not to file overtime claims for it. That means that Plaintiffs should be able to present some estimate of uncompensated time spent before and after their shifts. *See, e.g.*, *Senne*, 934 F.3d at 944 ("Defendants should not 'be heard to complain that the damages lack the exactness and precision of measurement that would be possible had [they] kept records in accordance with the [statutory] requirements,' even if their 'lack of accurate records grows out of a bona fide

1    mistake as to whether certain activities or non-activities constitute work."') (citation

2    omitted). In any event, the Court is unpersuaded it should strike the survey and the

3    reports and testimony built on it because Ms. Steiner used the word typically in questions

4    five and seven instead of the words average, mean, or mode.[25]

5          NDOC also argues the survey is unreliable because Ms. Steiner did not know

6    enough about NDOC's operations for the results to be meaningful, but the Court finds

7    that argument unpersuasive after reviewing the survey instrument Ms. Steiner prepared

8    and the report she prepared based on the survey. (ECF No. 395 at 12-14.) As Plaintiffs

9    explain in their response, the survey is not the only evidence they intend to put on at

10   trial. (ECF No. 404 at 24-25.) Viewed in that context, Ms. Steiner's report is an additional

11   piece of evidence that may be helpful to the jury in determining damages. Indeed,

12   NDOC's argument seems to ignore the report itself, which contains carefully caveated

13   conclusions limited only to those people who completed the survey, what those people

14   responded, and states that any specific numbers are approximations. (*See generally*

15   ECF No. 395-8.) And as mentioned, the fact that estimates of time spent pre and post

16   shift are approximate makes sense considering that nobody was recording the time at

17   issue, and the pertinent time period spans years.

18         NDOC finally argues as to the survey itself that Ms. Steiner did not identify the

19   correct universe, or group of people to attempt to contact for the survey (sometimes also

20   called a participant pool), making an argument similar to the argument raised

21   successfully in *Hostetler*, 2016 WL 3662263, at *9-*16. (ECF No. 395 at 15-18.)

22   However, NDOC's argument does not discuss the 'universe' mentioned in the report in

23   this portion of its argument. (*Id.*) Ms. Steiner explains in the report that she started with a

24   list of 2,945 potential class members and then added some people who signed consent

25

_____

26         [25]NDOC relies on two unreported cases from the Central District of California to
     support this portion of its argument, but neither bind the Court. (ECF No. 395 at 10-12.)
27   To the contrary, the Court is bound by the line of Ninth Circuit cases holding that for
     example, "[d]efendants' other objections—that the survey was only conducted in
28   Southern California and asked leading questions—go only to the weight, and not the
     admissibility, of the survey." *Southland Sod Farms*, 108 F.3d at 1143.

1  forms, and then removed a duplicate, two people who were dismissed from the lawsuit,

2  and 90 for whom no address was available. (ECF No. 395-8 at 4.) Ms. Steiner goes on

3  to describe the procedures she used to reduce response bias. (*Id.* at 5.) But NDOC's

4  argument does not address the propriety of using the list of 2,864 potential class

5  members and ignores the described methods intended to reduce nonresponse bias.

6  (ECF No. 395 at 15-18.) NDOC's argument is accordingly unpersuasive because it does

7  not address the actual report at issue or its underlying methodology.[26]

8       In sum, the Court is unpersuaded by NDOC's arguments that the challenged

9  survey is inadmissibly unreliable under Fed. R. Evid. 702.

10                    **c.**    **The Cover Letter**

11       NDOC also argues that the survey, and all of Ms. Steiner's report and testimony

12  based on it, should be excluded because some prospective respondents were sent the

13  survey with a cover letter on Plaintiffs' counsel's letterhead. (ECF No. 395 at 18-23.)

14  Plaintiffs point out in response that only 39 of the 220 respondents to the survey

15  received the cover letter, and NDOC does not argue that the responses of those

16  individuals differ in any way from the responses of the remaining employees who did not

17  receive the letter—nor is there any indication that is the case. (ECF No. 404 at 20 n.11.)

18  NDOC does not respond to this point in its reply. (ECF No. 406 at 9-11.) The persuasive

19  force of NDOC's argument is accordingly much reduced because NDOC does not even

20  contest that most respondents did not even see the cover letter or attempt to argue the

21  cover letter made any difference by comparing the responses of those who received it to

22  those who did not.

23  ///

---

25      [26]This case is also distinguishable from *Hostetler*, 2016 WL 3662263, at *9-*16,

26  because there, the district court's primary issue was with the way plaintiffs' counsel
constructed the universe of people to survey, rendering the universe or participant pool

27  unrepresentative of the group of people the survey intended to reflect—and was troubled
by the fact that plaintiffs' counsel constructed it. In contrast, here, NDOC does not even

28  mention the list of 2,864 potential class members or explain why using it is problematic.

1   And even setting aside the fact that NDOC's argument as to the cover letter
2   applies to only 39 of the 220 respondents to the survey, it is unpersuasive on its own
3   terms. First, and contrary to NDOC's argument (*id.* at 9), there is no rule in the
4   Reference Guide that all research must be double-blind. The Reference Guide instead
5   explains—for good reasons—that double-blind research is preferable whenever
6   possible. (ECF No. 395-2 at 53-54.)[27] Second, and as to NDOC's argument that
7   Plaintiffs' counsel made themselves witnesses because of the cover letter (ECF No. 406
8   at 11), that argument is unpersuasive because *Elliott*, 860 F.3d at 1160 & n.6 is
9   distinguishable. The issue in *Elliott* was that Elliott's counsel designed and conducted
10  the surveys. *See id.* Here, Ms. Steiner designed and conducted the survey. (ECF No.
11  395-8 at 2-10.) In sum, the Court also rejects NDOC's argument based on the cover
12  letter. And having rejected all of NDOC's arguments in its motion seeking to exclude the
13  survey and related evidence, the motion is accordingly denied.

14  **IV.   CONCLUSION**

15  The Court notes that the parties made several arguments and cited to several
16  cases not discussed above. The Court has reviewed these arguments and cases and
17  determines that they do not warrant discussion as they do not affect the outcome of the
18  motions before the Court.

19  It is therefore ordered that NDOC's refiled motion to seal (ECF No. 397) is
20  granted.

21  The Clerk of Court is directed to unseal the following docket entries: ECF Nos.
22  344-1, 344-2, 344-3, 344-4, 344-5, 344-6, 344-7, 344-8, 344-9, 344-10, 344-11, 344-12,
23  344-13, 344-14, 344-15, 344-16, 344-18, 344-19, 344-20, 344-24, 344-25, 357-1, 357-2,
24  357-3, 357-4, 357-5, 357-6, 357-8, 357-9, 357-10, 357-11, 357-12, 357-13, 357-14, 357-

25

26

27  _____

28  [27]NDOC's argument is rendered additionally unpersuasive because NDOC's own exhibit does not support its argument. (*Compare* ECF No. 406 at 9 *with* ECF No. 395-2 at 53-54.)

46

17, 357-18, 357-19, 357-20, 357-21, 357-22, 357-23, 357-24, 357-25, 357-26, 357-27, 357-28, 357-29, 357-30, 357-31, 357-32, 357-34, 357-45, 357-48.

It is further ordered that NDOC's motion to decertify (ECF No. 343) is denied.

It is further ordered that Plaintiffs' motion for partial summary judgment on liability (ECF No. 346) is granted in part, and denied in part, as described herein.

It is further ordered that NDOC's motion for summary judgment (ECF No. 355) is granted in part, but mostly denied, as described herein.

It is further ordered that NDOC's motion to dismiss claims of all non-participating Plaintiffs (ECF No. 354) is granted.

It is further ordered that the following Plaintiffs are dismissed from this case with prejudice: Robert Ahmad; Joseph Baros; Taerick Berry; Debbie Boone-Sharp; Andrew W. Bronk; John Hurt; Alexander Matta; Teresa McCastle; Jeanette Okivelas; Mark D. Poland; Sharon Sommervold; Francisco Bautista; Pamela Bellinger; and Timothy Maguire.

It is further ordered that NDOC's motion to exclude all evidence from Plaintiffs' experts the Employment Research Corporation (ECF No. 395) is denied.

It is further ordered that the Court finds it appropriate to refer this case to a settlement conference before United States Magistrate Judge Craig S. Denney under LR 16-5.

It is further ordered that, if this case does not settle at the settlement conference, the proposed joint pretrial order is due 30 days after the settlement conference.

It is further ordered that the parties must also contact the Court's Courtroom Administrator when they file the proposed joint pretrial order to arrange for a status conference with the Court.

DATED THIS 23rd Day of May 2022.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE